UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRENTON SILDACK,

USDC Case No. 11-cv-12939
Hon: Denise Page Hood

    Plaintiff,

v

CORIZON HEALTH INC.,
a Delaware Corporation, et al.,

    Defendants.

_____/

## EXHIBIT B

Exhibit B

Deposition Transcript of Trenton Sildack, 10-4-12

Respectfully submitted,

KITCH DRUTCHAS WAGNER
VALITUTTI & SHERBROOK

By: /s/ *Christina A. Doyle*
    RALPH F. VALITUTTI (P26128)
    SUSAN HEALY ZITTERMAN (P33392)
    CHRISTINA A. DOYLE (P68778)
    Attorneys for Paul A. LaHaye, MD
    10 S. Main Street, Suite 200
    Mt. Clemens, MI 48043-7903
    (586) 463-9770
    christina.doyle@kitch.com

Dated: November ___, 2012

KITCH DRUTCHAS
WAGNER VALITUTTI &
SHERBROOK
10 S MAIN STREET SUITE
200
MT CLEMENS MI 48043-
7903
(586) 463-9770

# In The Matter Of:

*Sildack vs.*
*Corizon Health, Inc., et al.*

*Trenton Sildack*
*October 04, 2012*



NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File SILDACK_TRENTON.txt*

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

---

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF MICHIGAN

 3   TRENTON SILDACK #255969

 4        Plaintiff,        Case No.: 2:11-cv-12939
                            Honorable Denise Page Hood
 5   vs.                    Magistrate R. Steven Whalen

 6   CORIZON HEALTH, INC.;
     et al.,
 7
          Defendants.
 8   _____

 9

10        DEPOSITION OF TRENTON SILDACK

11

12        Date:      Thursday, October 4, 2012

13        Time:      1:03 p.m.

14        Place:     Holiday Inn Express Gas City
15                   4914 Beaner Boulevard
                     Gas City, Indiana 46933
16

17

18   Called as a witness herein in accordance with the Rules
     of Civil Procedure before Shannon L. Zelt,
19   Certified Shorthand Reporter and Notary Public.

20

21

22

23

24

25
```

---

**Page 2**

```
 1   APPEARANCES:
          Frederick E. Mackraz, Attorney at Law
 2        The Mackraz Law Office, P.C.
          401 Hall Street, SW
 3        Suite 134
          Grand Rapids, Michigan 49503
 4        (616) 235-4000
          fred@mackrazlaw.com
 5             On Behalf of the Plaintiff;

 6   Carly Van Thomme, Attorney at Law
          Chapman and Associates, P.C.
 7        40950 Woodward Avenue, Suite 120
          Bloomfield Hills, Michigan 48304
 8        (248) 644-6326
          cvanthomme@chapmanlawfirmpc.com
 9             On Behalf of Defendants Prison Health
               Services, Inc.; Corizon Health, Inc.; Adam
10             Edelman, M.D.; Dr. Richard Miles; Mian Qayyum,
               M.D.; Dr. Lisbeth Ralles; James Rocco, M.D.;
11             Suzanne Kirk, NP; Larry Sell, M.D.; Sarah Hope
               Heebsh, PA; Dr. Rebekah Haggard; Dr. Sylvia
12             McQueen; Carl Keldie, M.D.; Joseph Robert
               Burtch, D.O.; and Kim Mahler, D.O.;
13
     Marcy R. Matson, Attorney at Law
14        Hall Matson, P.L.C.
          1400 Abbot Road, Suite 380
15        East Lansing, Michigan 48823
          (517) 853-2925
16        mmatson@hallmatsonlaw.com

17             On Behalf of Defendants David Dubriwney, D.O.;
               Lyle S. Mindlin, D.O.; and Michael A.
18             Henderson, D.O.;

19   Ryan D. Ewles, Attorney at Law

20   Kitch, Drutchas, Wagner, Calitutti & Sherbrook

21   10 South Main Street, Suite 200

22   Mt. Clemens, Michigan 48043

23   (586) 463-9770

24   ryan.ewles@kitch.com

25             On Behalf of Defendant Paul A. LaHaye, M.D.;
```

---

**Page 3**

```
 1   APPEARANCES CONTINUED:

 2        Mark G. Reynolds, Attorney at Law

 3        The Juip Richtarcik Law Firm

 4        645 Griswold, Suite 3466

 5        Detroit, Michigan 48226

 6        (313) 859-5900

 7        mgreynolds@thejrlawfirm.com

 8

 9             On Behalf of Defendants Correctional Medical

10             Services, Inc.; Suzanne Kirk, NP; Mian Qayyum,

11             M.D.; Joseph Burtch, M.D.; and Sara Hope

12             Heebsh, P.A.;

13
     Kevin M. Thom, Attorney at Law
14   Michigan Department Attorney General
     Corrections Division
15   Post Office Box 30217
     Lansing, Michigan 48909
16   (517) 335-7021
     thomk@michigan.gov
17
               On Behalf of Defendants Gary Freytag; Donna
18             Kovar; Donna Quinlan; Cathy M. Pope; Mary Ann
               Roose; Jeffrey C. Stieve, M.D.; Carol R.
19             Howes; Donna Croston; Tracie Hill; Jamie
               Monville; Jodi C. Nakata; David Kihm; and
20             Valerie Bradshaw.

21

22

23

24

25
```

---

**Page 4**

```
 1             W I T N E S S   I N D E X

 2

 3                                            PAGE

 4   DIRECT EXAMINATION

 5   TRENTON SILDACK

 6   BY MS. VAN THOMME:.................................5

 7   CROSS-EXAMINATION

 8   TRENTON SILDACK

 9   BY MS. MATSON:...................................26

10   CROSS-EXAMINATION

11   TRENTON SILDACK

12   BY MR. REYNOLDS:.................................57

13   CROSS-EXAMINATION

14   TRENTON SILDACK

15   BY MR. EWLES:....................................62

16   CROSS-EXAMINATION

17   TRENTON SILDACK

18   BY MR. THOM:....................................105

19   CROSS-EXAMINATION
     TRENTON SILDACK
20   BY MR. EWLES:...................................145

21

22        E X H I B I T   I N D E X

23

24   EXHIBIT                              MARKED
     Defendants' Exhibit A
25   accident report.................................125
```

---

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 5

1      TRENTON SILDACK,
2  called as a witness herein, having been first duly
3  sworn, as hereinafter certified, was examined
4      and testified as follows:
5      DIRECT EXAMINATION OF TRENTON SILDACK
6      BY MS. VAN THOMME:
7  Q.  Good afternoon.  Have you had your deposition taken
8      before?
9  A.  No.
10  Q.  Okay.  I'll just give you some basic guidelines to
11      keep in mind as we go through.  When I ask a
12      question, if it's a yes or no question, please
13      remember to yes or no instead of nodding, shaking
14      your head, saying uh-huh or huh-uh because those
15      things are difficult for the court reporter to take
16      down.  We want to make sure we have a nice clear
17      record.
18          When I ask a question, please wait for me to
19      finish even if you think you know what the question
20      is.  It's important that we're not talking over
21      each other.  Again, so that we can have a nice
22      clear record.  If you don't understand a question,
23      if it's vague, please tell me.  Ask me to reword
24      it, and I will do so.  If you don't say that you
25      don't understand, we will assume that you did

Page 6

1      understand the question; and, you know, we'll take
2      your answer as it is.
3          If you need to take a break at any time,
4      please just say so.  We can do that.  I just would
5      ask that you answer the question that's pending
6      before we stop and take a break.
7  A.  Yes, ma'am.
8      MR. EWLES:  If you can, make sure to keep your
9      voice up.
10  Q.  State and spell your name, please.
11  A.  Trenton Robert Sildack, T-R-E-N-T-O-N R-O-B-E-R-T;
12      Sildack, S-I-L-D-A-C-K.
13  Q.  And what is your date of birth?
14  A.  3/8 of '78, 1978.
15  Q.  What is your current address?
16  A.  5802 South Lincoln Boulevard.
17  Q.  What city?
18  A.  Marion, Indiana 46953.
19  Q.  What is your educational history?
20  A.  I have a G.E.D.
21  Q.  Are you currently employed?
22  A.  No, ma'am.
23  Q.  Have you been employed at any time since January
24      5th, 2011, when you were paroled?
25  A.  Yes, I have.

Page 7

1  Q.  And when was that?
2  A.  Not for sure, but August, end of August.
3  Q.  Of this year or last year?
4  A.  Last year, 2011.
5  Q.  Was that when you started?
6  A.  Yes.
7  Q.  And how long were you employed?
8  A.  For about a month, but I'm not exact.
9  Q.  And what were you doing?
10  A.  I was inspecting parts.
11  Q.  For what company?
12  A.  I worked through a temporary agency called All Star
13      Staffing.
14  Q.  Was that an hourly position?
15  A.  Yes.
16  Q.  And what was the rate per hour?
17  A.  I want to say $9.03 or around $9.
18  Q.  And how many hours a week did you work?
19  A.  Between 40 and -- there's a couple times I had
20      overtime, which we would go to about 50 to 60
21      sometimes.
22  Q.  Okay.  And with overtime did you get paid time and
23      a half?
24  A.  Yes.
25  Q.  Any other employment since your parole?

Page 8

1  A.  No, ma'am.
2  Q.  When was your last job before you were
3      incarcerated?
4  A.  I worked for Hollywood Tile.
5  Q.  When was that?
6  A.  It was, I'll say, 2007.
7  Q.  For how long approximately?
8  A.  About three months.
9  Q.  And what was your rate of pay there?
10  A.  There, I started out at $10 an hour.
11  Q.  How many hours a week?
12  A.  Between 40 and 60.
13  Q.  And what was your position called?
14  A.  I was a tile helper.
15  Q.  Installing tile?
16  A.  Yes.
17  Q.  And what was your employment prior to that
18      position?
19  A.  I was incarcerated.
20  Q.  Okay.
21  A.  But I worked for that company also before that
22      previous incarceration, too.
23  Q.  Okay.  And when was that?
24  A.  About 2004.
25  Q.  For how long?

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 9

1  A.  About a year and a half.
2  Q.  Was your rate of pay the same or different?
3  A.  It depended on the job that we had.
4  Q.  Okay.  What was the range?
5  A.  Between about $500 to $1500 a week.
6  Q.  And what did you do prior to 2004?
7  A.  I was incarcerated.
8  Q.  Okay.  Did you work before that incarceration?
9  A.  Yes, I worked for Jackson Citizen Patriot.
10  Q.  Is that a newspaper?
11  A.  Yes, ma'am.
12  Q.  And what was your position?
13  A.  Started out unloading semis.  I want to say
14    forklift driver.
15  Q.  What was your rate of pay there?
16  A.  Not for certain.  I want to say around 8 to $9.
17  Q.  Per hour?
18  A.  Yes.
19  Q.  And how many hours a week?
20  A.  Between 30 and 40.
21  Q.  And how long were you at that position?
22  A.  Roughly, about six months, seven months.
23  Q.  And what year was that, if you recall?
24  A.  I want to say 2001 or '02.
25  Q.  Okay.  Would you agree to sign releases so that we

Page 10

1    could get your income tax records?
2  A.  Yes.
3  Q.  From both the IRS and the State of Michigan?
4  A.  Yes.
5  Q.  Or, actually, we need to get State of Indiana.
6    Have you worked in Indiana recently?
7  A.  Yes.
8  Q.  Okay.  Those, as well.
9    Are you married?
10  A.  Yes, I am.
11  Q.  What's your wife's name?
12  A.  Melissa, M-E-L-I-S-S-A, Jean, J-E-A-N, Sildack,
13    S-I-L-D-A-C-K.
14  Q.  How long have you been married?
15  A.  Three years.
16  Q.  Do you have any children?
17  A.  Yes.
18  Q.  How many children do you have?
19  A.  One.
20  Q.  How old is your child?
21  A.  She's seven.  That's biological children, right?
22  Q.  Yes.  Do you have any other children that you
23    support?
24  A.  Step-children.  I have four.
25  Q.  Okay.  Does your biological daughter live with you?

Page 11

1  A.  No.
2  Q.  Do you support her?
3  A.  Yes, I pay child support.
4  Q.  Are you currently taking any medications?
5  A.  No, ma'am.
6  Q.  Do you smoke cigarettes?
7  A.  No, ma'am.
8  Q.  Do you drink alcohol?
9  A.  No, ma'am.
10  Q.  Do you take drugs?
11  A.  No, ma'am.
12  Q.  Have you ever smoked?
13  A.  Yes.
14  Q.  When did you smoke?
15  A.  While I was in prison this last time from 2007 till
16    they took it out.  I want to believe -- I want to
17    say 2009 or '08.  I'm not quite for sure.
18  Q.  Do you think it was February 2009?  Does that sound
19    right?
20  A.  Yes.
21  Q.  Have you ever drank alcohol?
22  A.  Yes.
23  Q.  When did you drink?
24  A.  Since I was about 15 years old.
25  Q.  Until when?

Page 12

1  A.  My incarceration.  I want to say until 2007.
2  Q.  What did you drink when you drank alcohol?
3  A.  I drank Heineken, Corona, sometimes Jager or --
4    Jagermeister or Remy Martin.
5  Q.  How often did you drink?
6  A.  Probably about, say, around three to four times a
7    week.
8  Q.  And how much did you drink each time?
9  A.  A lot.  I don't -- can't really --
10  Q.  Enough to get --
11  A.  Enough to be intoxicated.
12  Q.  Okay.  Did you ever take illegal drugs?
13  A.  Yes.
14  Q.  What did you take?
15  A.  I smoked marijuana, took LSD, mushrooms, snorted
16    cocaine, and ecstasy.
17  Q.  When did you begin using marijuana?
18  A.  When I was 15.
19  Q.  When did you stop?
20  A.  About 2007.
21  Q.  And how about LSD.  When did you start?
22  A.  Probably 17.
23  Q.  And when did you stop that?
24  A.  When I was 17.
25  Q.  And when did you start using mushrooms?

Page 13

1 A. Around 17.
2 Q. And when did you stop?
3 A. About 17.
4 Q. And how about cocaine, when did you start that?
5 A. It was in 2001 or '02.
6 Q. Until when?
7 A. Till about 2004.
8 Q. And ecstasy when did you start that?
9 A. I want to say about 17.
10 Q. Until when?
11 A. About 17.
12     MR. THOM: Could you ask him, what are
13 mushrooms?
14     THE WITNESS: It's a hallucinogenic type of --
15 LSD-effect type of drug.
16 Q. How many crimes have you been convicted of in your
17 lifetime?
18 A. I'm not for certain, a number, but too many.
19 Excuse me. I shouldn't say that, excuse me. I
20 want to say six. Probably more.
21 Q. What was the first conviction or convictions that
22 you had?
23 A. Delivery and possession of marijuana.
24 Q. And when was that?
25 A. '97.

Page 14

1 Q. And what was the next one?
2 A. It would have been the same thing, possession with
3 intent to deliver marijuana.
4 Q. And when was that?
5 A. '97.
6 Q. And when was the next conviction?
7 A. Possession with intention to deliver marijuana.
8 Q. When was that?
9 A. I want to say 2001 or '02. I'm not for sure on the
10 dates.
11 Q. Okay. And when was the next conviction?
12 A. It would have been larceny from a person.
13 Q. When was that?
14 A. 2004.
15 Q. And what was the next conviction?
16 A. That conviction was home invasion, second degree.
17 Q. When was that?
18 A. 2007.
19 Q. Any other convictions?
20 A. Home invasion, third degree, 2007.
21 Q. Any other convictions?
22 A. I think, yes, I was convicted of, I want to say,
23 possession of intent to deliver as a juvenile when
24 I was 17. There's also, I think, disturbing
25 education; and then there's a retail fraud which

Page 15

1 happened in 2007, as well. It wasn't con -- I
2 wasn't convicted of that. I got extensive criminal
3 history.
4 Q. Okay. Were all of these convictions in Michigan?
5 A. Yes.
6 Q. And are you still currently on parole?
7 A. Yes, I am.
8 Q. And how long does your parole continue?
9 A. Till January of 2013.
10 Q. What medical conditions do you have currently?
11 A. Currently, I have chronic -- I have a foot drop,
12 loss -- I have a numbness in my groin area, and so
13 I got lower pain. I got pain that shoots down
14 every once in a while. I've also been diagnosed
15 with ADD.
16 Q. Have you had other medical conditions in the past
17 that you no longer have today?
18     MR. MACKRAZ: Object to the form.
19     But you can go ahead and answer.
20 A. Sinus infections. I've had a broken arm as a kid.
21 In prison before, I had complained of back pain and
22 neck pain in my left arm, but it was never treated.
23 That happened in about 2004.
24 Q. Are you saying that your back and neck pain began
25 in 2004?

Page 16

1 A. Yes.
2 Q. And did anything happen that caused it that you're
3 aware of, or was it just kind of a sudden thing?
4 A. It was from lifting weights.
5 Q. Okay. And did that resolve or did that continue on
6 indefinitely?
7 A. It's continued to this day.
8 Q. And, let's see, did you have an injury while you
9 were in the MDOC in 2008?
10 A. 2008 is when the lower back injury occurred.
11 Q. Okay. Was that on or about July 7th?
12 A. Yes.
13 Q. And what were you doing when that occurred?
14 A. I was working for the food service garden. It was
15 horticulture, and I was moving slabs of cement that
16 weighed between 3- and 400 pounds.
17 Q. Could you describe what the lower back pain was
18 like?
19     MR. MACKRAZ: Objection form.
20     Go ahead.
21 A. It was excruciating, okay. As soon as it happened,
22 I felt like a pop or a snap. And then, look, it
23 just took my breath away, and I fell to the ground,
24 and I couldn't walk. It was just unbearable pain
25 and had to have some inmates help me, first, to the

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 17

1  barracks where they denied to call anybody, so they
2  helped me up to where we eat, the cafeteria, and
3  that's where a police officer called healthcare,
4  and I received a wheelchair, and then they took me
5  to healthcare.
6  Q.  Do you recall who you saw in healthcare?
7  A.  No, I do not.
8  Q.  After that date, did your problem get better or
9  worse?
10  A.  Worse.
11  Q.  How did it get worse?
12  A.  I started -- I had excruciating pain, and there was
13  incontinence of the bladder.  Then there's the
14  numbness and weakness in the leg.
15  Q.  And was there any further change before you were
16  paroled, or did your condition stay the same?
17  A.  It worsened as time went on.
18  Q.  Continued to worsen?
19  A.  Yes.
20  Q.  Have you sought treatment for your back problems
21  since your parole?
22  A.  Since parole?
23  Q.  Yes.
24  A.  Yes.
25  Q.  And when did you seek treatment?

Page 18

1  A.  Not for sure of the date.  It was within a week
2  that I was released.  I went to Marion General
3  Hospital, to the emergency room.
4  Q.  Okay.  And what did they do for you there?
5  A.  They referred me to Indiana Health Centers because
6  I didn't have any insurance.
7  Q.  Indiana Health Centers?
8  A.  Centers, yes.
9  Q.  Did you receive any treatment in the ER?
10  A.  They gave me some type of medication.  I'm not
11  quite positive what it was.
12  Q.  And did you go to Indiana Health Centers?
13  A.  Yes.
14  Q.  And did you receive further treatment?
15  A.  Yes, I was referred to Dr. Kachmann out of
16  Fort Wayne.
17  Q.  Okay.  And what treatment did you get with him?
18  A.  I went for a emergency consultation where he said
19  that I needed, I want to say, a discectomy.
20  Q.  Is that a type surgery for your back?
21  A.  Yes.
22  Q.  And did you have surgery?
23  A.  Yes.
24  Q.  And when was that?
25  A.  In April of 2010 -- '11, I think.  It would have

Page 19

1  been '11, I think.  I'm not quite for sure.
2  Q.  And was that surgery at Lutheran Hospital of
3  Indiana?
4  A.  Yes, it was.
5  Q.  Have you had any other treatment since then?
6  A.  I went back for the physical therapy.
7  Q.  How long were you in physical therapy?
8  A.  Three months.
9  Q.  Any other treatment beyond that?
10  A.  I went and seen doctor -- a Dr. Kershner which is a
11  local -- I don't know what you want to call him --
12  specialist.
13  Q.  And what kind of treatment did he provide?
14  A.  He gave me a consultation and said to continue on
15  with therapy.
16  Q.  When did you see him?
17  A.  Not for sure of the exact date.
18  Q.  Was that in 2011?
19  A.  Yes.  Might have been 2011.  If I was released in
20  2010, I think it would have been 2010.
21  Q.  I have your parole date as January 25th, 2011.
22  A.  Yeah, 2011.  I should have prepared more.  I
23  apologize.
24  Q.  That's okay.  Did you take any pain medications
25  after you were at the Marion General Hospital ER?

Page 20

1  A.  Yes.
2  Q.  Okay.  And what did you take?
3  A.  I was taking something called Lortabs, Valium.
4  Q.  And when did you take those?
5  A.  I want to say July of 2011.
6  Q.  Is that when you started or stopped?
7  A.  Stopped.
8  Q.  And why did you stop taking them?
9  A.  Well, the main pain from the surgery was gone.  I
10  was still having the side effects, and I just have
11  an extensive drug history and didn't feel that I
12  needed the -- didn't feel the benefits outweighed
13  the negatives.
14      MR. MACKRAZ: The what?
15  A.  Positives.  There was too many negatives,
16  counteracted, wasn't in my best interest.  That's
17  my belief.
18  Q.  Okay.  And how is your back currently?
19  A.  Currently, I still have numbness in the groin, the
20  foot drop, the weakness in the leg, and I got the
21  numbness and tingling still down here (indicating);
22  and then, occasionally, I get pain that shoots
23  down; and the bottoms of my feet hurt really bad
24  after surgery.
25  Q.  Okay.

Page 21

1      MR. THOM: Would the record reflect that when
2   he said "down here" he was pointing to his -- his
3   right calf area.
4      MS. VAN THOMME: Thank you.
5 A.  More outside of the leg down here (indicating),
6   shoots down here and the foot where it's numb.
7 Q.  Other than your back and neck pain issues, are
8   there any other medical conditions that you had
9   while incarcerated that are at issue in this
10  lawsuit?
11 A.  No, ma'am.
12 Q.  Other than what is stated in your amended
13  complaint, do you have any additional specific
14  complaints against any of the medical defendants?
15     MR. MACKRAZ: Object to the form and
16  foundation.
17     You can go ahead and answer if you can.
18 A.  I just wish they would have treated me at the time.
19 Q.  Do you claim that Prison Health Services or Corizon
20  had some kind of policy that violated your rights?
21     MR. MACKRAZ: Object to form, foundation.
22     Go ahead.
23 A.  I don't know if they had a policy; but from what I
24  witnessed and what was told to my family, you know,
25  that pretty much they weren't going to treat me.

Page 22

1   They told me that it was cheaper to sue 'em than it
2   would be to fix me.
3 Q.  Who told you that?
4 A.  That's what was told -- let's see, what doctor was
5   it? 'Cause Dr. Stieve told it to my wife. It
6   wasn't to me.
7 Q.  Have you ever met Dr. Rocco in person?
8 A.  Yes, I have.
9 Q.  When did you meet him?
10 A.  I was in Ojibway. I think it's Marenisco County.
11 Q.  And under what circumstances did you meet him?
12 A.  After Dr. Burtch, who I was seeing, was suddenly
13  transferred to the Thumb Correctional Facility --
14  he's the one that told me Dr. Burtch never put in a
15  request for surgery or for help.
16 Q.  Did you have a medical appointment with him when he
17  told you that?
18 A.  They just called me out of the blue, and I didn't
19  see him after that. I seen a Dr. Ralles that was
20  at the same facility where she did some tests on
21  me.
22 Q.  Have you ever met Dr. McQueen in person?
23 A.  No, I have not.
24 Q.  Have you ever met Dr. Keldie?
25 A.  Keldie? Not that I recall. I think I have, I'm

Page 23

1   not for sure.
2 Q.  While you were in the MDOC, what, to your knowledge
3   and in your opinion, was deficient about the
4   medical treatment you received?
5      MR. MACKRAZ: Objection, form and foundation.
6      You can go ahead and answer.
7 A.  Well, after not getting better -- after the X-ray
8   showed no damage -- that they said showed no
9   damage, I still had the symptoms I got with the
10  incontinence and the foot drop and the numbness
11  that they never -- failed to treat me. They didn't
12  want to give me MRI. They didn't want to give me
13  proper healthcare until I wrote grievances and had
14  an attorney write a letter on my behalf.
15 Q.  After your grievances, did you -- and after the
16  attorney wrote the letter, did you receive further
17  treatment?
18     MR. MACKRAZ: Do you mean while incarcerated
19  or after?
20     MS. VAN THOMME: While incarcerated.
21 A.  Yes, I did. I received a MRI.
22 Q.  Do you allege that the medical treatment was still
23  deficient after the MRI?
24 A.  Yes, I was referred to a outside specialist.
25 Q.  Did you see the specialist?

Page 24

1 A.  Yes, I did.
2 Q.  And then do you allege that, even after you saw the
3   specialist, the medical care was still deficient?
4 A.  Yes, he acknowledged that I need steroid injection
5   shots to relieve the pain and that -- that, most
6   likely, I was -- you know, if that didn't work,
7   most likely I was going to need a discectomy and,
8   possibly, a fusion.
9 Q.  Did you receive pain medications when you were in
10  the MDOC?
11 A.  I received Mobic, Tylenol, ibuprofen, naproxen,
12  some psych drug, I think, called alaview; and I
13  don't know. There's probably a list of others that
14  I just -- aren't on the top of my mind.
15 Q.  Have you retained any expert witnesses to assist
16  you in this case?
17     MR. MACKRAZ: Form, foundation.
18     Go ahead.
19 A.  Not to my knowledge.
20 Q.  Do you plan to retain any experts?
21     MR. MACKRAZ: Objection. form and foundation.
22     You can go ahead and answer.
23 A.  I mean, if I have to -- if you mean by the people
24  that treated me properly when I got out, was
25  released, then, yes.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 25

1 Q.  Do you plan to use your recent treating physicians
2   as experts in this case?
3     MR. MACKRAZ: Objection, form and foundation.
4     Go ahead and answer if you can.
5 A.  They would be the only ones that have knowledge
6   since they treated me.  I'm not a legal expert, so
7   I can't know what goes along with being an expert.
8 Q.  Did you pay medical bills for your -- out of your
9   pocket for your treatment after you were released
10   from prison?
11 A.  Yes.
12 Q.  What was the amount that you paid that you recall
13   or estimate?
14 A.  I want to say, oh, probably over a thousand
15   dollars, but I'm not for sure.
16 Q.  Do you claim lost wages as part of this lawsuit?
17     MR. MACKRAZ: Objection, form and foundation.
18     But go ahead.
19 A.  I mean, that's pretty much all up to my attorneys.
20   I just can tell you pretty much what happened, what
21   didn't happen, and let my legal representation
22   guide me from there.
23 Q.  Why did you leave your last job?
24 A.  'Cause as soon as I cleared to work, and then from
25   standing too long, I started to feel pain shoot

Page 26

1   down my leg again; and the bottoms of my feet,
2   like, are just painful.
3 Q.  Are you familiar with the MDOC Pain Management
4   Committee?
5 A.  No.
6     MS. VAN THOMME: Those are all the questions I
7   have at this time.
8     MS. MATSON: Mr. Sildack we met just prior to
9   this deposition.  My name, again, is Marcy Matson;
10   and I represent Dr. Mindlin, Dr. Henderson and
11   Dr. Dubriwney who, I will represent to you, are
12   three radiologists in this case.
13     CROSS-EXAMINATION OF TRENTON SILDACK
14     BY MS. MATSON:
15 Q.  I wanted to go back -- well, let me follow up on
16   few things first before I take you back.  You just
17   told us that you left your job that you got through
18   All Star Staffing, correct?
19 A.  Yeah, I got written off.
20 Q.  Can you explain to me what that means.
21 A.  I went to a doctor and was written off of work.
22 Q.  When did that happen?
23 A.  2011.
24 Q.  And what physician wrote you off work?
25 A.  He was at Marion General Hospital.  I'm not for

Page 27

1   sure of his name.
2 Q.  Do you have some sort of a note from him indicating
3   that you shouldn't do this particular position or
4   shouldn't work, at all?
5 A.  I had a note taking me off of work.  I have it
6   somewhere.
7 Q.  Is that something you think you could find at home?
8 A.  Yes.
9 Q.  Do you know how long a period of time you were not
10   to work?
11 A.  No, not that I recall.
12 Q.  And was it, generally, that you shouldn't work, at
13   all, or you shouldn't work at that particular
14   position?
15 A.  No, I should just take some time off and continue
16   therapy and not rush things.
17 Q.  How long after your last surgery did you start your
18   position with All Star Staffing?
19 A.  About five months.
20 Q.  So, roughly, five months or so after your surgery,
21   you worked about a month with All Star Staffing?
22 A.  Yes.
23 Q.  True?
24 A.  Yes, ma'am.
25 Q.  And at that point you began to have pain again?

Page 28

1 A.  Yes.
2 Q.  So you went to Marion General Hospital, I assume,
3   to investigate the pain.
4 A.  Yes.
5 Q.  And they wrote you a note saying you should take it
6   easy for a while?
7 A.  Yes.  Wrote me off of work, yes.
8 Q.  But you don't know exactly how long?
9 A.  No.  I know it wasn't permanent, but I'm not for
10   certain of the date, but they didn't want to get
11   into some type of legal -- I don't know.  It was a
12   long time ago.
13 Q.  Did you also follow up with the surgeon that did
14   your back surgery?
15 A.  Yes.
16 Q.  And who again was that?
17 A.  Dr. Jeff Kachmann.
18 Q.  Kachmann?
19 A.  Yes, ma'am.
20 Q.  Did Dr. Kachmann write you any sort of a
21   restriction in terms of work?
22 A.  No, he just told me to keep on doing the stretches
23   and the exercises and to give it time and to walk.
24 Q.  Did he give you some idea of how much time?
25 A.  No.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 29

1  Q.  Since you left your position at All Star Staffing,
2     have you made any attempts to find another job?
3  A.  Yes, I have.
4  Q.  Where have you applied, or what have you done?
5  A.  I haven't done anything. I've applied for a couple
6     fast food places, and I think I went through a
7     warehouse out here, Walmart.
8  Q.  And what were you thinking of doing for Walmart?
9  A.  I was going to see if I could do a forklift job.
10 Q.  This will show my total ignorance, but do you need
11    any sort of license or certification to run a
12    forklift?
13 A.  In Michigan I did. I watched a video, and then
14    they just gave me a little card.
15 Q.  Do you have to have a similar sort of card here in
16    Indiana?
17 A.  I'm not for sure.
18 Q.  Did you get any sort of a call back, at all, from
19    Walmart or interview?
20 A.  Nah, nope.
21 Q.  How long ago was that?
22 A.  I want to say about six months ago.
23 Q.  Have you been, then, continuously looking for work?
24 A.  Yes, I have; but it's been mostly just going to
25    businesses and asking if they have anything, if I

Page 30

1     can do odd jobs, or anything like that.
2  Q.  Have you earned any money, at all, from working
3     since you left All Star Staffing?
4  A.  No, I haven't.
5  Q.  No odd jobs?
6  A.  Nope.
7  Q.  But, as far as you're concerned, if you could get a
8     job at this point, you'd take it?
9  A.  Yes.
10 Q.  You mentioned to us that you have a seven-year-old
11    biological daughter.
12 A.  Daughter, yes, ma'am.
13 Q.  Is Melissa her biological mother?
14 A.  No.
15 Q.  Who is her biological mother?
16 A.  Tracy Brown.
17 Q.  And where does Tracy Brown live?
18 A.  Jackson, Michigan.
19 Q.  Do you happen to know her address?
20 A.  No, I do not.
21 Q.  Do you know what street she lives on?
22 A.  No, my daughter's at my mother's most of the time,
23    King Road.
24 Q.  Also in Jackson?
25 A.  Yes, Ann Arbor.

Page 31

1  Q.  What's your mother's name?
2  A.  Lugene Broxholm.
3  Q.  Can you spell that.
4  A.  L-U-G-E-N-E B-R-O-X-H-O-L-M.
5  Q.  You also told us you have four step-children.
6  A.  Yes.
7  Q.  And if you were able, you would be financially
8     supporting them?
9  A.  Yes.
10 Q.  How old are your step-children?
11 A.  I have one that's 18, one that's 16, one that's 13,
12    and one that's 11.
13 Q.  Do all four of them live with you full time?
14 A.  The 18-year-old goes to Indiana Purdue. She stays
15    at the dorm, and then the other three live with us.
16 Q.  Do they live with you full time?
17 A.  Yes, full time.
18    MR. MACKRAZ: Try to let her finish. I know
19    it's normal. It's hard for the court reporter.
20 Q.  When you get back this transcript, you'll be glad
21    because it will make a lot more sense to you if you
22    see the whole question, whole answer. If you try
23    not to cut me off, I'll try not to cut you off.
24 A.  I apologize.
25 Q.  That's okay. Everyone does it. What, at this

Page 32

1     point, is your source of income?
2  A.  My wife.
3  Q.  And where does Melissa work?
4  A.  I think she receives disability.
5  Q.  Does she receive -- let me ask you this: How long
6     has she been receiving disability?
7  A.  I have no idea.
8  Q.  Since before you married her?
9  A.  Yes.
10 Q.  And I believe you told us you got married in 2009.
11 A.  '10.
12 Q.  2010?
13 A.  Yes.
14 Q.  Her disability, then, is the only source of income
15    for the entire family?
16 A.  Yes.
17 Q.  You told us about your juvenile record and you told
18    us that there was something to do with disturbing
19    education.
20 A.  Yes, that was my adult record.
21 Q.  That was part of your adult record?
22 A.  Yes.
23 Q.  What does disturbing education mean?
24 A.  Just something -- I don't know what the law was,
25    but that's what I pled guilty to, and I did 90 days

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

---

Page 33

1  in jail for.
2  Q.  Give me some idea of what were the underlying facts
3      that would cause you to be in a position of
4      pleading guilty to disturbing education.
5  A.  I was supposed to be in house suspension, and I
6      wasn't. I opened the door to one of my friends
7      that was in class, and he gave me a ride home.
8      That's what it consisted of, not obeying the
9      teachers or authority figures in the school.
10 Q.  What school is this?
11 A.  Western. I think it's Parma Western, Jackson
12     Western.
13 Q.  This was high school?
14 A.  Yes.
15 Q.  But you were 18 at the time?
16 A.  No, I was 17 or 16.
17 Q.  And, I guess, my confusion -- I thought maybe I
18     misunderstood. You said this was part of your
19     adult record?
20 A.  Yes, at 17 -- I want to say I was 17. That's when
21     it happened, and then I got -- when I was
22     apprehended or captured -- I don't know what you
23     want to say -- had all these charges, and I pled
24     to.
25 Q.  You also told us that you had a retail fraud charge

---

Page 34

1  in 2007 for which you were not convicted; is that
2  true?
3  A.  Yes.
4  Q.  Was there a trial or was that charge dropped?
5  A.  Dropped.
6  Q.  Was that in exchange for you pleading guilty to
7      something else?
8  A.  Yes.
9  Q.  What did you plead guilty to?
10 A.  The home invasion.
11 Q.  Okay. Now, I do want to take you back in time to
12     July of 2008, and you told us that you were
13     assigned to garden detail.
14 A.  Yes, ma'am.
15 Q.  What were your responsibilities as part of the
16     gardening detail?
17 A.  We raised crops to feed the inmates and to donate
18     to charity.
19 Q.  And was there a specific job that you did, or did
20     it rotate?
21 A.  Just whatever they told us to do, we did.
22 Q.  I think you told us earlier that, even back as far
23     as 2004, you were having back pain.
24 A.  In the upper area, yes.
25 Q.  Had that gone away before you were assigned to this

---

Page 35

1  crop detail?
2  A.  No, it'd come and go.
3  Q.  Is that something which you had brought to
4      someone's attention prior to 2008?
5  A.  Yes.
6  Q.  Who did you tell?
7  A.  In 2004, when I was incarcerated, I made a
8      complaint to the doctors there. I also made a
9      complaint where I was back through R.G.N.C.
10     quarantine. I also made complaint at the doctors
11     at Coldwater.
12 Q.  When you were assigned to this -- crop detail is
13     the right phrase?
14 A.  Yeah, pretty -- horticulture, yeah, yeah.
15 Q.  Horticulture?
16 A.  Well, that's what they called it. I don't know.
17 Q.  Okay. When you were assigned to horticulture, did
18     you say to someone, "hey, I can't do that because I
19     have back problems"?
20 A.  On occasion, when it was bothering me, I would.
21 Q.  So, if it was acting up, you would tell someone, "I
22     can't do this today because of my back"?
23 A.  Yeah.
24 Q.  True?
25 A.  If it was too heavy or something, I couldn't do it,

---

Page 36

1  it was bothering me, yes.
2  Q.  So I take it on the day -- what was it July 7th?
3  A.  Yes.
4  Q.  That day, at least prior to you going out, your
5      back wasn't hurting?
6  A.  Not -- not -- not as bad in the usual way, no.
7  Q.  You felt comfortable enough that you could go and
8      do your horticulture job?
9  A.  Yes.
10 Q.  True?
11 A.  Yes.
12 Q.  And that particular day they were having you lift
13     concrete?
14 A.  Yes, we were building a pathway so the hoses
15     wouldn't be in the dirt.
16 Q.  Were you lifting these concrete slabs by yourself?
17 A.  Yes, I was.
18 Q.  Was anyone else assigned to help you, at all?
19 A.  There was a couple other guys doing this
20     theirselves. We'd load it onto a cart one at a
21     time, push it over, then push the cart across the
22     compound to the garden area, and then slide it off
23     the cart.
24 Q.  Was the idea that you would lift this 3- to 400
25     pound slab by yourself?

---

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 37

1  A.  Yes.
2  Q.  Or was the idea that you would work together to
3     lift these 300 to 400 pound slabs?
4  A.  Pretty much just told to go do it and did it.
5  Q.  Now, what makes you think they were 3- to 400
6     pounds?
7  A.  I've lifted weights for a while throughout my life,
8     and that's my guesstimate.  And, also, I think
9     somebody told us that's how much they weighed.
10 Q.  Who told you?
11 A.  One of the yard officers.
12 Q.  Any idea of the yard officer's name?
13 A.  No, ma'am.
14 Q.  Can you give me any description of this person?
15 A.  Shorter white guy with a mustache, goatee-type
16    thing.
17 Q.  Did he tell you they were 3- to 400 pounds before
18    you started lifting them or after?
19 A.  After.
20 Q.  Was it the same day that you hurt yourself?
21 A.  No.
22 Q.  Different day?
23 A.  Yes.
24 Q.  Do you know how long after?
25 A.  No.

Page 38

1  Q.  Did he give you any indication how he would know if
2     they weighed 300?
3  A.  He said they weighed one, one time.  He said they
4     had a form, poured the cement into the form for the
5     sidewalk.  We were taking the old sidewalk pieces,
6     using them.
7  Q.  Did anyone ever tell you you had to lift 3- to
8     400-pound concrete slabs by yourself?
9  A.  Well, we had one of the best jobs, so if we didn't
10    do it, then you got fired.
11 Q.  Did anyone ever tell you you couldn't do it in
12    teams of two; in other words, two of you lift?
13 A.  No.
14 Q.  As far as you know, would you have gotten fired if
15    two of you had lifted it?
16 A.  Not to my knowledge, no.
17 Q.  And I take it, based on what you told me about you
18    lifting weights, you could lift 3- to 400 pounds?
19 A.  Yes.
20 Q.  You felt a pop?
21 A.  Yes.
22 Q.  Where was the pop?
23 A.  In my lower back on the right side.
24 Q.  When you felt the pop, did you immediately drop to
25    the ground?

Page 39

1  A.  Yeah.  I couldn't even breathe.  It hurt when I
2     breathed.  It took my breath away.
3  Q.  Were you holding one of these concrete slabs at the
4     time?
5  A.  No, I went to pick it up and move it and barely
6     budged it, and I felt it.
7  Q.  And at that point I think you indicated that there
8     were some other people who came and helped you to
9     the cafeteria.
10 A.  Yes.
11 Q.  Were you under any sort of supervision while you
12    were lifting these slabs?
13 A.  No.
14 Q.  So there wasn't anyone employed by the prison that
15    was with you when this happened?
16 A.  No, ma'am.
17 Q.  I asked a bad question.  Was there any one who was
18    employed by the prison with you when this happened?
19 A.  No, ma'am.
20 Q.  Do you know the names of any of the people who
21    would have been there when this happened?
22 A.  I know a guy, they call him Crazy, and Redrum were
23    like the leaders, but I don't know their exact
24    names.  I know a bunch of nicknames.
25 Q.  When you got to the cafeteria at that point someone

Page 40

1     who was employed by the prison was actually
2     notified that this had happened?
3  A.  Yes.
4  Q.  What happened at that point?
5  A.  He called -- he called health service -- or, yeah,
6     health service, and they brought over a wheelchair,
7     and then they rolled me in the health center.  I
8     don't know if it was a doctor or nurse, and they
9     just evaluated me and sent me back to my barracks.
10 Q.  I take it you wanted to go to health service to be
11    seen?
12 A.  Yes.
13 Q.  And as far as you're concerned, taking you in a
14    wheelchair was good because you couldn't walk?
15 A.  Yes.
16 Q.  You don't know if it was a doctor or a nurse that
17    you saw?
18 A.  No.
19 Q.  When you say you were evaluated, what was done
20    specifically?
21 A.  They just pressed on some spaces.  They made me
22    touch my toes and stand on one leg and try to lift
23    up and stuff like that.
24 Q.  Did you stand on one leg?
25 A.  On my left leg I could.  That's how I hopped up

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

---

Page 41

1 there.
2 Q. But you couldn't stand on the right leg?
3 A. Not at the time, no. I had too much pain. I had
4 to lay down.
5 Q. Were you asked to stand on the right leg?
6 A. Yes.
7 Q. But you were unable to do that?
8 A. Yes. Initially, yes.
9 Q. How about touching your toes, could you touch your
10 toes?
11 A. No.
12 Q. At some point, I take it, they sent you to get an
13 X-ray?
14 A. Yes.
15 Q. Was it that same day?
16 A. No, it was, I believe, two weeks later
17 approximately.
18 Q. In that two-week interval, did you get any other
19 healthcare or treatment, at all?
20 A. No, I -- I put in the health care kite when I was
21 seen, and they did the same thing. Made me stand
22 on one leg and lift my heels up and stuff like
23 that.
24 Q. Did you continue to work on your horticulture
25 assignment in that two-week interval?

---

Page 42

1 A. After a week after -- after a week, I went out
2 there, but I really didn't do anything.
3 Q. Were Crazy and Redrum still lifting the slabs at
4 that point?
5 A. Yes.
6 Q. You told us earlier that, if you weren't lifting
7 the slabs, that you were going to get fired from
8 that position. So did that happen?
9 A. Well, I got transferred shortly after the X-rays.
10 Q. Well, let's stick to this two-week interval before
11 the X-rays, if I understood correctly, the first
12 week.
13 A. Well, they laid me in for, I think it was, a week
14 and didn't do anything, nothing.
15 Q. So at that point, whatever the recommendation was
16 of this evaluation, you didn't have to work for
17 that first week, true?
18 A. Nope.
19 Q. Again, I asked a bad question. Did you have to
20 work that first week?
21 A. Well, after it, no.
22 Q. And do you know -- I mean, did someone recommend
23 that you have a week off?
24 A. I do not recall.
25 Q. Would that be unusual? Ordinarily, would you have

---

Page 43

1 expected to be working in that week?
2 A. No.
3 Q. You always got that week off?
4 A. No. Yeah, normally, would have been expected to
5 work. Yes.
6 Q. Do you think that it was because of whatever had
7 happened to your back that you got that week off?
8 A. Probably, yes.
9 Q. And after that week, do you know how a decision was
10 made that you should go back out and try?
11 A. Nope. I didn't really do nothing, and then I got
12 transferred.
13 Q. Well --
14 A. Plus, once the injury happened, I really didn't
15 work.
16 Q. For a week no one expected you to work, true?
17 A. True.
18 Q. And then the second week somehow a decision was
19 made that you should go out there again and try to
20 work your horticultural job?
21 A. I'd just hobble out there and sit around.
22 Q. But at some point someone said to you,
23 "Mr. Sildack, you need to go back out there and
24 try"? How did you know to hobble out there?
25 A. Oh, 'cause Crazy was in charge of the -- of, like,

---

Page 44

1 us. He was a inmate. He was in charge of, like,
2 overseeing us.
3 Q. So it was Crazy's decision for you to get back out
4 there?
5     MR. MACKRAZ: Objection, foundation.
6 A. No, it wasn't his decision. Like I said, I just
7 went out there and would pretty much sit on a bench
8 and didn't do anything.
9 Q. But here's what I'm trying to figure out: In the
10 first week nobody expected you to even go out there
11 and sit on a bench, right?
12 A. Yeah, do nothing.
13 Q. But the second week somebody expected you to at
14 least go try? Is that fair, or is that not true?
15 A. Yeah, they wanted me to go out there just so I'd be
16 seen. That way they could justify still paying me.
17 Q. So somebody was almost doing you a favor because,
18 at least if you were out there, you could get paid?
19 A. Yes.
20 Q. But you didn't really do anything because at that
21 point didn't feel you could?
22 A. Yeah, I couldn't.
23 Q. But you got paid?
24 A. I believe so. I believe I did. I was transferred
25 out. They pay you once a month, and I was

---

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 45

1   transferred by then.
2   Q.  So after that second week where you were able to
3      get out there, but you couldn't really do anything,
4      at that point an X-ray was ordered?
5   A.  I think it was ordered, yes.  Whenever I -- ordered
6      some time, not -- not for sure when it was ordered.
7   Q.  What circumstances led to this X-ray being ordered?
8   A.  Well, I had weakness in my leg and incontinence of
9      the bladder, numbness, and excruciating pain.
10  Q.  So you had weakness and incontinence before you
11     ever had your first X-ray?
12  A.  Yes.
13  Q.  Well, do you know who ordered the X-ray?
14  A.  No, I do not.
15  Q.  Where'd you go to have the X-ray?
16  A.  Jackson, Duane Waters.
17  Q.  Duane Waters.  Did you ever see Dr. Mindlin, the
18     radiologist?
19  A.  Doctor who?
20  Q.  Mindlin, the radiologist?
21  A.  Not that I recall.
22  Q.  At any point would you have ever said to him that
23     you had weakness or incontinence?
24  A.  Not that I can recall.
25  Q.  You wouldn't have had a phone call with him or

Page 46

1   anything like that?
2   A.  No.
3   Q.  I'm going to ask you questions you may or may not
4      know.  If you don't know, that's fine.
5        Is it your understanding you had, what I would
6      call, a plain film?  In other words, not an MRI or
7      CT scan, but just a plain film X-ray
8        MR. MACKRAZ:  Do you want to put a time frame
9      on that?
10       MS. MATSON:  July 16th, 2008.
11  A.  So not an X-ray?
12       MR. MACKRAZ:  Not an MRI.
13  Q.  Not an MRI, not a CT?
14  A.  I never had a MRI.
15  Q.  It wasn't a CT scan?
16  A.  They did something to my heart where they put some
17     stuff.  I don't know what that is.
18  Q.  But in terms of the X-ray that you had?
19  A.  It was just a regular X-ray to my knowledge.
20  Q.  At any point has anyone ever said to you that you
21     actually had a fracture or a broken back?
22  A.  No, ma'am.
23  Q.  At any point in time have you ever spoken to
24     Dr. Mindlin, the radiologist?
25  A.  No, ma'am, not that I can recall.

Page 47

1   Q.  I'm going to jump way ahead in time; but,
2      eventually, you had a discectomy, true?
3   A.  Yes, ma'am.
4   Q.  Do you have some understanding as to why you had a
5      discectomy?
6   A.  Because it was -- the disc ruptured and was on the
7      nerves causing pain.
8   Q.  And is this something that Dr. Kachmann explained
9      to you?
10  A.  Yes, and Dr. LaHaye when I seen him while I was
11     incarcerated.
12  Q.  Did Dr. Kachmann give you any idea in terms of when
13     the disc might have ruptured?
14  A.  I never asked that question.  I just knew.
15  Q.  What about Dr. LaHaye, do you know when, in time,
16     you would have seen him?
17  A.  I seen him after the MRI.  He was the specialist
18     that I went and seen.
19  Q.  I'm going to jump back in time.  Did Dr. LaHaye say
20     when it might have ruptured?
21  A.  That was never brought up, that question.
22  Q.  Did Dr. Kachmann say anything to you about whether
23     a ruptured disk can even be seen on what you call a
24     regular X-ray?
25  A.  I never asked.

Page 48

1   Q.  How about Dr. LaHaye?
2   A.  Dr. LaHaye, I think, did say something -- that he
3      noticed something in the X-rays.
4   Q.  In the MRI?
5   A.  And the MRI, of course.  Yeah, he is the one that
6      showed me the MRI, explained everything to me, what
7      was going on.
8   Q.  Okay.  I want to jump you ahead then, and I'm sure
9      these gentlemen will have some more detailed
10     questions about the time in between; but on
11     January 6th, 2009, you had another X-ray on your
12     low back, true?
13  A.  I'm not sure of the date, and I'm not for sure.
14  Q.  How about if we say January of 2009 you had another
15     X-ray.  Do you remember that?
16  A.  Possibly.
17  Q.  Since you don't actually remember it, is it fair to
18     tell me you can't tell me where you had it or why
19     you had it?
20  A.  No, ma'am.
21  Q.  Do you remember ever meeting Dr. Henderson who's
22     also a radiologist?
23  A.  No, ma'am.
24  Q.  Would you have ever spoken to Dr. Henderson for any
25     reason?

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 49

1   A.   No, ma'am.
2   Q.   How about Dr. Dubriwney, another radiologist?
3   A.   No, ma'am.
4   Q.   Would you ever have met him?
5   A.   Don't know if I've met him.
6   Q.   You don't remember ever speaking to him?
7   A.   No, ma'am.
8   Q.   At any point did you go to the radiologist's office
9      for anything?
10  A.   No, ma'am.
11  Q.   Your films were taken at Duane Waters?
12  A.   Yes, ma'am.
13  Q.   You told us that you have spent over a thousand
14     dollars in medical bills.
15  A.   That's a guesstimate or estimate. I'm not for
16     sure. Possibly more.
17  Q.   This Indiana Health Centers, is that some sort of
18     system that provides --
19  A.   Yes, it goes by your income.
20  Q.   Have they been notified that you are pursuing this
21     lawsuit?
22         MR. MACKRAZ: Objection, foundation.
23         If you know.
24  A.   Not that I'm aware of, no.
25  Q.   Do you know -- do you have any idea if they are

Page 50

1      expecting to be paid back for any monies that
2      they've paid toward your surgeries?
3   A.   No, I ended up getting covered under HIP which is a
4      healthcare provider or whatever, and I had to make
5      co-payments and things like that. So, no, I don't
6      believe they -- no.
7   Q.   What is HIP?
8   A.   Healthy Indiana Living or People or something like
9      that.
10  Q.   Probably something that starts with a P?
11  A.   Yeah.
12  Q.   Yeah. So did HIP actually end up paying then?
13  A.   For the surgery, yes. I had to pay the co-payment.
14  Q.   Did they pay for your physical therapy?
15  A.   I believe so.
16  Q.   Do you know if HIP has been notified about this
17     lawsuit?
18  A.   Not that I'm aware of. I no longer have 'em.
19  Q.   Do you know -- or do you have any understanding as
20     far as the terms of that program, if you get money
21     for this, if you have to pay them back for what
22     they paid for your surgery?
23  A.   I have no idea.
24  Q.   When you say that you've spent over a thousand
25     dollars, would those be the co-pays?

Page 51

1   A.   Probably with co-pays, and then I had to pay the
2      initial consultation from Dr. Kachmann.
3   Q.   Other than co-pays and Dr. Kachmann, anything else
4      that you've had to spend out of your own pocket?
5   A.   Believe with Dr. Kershner.
6   Q.   Other than medical expenses that you told us about,
7      anything else that you've had to spend out of
8      pocket that you think is related to your back or
9      any claims that you have in this case?
10  A.   Could you repeat the question, please.
11  Q.   Sure. I'll try to even make it a clearer question.
12         You've told us now that you've had to spend
13     some money out of your pocket because you had to
14     pay co-pays. You had to pay Dr. Kachmann; you had
15     to pay Dr. Kershner.
16  A.   Yes, ma'am.
17  Q.   Other than those things is there anything else you
18     had to pay out of your own pocket?
19  A.   Prescription medication.
20  Q.   Does all of that figure into the thousand dollar
21     number you came up with?
22  A.   Yeah, I believe so.
23  Q.   And I guess what I'm trying to find out is, other
24     than the thousand dollars for medical related
25     things, anything else you've had to pay out of your

Page 52

1      own pocket that you think is caused by your back
2      problem and your claims related to this lawsuit?
3   A.   Just being -- not being able to provide for my
4      family, not being able to do tile and stuff like
5      that, being injured.
6         MR. MACKRAZ: She means, have you shelled out
7      money for anything else?
8   A.   No.
9   Q.   And then we'll get to what you've said now. Not
10     being able to provide for your family, are you
11     saying that, because you had to quit your position
12     at All Star Staffing?
13         MR. MACKRAZ: Objection, form and foundation
14     of the question.
15  A.   Basically, yes. I mean, there's not a lot of jobs
16     around this area, so it's difficult. As a man,
17     it's just -- I don't know. It's just depression.
18     I've got no -- that's all my fault, though.
19  Q.   This position with All Star -- or through All Star
20     Staffing, was that intended to be a permanent
21     position, or was it a temporary position?
22  A.   It's a temporary service, and I don't know if you
23     ever worked a temp. job; but you go in there and
24     you hope, after a certain amount of time, that they
25     do hire you in.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 53

1  Q.  What, again, is the name of the company you were
2  working for?
3  A.  All Star Staffing.
4      MR. MACKRAZ: Where were you placed?
5  A.  Wiley Metal.
6  Q.  Can you spell that for me.
7  A.  W-I-L-E-Y. It might be two Ls. I think it's just
8  one, though.
9  Q.  Metal, M-E-T-A-L?
10  A.  M-E-A-T-A-L.
11  Q.  Did you have a supervisor or someone at Wiley?
12  A.  I did. I'm not quite for sure of his name. I want
13  to say Ed.
14  Q.  In the month that you worked there, did anyone talk
15  to you about, "Hey, we want you to come on
16  permanently"?
17  A.  No. It was pretty much you had to work there a
18  year before they'd hire you. If you worked
19  there for a year, you get hired in.
20  Q.  Did you have any benefits, at all, through this job
21  with Wiley Metal?
22  A.  Not that I'm aware of, no.
23  Q.  Anything else money-wise, any other kinds of
24  damages you can think of because of your back or
25  claims you can think of in this case?

Page 54

1  A.  No.
2  Q.  And you started to tell me a little bit about how
3  this has affected you. You said you were depressed
4  now.
5  A.  Yeah.
6  Q.  And that is related to the fact that you're not
7  working right now?
8  A.  Not working, can't provide for my family. I got
9  numbness in my groin area, so I got erectile
10  dysfunction, whatever you want to call it.
11  That's -- problems with the marriage because of it.
12  Can't play sports with the kids and --
13  Q.  Have you sought any treatment for erectile
14  dysfunction?
15  A.  No.
16  Q.  Do you have someone that you would consider sort of
17  your family doctor?
18  A.  Probably Ann Michelle Web. She's a nurse
19  practitioner, I believe.
20  Q.  Is it Web, W-E-B?
21  A.  E-B, yeah.
22  Q.  Where is Nurse Practitioner Web?
23  A.  Indiana Health Centers.
24  Q.  Have you talked to her, at all, about erectile
25  dysfunction?

Page 55

1  A.  Yes.
2  Q.  She hasn't recommended any sort of treatment?
3  A.  No.
4  Q.  How about depression, have you talked to her, or
5  anyone for that matter, about depression?
6  A.  No.
7  Q.  I take it, then, that you aren't taking any sort of
8  medication for depression?
9  A.  No, ma'am.
10  Q.  How about counseling?
11  A.  I was receiving counseling, and I'm not anymore.
12  Q.  Where were you getting counseling?
13  A.  I can't recall the name.
14  Q.  Was it --
15  A.  It was about -- it was in 2011.
16  Q.  Was it something, again, through Indiana Health
17  Centers?
18  A.  It was a Christian-based place.
19  Q.  Was it through your church?
20  A.  No, ma'am.
21  Q.  How did you find this place?
22  A.  Phone book. It was close to home.
23  Q.  Would you have anything, at home, that would kind
24  of help refresh what this place was?
25  A.  Yeah.

Page 56

1  Q.  Any other counseling?
2  A.  No, ma'am.
3  Q.  You also indicated that this has caused problems in
4  your marriage. Are there any plans, at this point,
5  to separate or divorce?
6  A.  No, ma'am.
7  Q.  Whatever problems there are, they're not to that
8  extent?
9  A.  Hopefully not, no.
10  Q.  Do you have any sort of notes or calendar with
11  dates or entries or diary or anything that would be
12  in writing about these events?
13  A.  I believe I have personal notes, and I have some
14  documentation.
15  Q.  When you say you have "some documentation," what
16  are you talking about?
17  A.  Just whatever I was able to obtain from the prison
18  medical records.
19  Q.  The documentation being what the prison wrote about
20  these events?
21  A.  Yes.
22  Q.  As opposed to what you wrote?
23  A.  Yes.
24  Q.  But do you have personal notes, as well?
25  A.  Yes.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

---

Page 57

1 Q. How about your wife, do you know if she has any
2 sort of notes or writings or calendar, anything
3 like that?
4 A. I believe she does. She's organized.
5 Q. Do you know if your wife ever spoke to any of the
6 radiologists?
7 A. No, ma'am, except maybe the ones that did the MRI
8 in Newberry.
9 Q. But in terms of what you've called the "regular
10 X-ray," you've not had any contact and your wife
11 hasn't had any contact?
12 A. No, ma'am.
13 MS. MATSON: I am going to pass you at this
14 time. Thank you very much. I appreciate your
15 time.
16 THE WITNESS: Thank you.
17 MR. REYNOLDS: Good afternoon, Mr. Sildack.
18 My name's Mark Reynolds. I represent some of the
19 CMS defendants. I just got a couple quick
20 questions for you.
21 CROSS-EXAMINATON OF TRENTON SILDACK
22 BY MR. REYNOLDS:
23 Q. What did you review, if anything, before this
24 deposition?
25 A. Before this deposition I reviewed personal notes

---

Page 58

1 that I have and some of the medical records I have
2 from my incarceration.
3 Q. The MDOC medical records?
4 A. Just what I have of 'em. I don't have the whole
5 file or nothing.
6 Q. When did you get the -- strike that.
7 What records do you have? Do you have a
8 certain time frame they're between or --
9 A. Started -- I think I asked for the records after I
10 wrote the grievance and after I seen Dr. LaHayes.
11 Q. Do you have any -- strike that.
12 Do you have a specific recollection of P.A.
13 Heebsh -- Physician Assistant Heebsh?
14 A. No, sir.
15 Q. You don't?
16 A. Not that I recall.
17 Q. So you don't remember if you met with Heebsh, at
18 all?
19 A. The name is like on the top of my head. I want to
20 say he's a little Indian guy, but I'm not -- not
21 recalling exactly where it was at or when.
22 Q. Okay. Do you remember how many times you met with
23 him?
24 A. It was probably once, maybe twice, if I did.
25 Q. Do you know if he gave you any medication?

---

Page 59

1 A. He might have gave me -- might have gave me
2 naproxen.
3 Q. Okay. Do you know if he ordered any sort of any
4 testing?
5 A. Not -- not that I know of.
6 Q. You don't remember, or he didn't, or you don't
7 remember?
8 A. I don't remember.
9 Q. Okay. What about Nurse Practitioner Kirk, Do you
10 remember?
11 A. Kirk?
12 Q. Do you have a specific recollection of NP Kirk?
13 A. Not that I -- nope, not that I'm aware of.
14 Q. Okay. What about Dr. Qayyum?
15 A. Dr. Qayyum.
16 Q. Yeah, correct?
17 A. I don't know. I'm -- I'm not good with names. I'd
18 have to remember, like, what facility I was at.
19 MR. MACKRAZ: If you know. Let him know if
20 you don't.
21 Q. I don't want you to guess.
22 A. I don't know for sure.
23 Q. Okay. How long have you been with Melissa?
24 A. For seven years.
25 Q. Seven years. So that was before the last time you

---

Page 60

1 were in prison, you guys were together?
2 A. We weren't together, together, no.
3 Q. Okay.
4 A. But we knew of each other since I've been about 15
5 years old.
6 Q. Okay. When did you guys begin having a sexual
7 relationship?
8 A. It was in the past when I was younger couple times,
9 and then right before I got incarcerated, 2007.
10 Q. You guys started dating?
11 A. Messing around, yeah.
12 Q. Okay. Before then, how often would you guys have
13 sex before you were incarcerated?
14 MR. MACKRAZ: Objection, relevance.
15 A. Let's see, we were together two or three times a
16 day.
17 Q. Okay. What about since you've been released?
18 A. Maybe once every two or three weeks, but it don't
19 really work. It's like not -- I don't know. It's
20 hard to explain.
21 Q. I apologize if I missed this, but are you taking
22 any E.D. medication?
23 A. No, sir.
24 Q. I believe you said you complained or have
25 complained of incontinence.

---

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 61

1  A.  Yes, sir.
2  Q.  When did that begin?
3  A.  About, say, a little over a week, close to two
4  weeks after the incident July 7th of 2008.
5  Q.  Okay.  So pretty soon after the injury?
6  A.  Yeah, wake up and be wet the bed.
7  Q.  Wet the bed?
8  A.  And then it drips, you know.
9  Q.  Okay.  Would the prison have to change your sheets?
10  A.  I do it myself.  Take it to the laundry man and get
11  my stuff washed.
12  Q.  Okay.  And then just get new sheets and bring it
13  back?
14  A.  Yes.
15  Q.  How often would you wet the bed?
16  A.  Probably about three to five times a week
17  sometimes.
18  Q.  Okay.  And did that continue throughout your entire
19  incarceration?
20  A.  Yes.
21  Q.  And each time you would take your sheets to the
22  laundry, get new sheets, and bring them back?
23  A.  Yes.
24  Q.  Did you ever tell anybody about it?
25  A.  I did when I was at Newberry because at first I

Page 62

1  didn't know it was nothing to do -- related or
2  anything like that.  You know, I was embarrassed,
3  didn't know what was going on.
4  Q.  Okay.  So while you were in Newberry is when you
5  first told somebody about it?
6  A.  Yes.  Actually, I think I did at Jackson Cotton
7  Facility right before I got transferred to
8  Newberry.
9  Q.  Okay.  So the time period right around the transfer
10  from Jackson to Newberry?
11  A.  Yeah.
12  MR. REYNOLDS: I'm all set.
13  MR. EWLES: Mr. Sildack, my name's Ryan Ewles.
14  I represent Dr. LaHaye.  I'll try not to be too
15  long with you.  I'll try not to ask you anything
16  the others have asked.  If I do, I apologize.
17  CROSS-EXAMINATION OF TRENTON SILDACK
18  BY MR. EWLES:
19  Q.  Have you been arrested or convicted of any crimes
20  in any states other than Michigan?
21  A.  No, sir.
22  Q.  Nothing in Indiana?
23  A.  No, sir.
24  Q.  Okay.  You talked about your current medical
25  conditions and in a little bit of detail and

Page 63

1  described foot drop, groin numbness, shooting pain
2  in the leg, said you've been diagnosed with ADD,
3  bladder incontinence and leg weakness.
4  A.  Yes.
5  Q.  Those are all complaints that you currently have?
6  A.  Yes, and the old injury, 2004, to the upper back.
7  Q.  Okay.  That continues to --
8  A.  Yes.
9  Q.  -- be a bother to you?
10  A.  Yes.
11  MR. MACKRAZ: Try not to do the talk over
12  thing.
13  Q.  You said you had your discectomy with Dr. Kachmann?
14  A.  Yes, sir.
15  Q.  When was that?
16  A.  In April of 2011.
17  Q.  All right.  When you had the surgical procedure
18  performed, did the doctor, or maybe one of his
19  staff, tell you what the procedure would address as
20  far as trying to correct complaints that you had?
21  A.  He told me, because it went so long without being
22  treated, that he couldn't guaranty any of the
23  symptoms stopping except the excruciating pain down
24  my leg.
25  Q.  Did he tell you that would be the case with any

Page 64

1  sort of surgical procedure, back procedure?
2  A.  He said that -- what, that they could guaranty
3  that?
4  Q.  No, that he wouldn't be able to guaranty any sort
5  of result with any procedure?
6  A.  Oh, yeah.
7  Q.  Do you remember signing authorizations to that
8  effect, acknowledging that you had an understanding
9  that a surgical procedure of any nature may or may
10  not be successful, may have some complications,
11  things like that?
12  A.  Yes.
13  Q.  Okay.  Specific to the foot drop, is that an issue
14  that you approached or discussed with Dr. Kachmann?
15  A.  Yes.
16  Q.  Okay.  What are your limitations?  It's on the
17  right side, correct?
18  A.  Yes.
19  Q.  What are your limitations, would you say, with that
20  right foot?
21  A.  It's just -- it's about 50 percent as strong as my
22  left leg, and then sometimes like --
23  Q.  I don't want to interrupt you.  Let me stop you for
24  a minute.  You said your right --
25  A.  I mean my right leg, right leg.

Page 65

1  Q.  I want to make sure we're being specific to your
2     right foot.
3  A.  Right leg.
4  Q.  Right foot --
5  A.  Right foot.
6  Q.  -- is 50 percent as strong as your left foot. I
7     didn't mean to cut you off. Go ahead.
8  A.  Yes, sir. And so -- and then sometimes my leg will
9     just wobble and just give out sometimes, too.
10 Q.  That's the leg. I'm going to work my way up.
11 A.  Just the foot. The foot is 50 percent as strong
12    as -- the right foot is 50 percent as strong as the
13    left one.
14 Q.  Let me try to be more specific for you. As far as
15    your toes, can you wiggle your toes on the right
16    side?
17 A.  A little bit now, yes.
18 Q.  When you say "now" --
19 A.  Before surgery I couldn't.
20 Q.  Before your surgery in April of '11 with
21    Dr. Kachmann, you could not wiggle your toes?
22 A.  No.
23 Q.  Okay. When did that start?
24 A.  That started about two weeks, a week, close to two
25    weeks. Roughly, two weeks after the incident.

Page 66

1  Q.  Okay. So you didn't notice that, between July 7th
2     of '08 and approximately July 21st of '08, that you
3     had any problems wiggling your toes?
4  A.  I just knew it was excruciating pain, and it was
5     numb, and it was dead. I could take -- you know, I
6     couldn't even feel it.
7  Q.  But then at some point, though, you recognized that
8     you couldn't wiggle your toes?
9  A.  Yes.
10 Q.  And you think that was about two weeks after this
11    July 7th incident that we've talked about in some
12    detail?
13 A.  Yes.
14 Q.  Okay. Did you bring that to anybody's attention at
15    the time, that you couldn't all of a sudden -- or
16    let me rephrase that.
17       Did you bring it to anybody's attention at the
18    facility that you noticed that you could now not
19    wiggle your toes?
20    MR. MACKRAZ: Which facility, any?
21 Q.  Well, where he was at on July 21st?
22 A.  I never specifically said the toes. I just would
23    tell them about the pain and how I can't control my
24    foot.
25 Q.  When you say --

Page 67

1     MR. MACKRAZ: Let him answer.
2  Q.  Go ahead. You can't control your foot?
3  A.  Yeah, I can't control my foot, like strength to
4     lift. What they'd have you do is, like, lift the
5     heel up like this (indicating).
6  Q.  When you say -- I couldn't tell if you said they or
7     he had you do. Who was they or he?
8  A.  The numerous doctors I seen. They, basically, all
9     did the same test to me.
10 Q.  When you were motioning just now, you were
11    motioning with your hand.
12 A.  Yeah, you take your heel.
13    MR. MACKRAZ: Wait for him to finish.
14 A.  You take the heel, lift it up like this
15    (indicating), and they press down.
16    MR. MACKRAZ: Heel or toes?
17 A.  The toes. You have to try to lift it up as they
18    press down.
19 Q.  The person who was examining you would offer
20    resistance against your foot, you would try to
21    bring it up, and then they'd press down?
22 A.  Yes, sir.
23 Q.  Okay. Did any of the caregivers -- and I'm talking
24    at any of the facilities now -- offer an opinion to
25    you as to what had caused that weakness?

Page 68

1  A.  Larry Sell, he told me it was most likely a
2     ruptured disc, but this was before the MRI.
3  Q.  Okay.
4  A.  This was his diagnosis. After the MRI when I seen
5     Dr. LaHaye, he's the one that told me everything,
6     showing me on the MRI what was wrong and that, you
7     know, I needed -- conservative treatment probably
8     wasn't going to do no good, but he was going to
9     recommend the steroid shots just as a long shot
10    just so I could deal with the pain; but he told me,
11    if that didn't work, I would need a discectomy
12    possibly a fusion, too.
13 Q.  We'll get to that in a little bit. Dr. Sell was
14    the first person you believe that gave you some
15    input as to what was going on with the foot
16    weakness?
17 A.  Yes. Before everybody acted like I was lying.
18    Even when I got the MRI, police officers, they
19    wanted me to jump down. "You're all right.
20    Nothing's wrong with you." Tried to push me down
21    'cause they didn't want me to get the MRI.
22 Q.  Okay. We've been specific to your right foot
23    talking about that weakness. Was this opinion of
24    Dr. Sell offered, that you just described, about
25    the ruptured disc, was that also what he attributed

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 69

1 the leg weakness to and the other problems you've
2 described?
3 A. Yes.
4 Q. Okay. Did he -- did he address, at all, the
5 incontinence issue?
6 A. No.
7 Q. Okay. All right. Groin numbness continues to be a
8 issue today?
9 A. Yes.
10 Q. When did you first notice groin numbness?
11 A. I noticed it about, say, two to three weeks after
12 the thing happened.
13 Q. Did you have feeling in the groin between the time
14 it happened July 7th, and about two weeks later,
15 and then all of a sudden -- and I hate to use this
16 because it's too simplified -- it was like a flick
17 of a switch, all of a sudden you didn't have
18 feeling or numbness?
19 A. Well, I -- normally I'd wake up with an erection or
20 whatever and then, went to masturbate, thing
21 wouldn't get hard or whatever.
22 Q. Okay. So that's what made you notice that you had
23 groin numbness?
24 A. I noticed it. I was in so much pain at that
25 time -- it was hard to even breathe then -- that I

Page 70

1 didn't -- you know, wasn't just focused on one
2 thing. It was just excruciating pain shooting down
3 to me to where I wasn't just focusing on one
4 certain thing.
5 Q. Okay. You described the popping sound in your
6 back. You've talked about that a little bit. The
7 pain that you experienced right when that happened,
8 on a scale of one to ten, with one being no pain,
9 ten being the worst you ever felt, where did that
10 popping sensation -- or where would it rank, I
11 should say?
12 A. Ten.
13 Q. Okay. In the immediate hours after that happened
14 where you heard the popping sound, did that pain
15 decrease?
16 A. No, it increased.
17 Q. It increased, okay.
18 A. Well, it was about the same.
19 Q. And so we're clear, you described a ten when it
20 happened; and on a scale of ten, it can't increase,
21 but you think it stayed the same?
22 A. If it could go up, it would have.
23 Q. Okay. How about in the days, couple days after,
24 did that pain decrease?
25 A. No.

Page 71

1 Q. At the time that you started noticing the numbness
2 in the groin, the weakness in the leg, weakness in
3 the toes that we've been talking about, what was
4 the pain at this point? This is now a couple weeks
5 after the 7th.
6 A. I'd say like a consistent pain.
7 Q. Well --
8 A. Because it'd be like a ten, like, off and on. Like
9 if I just walk from here to the door, sometimes I'm
10 gonna have -- I did sit down and have to like pull
11 my knee to my chest and stretch to try to relieve
12 some of the tension because it was hurting so bad.
13 Q. That's a good point you make. Was the pain a
14 constant pain in those two weeks, the first two
15 weeks?
16 A. Yes.
17 Q. And you've described a ten in the hours right after
18 and in the hours later. Was it a ten for two
19 weeks, or did it decrease?
20 A. It was a ten for two weeks.
21 Q. Okay. In those two weeks, were you complaining to
22 anybody, talking to anybody, seeing anybody --
23 A. Yes.
24 Q. -- about that pain?
25 A. To the officers, to the unit officers, to a couple

Page 72

1 guys in my cube, and people I work for.
2 Q. Were you on any meds at that time?
3 A. Just I was -- some form of NSAIDS or whatever it
4 is. I'm not for sure exactly which one.
5 Q. You don't know exactly which one?
6 A. No, sir.
7 Q. Any others that you can think of?
8 A. Think it was mostly Mobic and Naprosyn.
9 Q. Do you know what those were for?
10 A. Supposed to be like a anti-inflammatory. Like a
11 ibuprofen of some type, I think.
12 Q. Okay. In those two weeks -- and you may have
13 covered this, I apologize, but I'm not
14 remembering -- did you continue on, I'm going to
15 call it, garden duty? Horticulture duty is what
16 you phrased it. Did you continue on that duty?
17 MR. MACKRAZ: Why don't you remind him about
18 what you testified to.
19 Q. Is that what you talked about, earlier, where you
20 were off for a week?
21 A. Yes, I was off for a week, and then I went out
22 there and did nothing.
23 Q. Okay, we've talked about that. Did you continue
24 lifting weights during those two weeks?
25 A. Not during those two weeks, no.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

---

Page 73

1 Q.  When did you start lifting weights again?
2 A.  I'd say about, approximately, three weeks to a
3    month. I'd go out and try to mess around. I
4    wouldn't really say I was lifting weights because
5    when I lift weights, you lift weight. It was just
6    playing around, kind of.
7 Q.  You're a big guy. When you say playing around,
8    what's playing around, to you, in terms of weights?
9    Because playing around to you might be something
10   completely different.
11 A.  I couldn't do dead lifts or squats. I'd sit on the
12   bench, do curls, shoulder presses, simple things.
13 Q.  Okay. Before you heard this popping sound in your
14   back, when you would go in for shoulder presses,
15   how much would you lift?
16 A.  I could do about 315, 325 on shoulders.
17 Q.  And then you said about three weeks to a month
18   after you had the popping sound. If you went to do
19   a shoulder press then?
20 A.  I'd do about 135 to 185.
21 Q.  Okay. Now is the -- wait, 135 or 185, somewhere in
22   there?
23 A.  Yeah, one of them.
24 Q.  Is the 135 or 185 that you were doing three weeks
25   to a month after, was that what you could do with

---

Page 74

1    no pain?
2 A.  No, I had pain. That's why I'd do so less because
3    you go like that (indicating), and it tightens
4    down.
5 Q.  Were you lifting weights every day again starting
6    at about three weeks after the 7th?
7 A.  I'd go in there and occasionally, not every day,
8    but about four or five times a week, try to
9    stretch. I was mainly doing more walking and
10   pushups and stuff like without weights.
11 Q.  And with that four to five days a week that you
12   were lifting after the three to four weeks after it
13   started, was that consistent with what you had been
14   doing prior?
15 A.  No.
16 Q.  You used shoulder press as an example at 315.
17 A.  Yeah.
18 Q.  Were you doing that four to five times a week?
19 A.  Different. I'd do like a different muscle group
20   every day, just go in and do something.
21 Q.  The back and neck pain that you described since
22   dating back to '04, that was something that -- a
23   pain that you had pretty regularly, as well?
24 A.  Yes.
25 Q.  Okay. If you were asked to describe that pain on a

---

Page 75

1    scale of one to ten -- and I'm talking about on a
2    daily basis. I understand you may have some
3    fluctuations up or down; but, on average, what
4    would that pain rank on a daily basis?
5 A.  Say about five to six.
6 Q.  So since 2004 you were living, basically, on a
7    daily basis, with a five to six pain in what you've
8    said is your upper back and neck area?
9 A.  Yeah.
10 Q.  On which side?
11 A.  It would be my left.
12 Q.  On your left side?
13 A.  Yep.
14 Q.  Would that pain radiate down into your left arm?
15 A.  Yes, it would.
16 Q.  How about over across your back into your right?
17 A.  Maybe not my right arm, but into my right upper
18   back a little bit.
19 Q.  Okay. Would it come down into your left chest, at
20   all?
21 A.  No.
22 Q.  Okay. How far down your back would it go?
23 A.  It'd go down probably like -- probably towards the
24   middle. It starts at the neck and shoots like in
25   between your shoulder blades right here and shoots

---

Page 76

1    down.
2 Q.  Okay. You look to be about 6 to 12 inches down
3    your back.
4 A.  About 12.
5 Q.  Okay. Was it solely on the left side, or would it
6    be across your whole back?
7 A.  No, just the left side, go through the neck down
8    through the shoulder blades and stuff, right in the
9    middle, kind of.
10 Q.  Was that a weightlifting --
11 A.  Yes, it was.
12 Q.  Something you attributed to weightlifting?
13 A.  Yes, it was.
14 Q.  Was that done while you were in prison, as well?
15 A.  Yes, 2004.
16 Q.  You said that you went to the Marion General
17   Hospital ER about a week after being released,
18   right?
19 A.  Yes.
20 Q.  Okay. What made you go to that facility?
21 A.  It was the closest one.
22 Q.  About how far is it from your residence?
23 A.  About 15 minutes.
24 Q.  Okay. Did you drive yourself there?
25 A.  I think my wife drove me till I got my license.

---

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 77

1  Q.  When you went there, what was the reason you went
2  to the hospital?
3  A.  To get my back checked out.
4  Q.  Okay.  Was it something you considered to be an
5  emergency --
6  A.  Yes.
7  Q.  -- situation?
8  A.  Yes.
9  Q.  Okay.  You might have just motioned to your back, I
10  know.  What specifically was bothering you?
11  A.  The lower back and the leg pain was the main thing.
12  Q.  All on the right side?
13  A.  All on the right side.
14  Q.  Okay.
15  A.  I was a candidate for surgery for this one, too, is
16  what my surgeon said; but because this one was so
17  painful, more serious, they took care of this.
18  Q.  This is Dr. Kachmann or somebody else?
19  A.  Yes, Dr. Kachmann.
20  Q.  Now, my understanding is you referred to
21  Dr. Kachmann as a result of your visit to the ER at
22  Marion.
23  A.  No, the ER recommended me to Indiana Health
24  Centers.
25  Q.  Okay.

Page 78

1  A.  Because I went -- I went through the hospital
2  program and applied for the insurance.
3  Q.  Okay.  And that's how you got to Dr. Kachmann?
4  A.  Yes, it was through Ann Michelle Web I got through
5  Dr. Kachmann.
6  Q.  How long, after being at the Marion General
7  Hospital ER, was it that you saw Dr. Kachmann?
8  A.  About ten days --
9  Q.  Okay.
10  A.  -- to two weeks.
11  Q.  Fort Wayne?
12  A.  Yes, sir.
13  Q.  How far from where you were living to Fort Wayne?
14  A.  About 40 minutes.
15  Q.  Okay.  So when you --
16  A.  45.
17  Q.  Sorry.
18  A.  40, 45 minutes.
19  Q.  When you went to see Dr. Kachmann for the first
20  time, do you remember what the date was?
21  A.  No, sir.
22  Q.  But, based on what we've said, it's about a month
23  after being released from prison?
24  A.  Yes.
25  Q.  Okay.  Did you drive yourself to see Dr. Kachmann

Page 79

1  that first visit?
2  A.  No.
3  Q.  I know you're anticipating.  She's going to get mad
4  at us.  I don't care, but she does.
5  Who drove you?
6  A.  My wife.
7  Q.  Okay.  Did you have your license?
8  A.  At that time, yes.
9  Q.  Okay.  Has there been a time where you haven't had
10  your license?
11  A.  No.
12  Q.  Okay.  How many visits or how many times did you
13  see Dr. Kachmann before the actual surgery?
14  A.  The amount for the -- met him for the initial
15  consultation, met him one time after that, then I
16  had the surgery.
17  Q.  At the initial consultation, was your wife there
18  with you?
19  A.  Yes, sir.
20  Q.  In the room?
21  A.  Yes, sir.
22  Q.  Okay.  Anybody else?
23  A.  Just the doctor.
24  Q.  Okay.  You, wife, doctor?
25  A.  Yes, sir.

Page 80

1  Q.  Okay.  How long was the visit?
2  A.  Say about -- about a hour.
3  Q.  Okay.  And did you -- or were you examined or was a
4  history taken by someone other than Dr. Kachmann
5  prior to you seeing him?
6  A.  I think his assistant was named Hilary.
7  Q.  Hilary came in and did what as far as you recall?
8  A.  Just did all the paperwork and whatever.  I don't
9  know what she does.
10  Q.  Did she do any exam?
11  A.  No.
12  Q.  Anything more than weighing you, anything like
13  that?
14  A.  No.
15  Q.  You saw Dr. Kachmann that day?
16  A.  Yes, sir.
17  Q.  What testing did he do on you that day?
18  A.  He tested my reflexes and -- tested my reflexes,
19  had me stand up, do a couple stretches and move,
20  and just went over the MRI.
21  Q.  That was the MRI --
22  A.  From Marion General Hospital.
23  Q.  Okay.  When was that MRI done?
24  A.  Before the -- I want to say -- I don't know --
25  before the consult or the -- before I went and seen

Page 81

1  Dr. Kachmann.
2 Q.  Okay.  Was the MRI done when you went to the ER
3  visit?
4 A.  No, I had seen Ann Michelle Web, and she had to
5  place the order.
6 Q.  For the MRI?
7 A.  Yes, sir.
8 Q.  Did you talk to anybody at Marion General Hospital
9  about what the MRI showed?
10 A.  No.
11 Q.  Okay.  How about anybody besides or before seeing
12  Dr. Kachmann, did you discuss the results of the
13  MRI, at all, with anybody before?
14 A.  No, that's the reason I got the MRI, is because she
15  got me the emergency consultation with Dr. Kachmann
16  and then, when he got the MRI, he made an emergency
17  consultation because it was so serious.
18 Q.  Okay.  And so the day that you first saw
19  Dr. Kachmann you -- he did these tests -- this test
20  or evaluation that you talked about, and you went
21  over the MRI?
22 A.  Yes.
23 Q.  Okay.  What did he tell you about the MRI?
24 A.  He told me that I had the ruptured disc down low,
25  and that's what was causing the pain and the

Page 82

1  weakness; and he told me, because it was so long
2  untreated, that he didn't know what symptoms it
3  would, you know, get rid of, but he was
4  confident -- but I'd be done with the pain shooting
5  down my leg.
6 Q.  When you say that he told you "how long it had gone
7  untreated," was he basing that on --
8 A.  Yes.
9 Q.  -- based on how long you think it happened?
10     MR. MACKRAZ:  Objection, foundation.
11     Go ahead.
12 A.  Yes.
13 Q.  The surgery that you had with Dr. Kachmann, was
14  that planned or scheduled on that day?
15 A.  No, sir.
16 Q.  Okay.  You came back for that second visit?
17 A.  I had to wait till he was available.
18 Q.  Okay.  But so we're clear --
19 A.  No.
20 Q.  We may be misunderstanding each other a little bit.
21  I understand you didn't have the surgery that day;
22  but do you know if it was scheduled that day?
23 A.  I think there was one scheduled a week later, but
24  it was put off because we were waiting for my HIP
25  to go through.  His assistant, Hilary, helped me to

Page 83

1  get it to go through in order to help pay for it.
2 Q.  Okay.  Prior to the HIP -- and you've talked a
3  little bit about that.  Any other insurance
4  coverage or third-party payers that you're aware of
5  that you had?
6 A.  No, sir.
7 Q.  You went back in for a second visit with
8  Dr. Kachmann prior to the surgery; is that right?
9 A.  I believe so, but I'm not a hundred percent sure.
10 Q.  Okay.  Don't guess.  If you don't know, you don't
11  know.  You don't remember one way or the other?
12 A.  Yes.
13 Q.  Okay.  How long after the first visit, then, was it
14  about that you had the surgery with Kachmann?
15 A.  Three weeks; two, three weeks.
16 Q.  After that first visit?
17 A.  Yes.
18 Q.  Okay.  Where was the surgery performed?
19 A.  At Lutheran Hospital.
20 Q.  Between the time that you first went to Marion
21  General in the ER there and the time that you had
22  the surgery at Lutheran Hospital, I know that you
23  saw Dr. Kachmann.  Did you treat any other places,
24  any other hospitals, clinics with any other doctors
25  or nurses?

Page 84

1 A.  Just Marion General and the Indiana Health Centers
2  and there.
3 Q.  Did Dr. Kachmann address, with you, the issue of
4  the urinary incontinence; or did he say that that
5  would be something that would have to be addressed
6  by another specialist?
7 A.  No, he said that -- he said he didn't know if it
8  was because of this or not.
9 Q.  And that means -- so we're clear and the record's
10  clear, are you saying that he wasn't sure if it was
11  due to the July 7th, 2008 incident -- let me
12  finish -- or from something else; is that what
13  you're saying?
14 A.  No, he pretty much -- I don't want to put words in
15  his mouth.
16 Q.  Sure.
17 A.  But he was, you know, pretty much he went on
18  about -- I don't really recall that, you know,
19  really, the addressing the incontinence.  It's not
20  real clear to me.  I don't want to say no exact
21  words if I don't know.
22 Q.  What I want to -- so we have an understanding, is
23  anything that you talked about with him that's what
24  I don't want you to guess as to, what he was
25  thinking.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 85

1  A.  Talked to him about incontinence of the bladder,
2  foot drop, loss of weakness, numbness in the groin,
3  the pain.
4  Q.  The incontinence issue, are those questions that
5  you addressed to him or concerns you had for him
6  versus him coming to you and saying here's this and
7  this and this about incontinence?
8  A.  No, I told him my -- the issues that I was having.
9  He -- he's not really a talkative person, you know,
10 so it wasn't real to the point.
11 Q.  Okay.
12 A.  I mean, it was to the point, you know.
13 Q.  Sure.  So you had an understanding, at least, that
14 the incontinence issue may or may not be related to
15 the July 2008 incident and Dr. Kachmann may or may
16 not have been able to address that through the
17 surgical procedure?
18      MR. MACKRAZ:  Objection; form, foundation.
19      Go ahead if you can.
20 A.  Only thing Kachmann told me that he could be
21 certain of was that he could get rid of the pain
22 shooting down my leg.
23 Q.  And that was because of the type of the procedure
24 he was performing?
25 A.  Yes, and then everything else would have to be

Page 86

1  time; and the longer you go without treatment, the
2  more permanent damages I will have.  That's what he
3  told me.
4  Q.  Has Dr. Kachmann told you or diagnosed you with
5  having foot drop; or is that something that you
6  feel a weakness and have and that's how you
7  describe it to people?
8      MR. MACKRAZ:  Objection, foundation.
9      Go ahead.
10 Q.  Well, what I'm asking is:  Has Dr. Kachmann ever
11 told you, Mr. Sildack, you have --
12 A.  Yeah, I believe he has on his -- he talks into a
13 thing after every visit.
14 Q.  You mean dictation?
15 A.  Yeah, dictation.
16 Q.  Okay.  Has Dr. Kachmann, as far as you remember,
17 referred you to any other caregivers, any other
18 specialists?
19 A.  No.
20 Q.  When's the last time you saw him?
21 A.  It was a while ago.  I'm not for sure of the date.
22 Q.  How many times, after the surgery in April of '11,
23 did you see Dr. Kachmann?
24 A.  I want to say once or twice.
25 Q.  Okay.

Page 87

1  A.  I'd go see Hilary, his assistant.
2  Q.  Okay.  How long were you in the hospital after the
3  surgery?
4  A.  I went home that day.
5  Q.  It was outpatient?
6  A.  Yes.
7  Q.  Okay.  Did you follow up with Dr. Kachmann four,
8  five days or maybe a week later?
9  A.  No, we followed up kind of regularly for like three
10 months after.
11 Q.  Did there come a time where Dr. Kachmann said to
12 you, "I don't need you to keep following up with
13 me"?
14 A.  Looked like I was getting better, yes.
15 Q.  And you think that was several months after the
16 surgery?
17 A.  No, it was about, I want to say, three to four
18 months after.
19 Q.  Okay.
20 A.  Said I could, you know, that --
21 Q.  Dr. Kachmann ever told you that you would need
22 additional or future surgeries?  Did he?
23 A.  No, just on that -- this up here, he did.
24 Q.  He thought that you might be a candidate for
25 surgery up on your upper back?

Page 88

1  A.  He said that I was a candidate.
2      MR. MACKRAZ:  Let him finish.
3  Q.  Just let me finish.  That surgery hasn't been
4  performed?
5  A.  No, sir.
6  Q.  Okay.  And you attribute that to this 2004
7  weightlifting incident, correct?
8  A.  Yes, sir.
9  Q.  Okay.  Besides Dr. Kachmann, have you seen any
10 other specialists -- and I know we talked about
11 before you saw Kachmann, but how about since?
12 A.  Yes, I've -- I've seen Dr. Kershner.
13 Q.  And what do you see or what did you see
14 Dr. Kershner for?
15 A.  About possible physical therapy down here and long
16 term physical therapy because he was local, and it
17 hurt to drive a long distance; and he was local.
18 So, instead of going to Fort Wayne, to have
19 follow-up care done by Dr. Kershner.
20 Q.  On those follow-up visits with Dr. Kachmann -- and
21 I know you're not aware of exactly how many there
22 were -- would that be something that you drove
23 yourself to?
24 A.  No, my wife drove me.
25 Q.  To all those visits?

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 89

1  A.  Yes.
2  Q.  And then Dr. Kershner is located out of where?
3  A.  Marion, Indiana.
4  Q.  At Marion General?
5  A.  No, he has his own orthopaedics, I believe it is.
6  Q.  Is that what his specialty is --
7  A.  Yes.
8  Q.  -- orthopaedics?
9      How many times have you seen Dr. Kershner?
10  Sorry.
11  A.  I seen him once, maybe twice.
12  Q.  You've seen him that much, that many times?
13  A.  Yeah.
14  Q.  Do you have any appointments scheduled with him,
15  currently?
16  A.  No, sir.
17  Q.  Okay.  When is -- when's the last time you saw
18  Dr. Kershner?
19  A.  I want to say close to a year.
20  Q.  A year ago?  You have to say.
21  A.  Yes, yes.
22  Q.  You were seeing Dr. Kershner, I think you said,
23  about getting therapy services down in this area of
24  the state, in the Marion area, correct?
25  A.  Yes.

Page 90

1  Q.  Okay.  Did you obtain physical therapy?
2  A.  No, I did not.
3  Q.  Okay.  Why was that?
4  A.  'Cause I wasn't financially able.  I lost my
5  insurance.  I couldn't -- just couldn't afford it.
6  Q.  It wasn't something that was available through this
7  HIP?
8  A.  Yes.
9  Q.  It was not?
10  A.  Was not available.
11  Q.  Did you have any physical therapy sessions, at all,
12  after your surgery?
13  A.  Yes.
14  Q.  Where were those?
15  A.  It was with Hilary at Dr. Kachmann's office.
16  Q.  Okay.  Do you know how many sessions that was?
17  A.  No, sir.
18  Q.  Okay.  Did you have any physical therapy sessions
19  down here with either Dr. Kershner or someone out
20  of his office?
21  A.  No, sir.
22  Q.  Okay.  Did Dr. Kershner give you any input or
23  advice as to what was going on with you, what you
24  could expect as a prognosis?
25  A.  He just said that all I could do is continue to do

Page 91

1      exercises and only time would tell if I would ever
2      recover from the damages that I had.
3  Q.  Okay.  How about -- the same question as to
4      Dr. Kachmann.  Did he give you any sort of
5      prognosis?
6  A.  No.
7  Q.  He told you you wouldn't need any additional
8      service.  Did he give you any prognosis?
9  A.  No.
10  Q.  How about Hilary?
11  A.  No.
12  Q.  Did Dr. Kershner offer any opinion to you or state
13      to you that one or more of the people that you had
14      seen in the past had done anything wrong, at all?
15  A.  Yes, he had.
16  Q.  What did he say?
17  A.  Said it was deliberate indifference.
18  Q.  Dr. Kershner used those words?
19  A.  Yes.
20  Q.  When was that?
21  A.  Say about a week after our visit.
22  Q.  A week after your visit?
23  A.  Yes.
24  Q.  Explain that to me.  What do you mean a week after?
25      Was it at a second visit?

Page 92

1  A.  Well, I went and seen him, and he went over the
2      MRIs; and he did his own physical on me, and then
3      he said, once they seen the MRI at Newberry, that
4      they should have done surgery, just like Dr. LaHaye
5      said they should.
6  Q.  Dr. LaHaye said that surgery should be done?
7  A.  Yes.
8  Q.  Dr. Kershner, though, used the specific words
9      "deliberate indifference"?
10  A.  Yes.
11  Q.  Did you ask him what that meant?
12  A.  No.
13  Q.  Did you know what it meant?
14  A.  I still don't know what it means all the way.
15  Q.  Have you discussed deliberate indifference with any
16      other caregiver that you've seen?
17  A.  No.
18  Q.  That's the extent of your conversation about
19      deliberate indifference with Dr. Kershner?
20  A.  Yes.  There might have been some discussion with
21      Dr. Kachmann.
22  Q.  About deliberate indifference?
23  A.  About medical negligence.
24  Q.  Okay.  Do you have an understanding that this
25      lawsuit -- strike that.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

---

Page 93

1   Is the purpose or the reason that you have
2   brought that lawsuit because you feel like there
3   was negligence with regard to your medical care?
4       MR. MACKRAZ: Objection to form and
5   foundation. You're asking legal opinions from him.
6   Q. Well, I'm asking you why you brought the lawsuit.
7   What I'm interested in is: Do you believe that a
8   doctor or a nurse or other medical care provider
9   did something that was wrong relative to your care
10  and treatment?
11  A. Yes.
12  Q. Okay. And is it your belief that, because
13  something was done wrong, that caused you to have
14  some problems that are the problems that you've
15  described?
16  A. Yes, permanent ones.
17  Q. Is that your understanding as to why you brought a
18  lawsuit?
19  A. Yes.
20  Q. And is that your understanding as to what the basis
21  of the lawsuit would be?
22  A. Yes.
23  Q. Okay.
24  A. And that way it doesn't happen to anybody else
25  that's in my position.

---

Page 94

1   Q. Okay. You see commercials on TV about attorneys
2   advertising, maybe on the radio even, for medical
3   malpractice actions? Yes?
4   A. Yes.
5   Q. Okay. Is that what you believe -- or the intention
6   of this lawsuit is, is a medical malpractice-type
7   case as far as you understand it?
8       MR. MACKRAZ: Objection; form, foundation.
9   A. No, I believe it's deliberate indifference for the
10  simple fact they knew something was wrong with me,
11  they knew I was going to have permanent damage,
12  chose not to do anything even after listening to
13  your client.
14  Q. You don't believe Dr. LaHaye was deliberately
15  indifferent?
16      MR. MACKRAZ: Objection; form, foundation.
17  A. I believe Dr. LaHaye, after him seeing me, could
18  have had the Department of Corrections fix me
19  properly.
20  Q. Have you seen Dr. LaHaye's medical records, at all?
21  A. No.
22  Q. If Dr. LaHaye made recommendations for surgery or
23  made recommendations like we've talked about and --
24  I think you've indicated -- for steroid injections,
25  do you have any problem with that?

---

Page 95

1   A. No, I think they should have did it. I like
2   Dr. LaHaye, wish they would have listened to him,
3   which Dr. LaHaye said that was like the last resort
4   for conservative treatment, was steroid injections.
5   Q. And he discussed that in some detail with you,
6   correct?
7   A. Yes, and that would be the last thing, you know.
8   He was going to give them to me. If that didn't
9   work, he was going to schedule -- told me I was
10  going to back to Marquette for surgery for
11  discectomy or possibly a fusion.
12  Q. Okay. Did you see Dr. LaHaye in Sault Ste Marie?
13  A. Yeah.
14  Q. You had never seen Dr. LaHaye prior to that? You
15  had saw -- you saw him one time, correct?
16  A. That's -- that's it. Yes, sir.
17  Q. And you had never seen him before?
18  A. No, sir.
19  Q. You never saw him since?
20  A. No, sir.
21  Q. Okay. You see him at a clinic in Sault Ste Marie?
22  A. It might have been. I'm not really aware. It was
23  right across from the hospital.
24  Q. Okay. You had never heard of Dr. LaHaye before
25  seeing him?

---

Page 96

1   A. No, sir.
2   Q. Okay. You've had no follow up, since your release
3   from prison, with Dr. LaHaye?
4   A. No, sir.
5   Q. Any follow up with Dr. LaHaye as it pertains to
6   your care and treatment with Dr. Kachmann? Did you
7   make any phone calls to Dr. LaHaye's office or
8   trying to get in touch with Dr. LaHaye when you
9   went to go see Dr. Kachmann?
10  A. I believe my wife might have to --
11  Q. Okay.
12  A. Yeah.
13  Q. When you saw Dr. LaHaye, do you remember when it
14  was?
15  A. Want to say sometime in, say, '09.
16  Q. September '09 sound about right?
17  A. Yes, yep.
18  Q. You remember the visit, I can tell.
19  A. Yes, I remember the visit. I just don't know the
20  dates and names and stuff like that.
21  Q. Sure. Can you describe Dr. LaHaye as we sit here?
22  A. Probably little taller than me, maybe my height,
23  slender.
24  Q. Okay.
25  A. Brown hair.

---

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 97

1  Q.  Okay.  Was it just the two of you at the
2  appointment?
3  A.  No, there was also two COs escorting me.
4  Q.  Did they go in the room with you?
5  A.  Yes.
6  Q.  You were at which facility at the time?
7  A.  Newberry.
8  Q.  Okay.  You didn't have any indication or
9  understanding that Dr. LaHaye was affiliated with
10  any of the facilities that you were at, correct?
11  A.  I thought he was because that's who sent me there.
12  Q.  You didn't see him at Newberry, correct?
13  A.  No, sir.
14  Q.  Okay.  You saw him at a off-site --
15  A.  Yes.
16  Q.  -- clinic?
17  A.  Yes, sir.
18  Q.  Okay.  Do you remember, when you went to see
19  Dr. LaHaye at that one visit, what the reason for
20  your visit was?
21  A.  It was after finding out that the MRI -- it was to
22  get his opinion.
23  Q.  Do you remember who referred you to see Dr. LaHaye?
24  A.  I believe Dr. Larry Sell, maybe.
25  Q.  Okay.  After seeing Dr. LaHaye, did you have any

Page 98

1  conversation with Dr. Sell about your visit with
2  Dr. LaHaye?
3  A.  Well, yes.
4  Q.  What was the substance of those conversations?
5  A.  He said it -- he was going to put in for me to get
6  surgery.
7  Q.  Dr. Sell?
8  A.  Yes.
9  Q.  Said that about Dr. LaHaye?
10  A.  No, that he agreed with Dr. LaHaye and was going to
11  recommend his treatment plan.
12  Q.  You had an understanding, after seeing Dr. LaHaye,
13  that he had a treatment plan in his mind for you?
14  A.  Yes.
15  Q.  Okay.  You talked about the MRI and that was the
16  reason you saw Dr. LaHaye.
17  A.  Yes.
18  Q.  Did you have an understanding as to what kind of
19  physician he was?
20  A.  A neurosurgeon.
21  Q.  Okay.  When you went and saw him, do you -- and I
22  don't want you to guess.  If you remember, you do.
23  If you don't, you don't; but do you remember what
24  you told him your problems were physically?
25  A.  Told him about the weakness in the leg, of the pain

Page 99

1  shooting down the leg, about not having strength in
2  there.  I told him about my neck up here, told him
3  about my arm.  He did the test on my arm, test on
4  my foot.  He tested my reflexes, as well.
5  Q.  Okay.
6  A.  I think he mentioned -- he mentioned about in the
7  X-ray that he could tell something was wrong.
8  Q.  Do you remember what medications you were on, if
9  any, at the time?
10  A.  No, sir.
11  Q.  Okay.  Do you remember what the results -- or
12  Dr. LaHaye telling you what he found when he did
13  those tests?  You talked about the arm, leg, foot.
14  Do you remember what he told you?
15  A.  No.  He told me that, most likely, I was going to
16  need a discectomy and, possibly, a fusion if --
17  well, he said he doesn't like to do fusions because
18  you can't bend, you know.  He's going to tell me,
19  if I had to have a fusion, it was going to be that,
20  and he was going to recommend steroid injections
21  for last resort for conservative treatment; and if
22  that didn't work, that he'd schedule me for
23  surgery.
24  Q.  He went into some detail regarding his thoughts on
25  your condition, correct?

Page 100

1  A.  Yes, sir.
2  Q.  He explained the pros and cons of the treatment
3  that he was suggesting to you, correct?
4  A.  Yes.
5  Q.  What I mean is he -- what you just described, he
6  talked about different types of surgery with you,
7  and one might be good.  The other one might be
8  better, or one might leave you with pain?
9  A.  No, he said I was going to need a discectomy no
10  matter what and, possibly, a fusion.
11  Q.  Do you remember him talking to you about things he
12  wouldn't recommend because it might leave you with
13  ongoing or lingering pain?
14  A.  No.
15  Q.  Okay.  Did he talk to you about the risks of some
16  of the procedures?
17  A.  No.
18  Q.  Okay.  Talked about the steroid injections.  Did he
19  explain what that would involve and why he would
20  go -- I think you've used the words "conservative
21  therapy."
22  A.  Yes.
23  Q.  Did you understand what that meant?
24  A.  Yes, to a certain degree.  Just regular treatment
25  as far as I understand.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 101

1 Q. Did you understand that to be that he might
2 undertake that route or might recommend that you
3 undertake that route prior to surgical
4 intervention?
5 A. No, he told me steroid injections weren't going to
6 work.
7 Q. Okay. Is that based upon --
8 A. His opinion.
9 Q. Did he recommend that you have any additional
10 testing?
11 A. No.
12 Q. Do you remember whether or not he recommended that
13 you should have an additional MRI?
14 A. For the upper part because he couldn't tell what
15 was wrong with the upper because he never seen the
16 MRI for my upper.
17 Q. You remember talking about that with him?
18 A. Yeah.
19 Q. So he addressed both the 2004 complaint and the
20 2007 -- or what you alleged to have resulted from
21 the 2007 incident?
22 A. Yeah. What did happen, yes.
23 Q. Oh, sorry, 2008. I was thinking July 7th.
24    When you left Dr. LaHaye's office on
25 September 9th -- or that clinic location where you

Page 102

1 saw him, were you pleased with what you had heard
2 as far as a treatment plan?
3 A. Yes, I was.
4 Q. Okay. Did you have an understanding of what that
5 treatment plan was?
6 A. Yes.
7 Q. Okay. You were happy with the examination he
8 performed upon you that day?
9 A. Yes.
10 Q. Were you happy with the evaluations he performed
11 upon you that day?
12 A. Yes.
13 Q. Yes?
14 A. Yes.
15 Q. Okay. Did he listen to your symptoms when you were
16 telling him about what had gone on in the past?
17    MR. MACKRAZ: Objection, foundation.
18    Go ahead and answer if you can.
19 A. Yes.
20 Q. Was he writing things down as you talked to him?
21 A. Yes, he, basically, was on a computer showing me
22 the MRI pointing out and showing me where the black
23 part meant that was a bulging disc.
24 Q. Do you remember how long your visit with him was?
25 A. I'd say about a half hour.

Page 103

1 Q. Okay. I may have asked you this a little bit ago;
2 but have you ever seen any of the records from your
3 visit with Dr. LaHaye?
4 A. No, I don't believe he would have released 'em.
5 Q. Do you remember asking him?
6 A. My wife did.
7 Q. Okay.
8 A. She was my power of attorney at the time; but
9 because it was with the Department of Corrections,
10 she had to go through them or something.
11 Q. Did you have a nickname? You talked about Crazy
12 and someone else.
13    MR. MACKRAZ: Redrum.
14 A. Yeah.
15 Q. Did you have a nickname?
16 A. There was a couple of them kind of. Some people
17 called me Big Jack. Other people called me -- I
18 don't know, Jack Town because I was from Jackson.
19 That was about it.
20 Q. Those two?
21 A. Yep.
22 Q. Were you typically called those names, or did
23 people go with Trenton?
24 A. Trent.
25 Q. You were called by your first name rather than a

Page 104

1 nickname?
2 A. People that didn't know me, called me Big Jack or
3 whatever; but I didn't associate with a lot of
4 people.
5 Q. Okay. Have you ever been diagnosed with any STDs?
6 A. No, sir.
7 Q. Have you been to a urologist, at all, for treatment
8 of the erectile dysfunction or urinary
9 incontinence?
10 A. No, sir.
11 Q. Have you discussed that with either Dr. Kachmann or
12 Kershner that, maybe, they would recommend you
13 seeing a urologist?
14 A. No, sir.
15 Q. Okay. In your Answers to Interrogatories that you
16 provided -- or counsel provided, I guess,
17 recently -- I think you signed off on them. Do you
18 remember signing --
19 A. Yes.
20 Q. -- on July 30th, 2012, this year?
21 A. Yes.
22 Q. In answer to one of the questions, you indicate
23 that Dr. LaHaye refused to treat you. Would you
24 disagree with that?
25 A. That he refused to treat me?

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 105

1 Q. He refused treatment. Would you disagree with that
2 statement based on what you've told me here today?
3 **A. No, he didn't refuse. I believe that he -- I don't**
4 **believe he had the choice to treat me.**
5 Q. What do you mean by that?
6 **A. That -- well, if he wasn't with the Department of**
7 **Corrections, then he didn't -- you know, it wasn't**
8 **up to him. It was up to the Department of**
9 **Corrections.**
10 Q. We'll go -- I'll go back.
11    You said earlier you were happy with
12 Dr. LaHaye, correct?
13 **A. Yes.**
14 Q. No problem with him?
15 **A. No, sir.**
16    **MR. EWLES: That's all the questions I have.**
17 Thank you very much.
18    **MR. MACKRAZ: Are you long, short, medium?**
19    **MR. THOM: Need a break?**
20    **THE COURT REPORTER: I need a break.**
21    (Whereupon, a recess was taken from 3:18 p.m.
22 to 3:26 p.m.)
23    CROSS-EXAMINATION OF TRENTON SILDACK
24 **BY MR. THOM:**
25 Q. My name is Kevin Thom. I represent about 14

Page 106

1 defendants in this case, and I'd like to ask you
2 some questions.
3    First of all, when you got married to Melissa
4 Jean Sildack, was that on July 7th, 2010?
5 **A. Yes, sir.**
6 Q. Were you married in the prison in Jackson Michigan
7 at Cooper Street Correctional Facility?
8 **A. Yes, sir.**
9 Q. So you had been in prison for about three, three
10 and a half years at the time you got married,
11 right?
12 **A. Yes, sir.**
13 Q. So you had not been having any conjugal visits with
14 her or having sexual relations with her prior to
15 your marriage for about three and a half years; is
16 that right?
17 **A. Yes, sir.**
18 Q. Now, your four step-children, did you adopt any of
19 those?
20 **A. No, sir.**
21 Q. So, really, their biological fathers, are they
22 paying child support to your wife?
23 **A. I believe so.**
24 Q. Okay. And, now, your wife, you said, she's on
25 disability. What kind of disability are we talking

Page 107

1 about here, Social Security Disability or some
2 other type?
3 **A. I'm not for sure. I don't know.**
4 Q. Okay. Have you ever seen the checks, do they come
5 in the mail?
6 **A. I think they're transferred to the bank. I'm not**
7 **for sure.**
8 Q. EFT, electronic funds transfer, to a bank account?
9 **A. Most likely.**
10 Q. All right. And have you ever filed a Worker's
11 Compensation claim in Michigan or Indiana?
12 **A. No.**
13 Q. Have you ever filed for unemployment in Michigan or
14 Indiana?
15 **A. No.**
16 Q. Do you have any other lawsuits pending right now?
17 **A. No, sir.**
18 Q. Have you filed any other lawsuits before for any
19 personal injuries?
20 **A. No, sir.**
21 Q. Are you on Social Security Disability?
22 **A. No, sir.**
23 Q. Have you ever applied for Social Security
24 Disability?
25 **A. No, sir.**

Page 108

1 Q. Do you have any military service?
2 **A. No, sir.**
3 Q. All right. Now, when you were in prison, did you
4 have a prisoner account?
5 **A. Yes, sir.**
6 Q. And could you tell us what is a prisoner account?
7 **A. It's where, if somebody sends you money, people --**
8 **somebody sends money, it goes into your account.**
9 Q. So it's like a bank account for prisoners?
10 **A. Yes, sir.**
11 Q. And can you receive money from relatives or
12 friends?
13 **A. Yes.**
14 Q. They send it to you, put it in your account?
15 **A. Yes.**
16 Q. What can you do with that money in your account?
17 **A. You can buy your hygiene items and food items off**
18 **the prisoner store.**
19 Q. Did each of the prisons where you resided when you
20 were incarcerated have a prisoner store?
21 **A. Yes, sir.**
22 Q. Did you, routinely, on a regular basis, purchase
23 items from the prisoner stores?
24 **A. Yes, sir.**
25 Q. Did you also have a prisoner job for the entire

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 109

1   time you were at Lakeland Correctional Facility?
2   A.  No, sir.
3   Q.  Okay.  When did you start your prisoner job at
4   Lakeland?
5   A.  I want to say in May -- yeah, around May, end of
6   May.
7   Q.  May what year, sir?
8   A.  2008.
9   Q.  All right.  And you continued to work at that
10  prison job -- in the garden, was it, you said?  Was
11  it, actually, you worked outside on the yard; is
12  that right?
13  A.  Yes, sir.
14  Q.  And did you do such things as mow lawns and sweep
15  sidewalks, shovel show in the wintertime, that sort
16  of thing?
17  A.  No, sir.
18  Q.  What did you do?  What were your job duties?
19  A.  My job duties was to make -- make a garden,
20  gardening.
21  Q.  All right.  Did you plant in the spring, plant the
22  seeds and pull weeds and harvest vegetables --
23  A.  Yes, sir.
24  Q.  -- in the summer?  Is that what you did?
25  A.  Yes, sir.

Page 110

1   Q.  Did they have any animals, or this was just
2   vegetables and plants?
3   A.  There was animals at the facility.  There was
4   greyhound dogs, and then also they brought in some
5   mixed breeds.
6   Q.  Did you have to work with those animals or not?
7   A.  No, sir.
8   Q.  All right.  Now, if you spent money at the prisoner
9   store, how did you keep track of what was -- how
10  much you had in your prisoner account?
11  A.  They gave you a account balance once a month or
12  when you asked for it.
13  Q.  When you purchased items at the prisoner store, did
14  you have to fill out a store order form --
15  A.  Yes, sir.
16  Q.  -- and tell the store what items you wanted to
17  purchase?
18  A.  Yes, sir.
19  Q.  And then how did it get filled?
20  A.  Inmates would fill.
21  Q.  Okay.  And then would you go through and check on
22  your store order form, make sure you got everything
23  you ordered?
24  A.  Yes, sir.
25  Q.  You inventoried your stuff, make sure you got what

Page 111

1   you paid for?
2   A.  Yes, sir.
3   Q.  Then you'd take it back to your cell?
4   A.  Yes, sir.
5   Q.  And how often do you order things from the store?
6   A.  Sometimes once a week.  Then they went to every
7   other week, so once every two weeks.
8   Q.  And what could you purchase at the prisoner stores?
9   A.  Food, hygiene, cosmetics, envelopes, stamps,
10  writing utensils.
11  Q.  What else?
12  A.  Whatever's on the store list.
13  Q.  Tobacco products?
14  A.  At a time, yeah.
15  Q.  Until they went tobacco free in February of 2009;
16  is that right?
17  A.  Yes, sir.
18  Q.  So up to that point you could buy tobacco.  Did you
19  buy tobacco up to February 2009?
20  A.  Yes, sir.
21  Q.  And did you buy things for your cold or your sinus
22  problem?
23  A.  Yes, sir.
24  Q.  Do you have, kind of, allergies?
25  A.  Yes, sir.

Page 112

1   Q.  What did you buy at the prisoner store for that?
2   A.  Chlora-something.  I don't know.  Whatever is.
3   Q.  Stuff for your allergies?
4   A.  Yes, sir.
5   Q.  Keep your nose from running, whatever, keep you
6   from sneezing; is that about right?
7   A.  Yes, sir.
8   Q.  Did they have aspirin and over-the-counter
9   medications in the prisoner store?
10  A.  Yes, sir.
11  Q.  Okay.  Did you ever buy any aspirin or
12  over-the-counter medications besides your sinus or
13  allergy medication?
14  A.  Yes, sir.
15  Q.  Okay.  How many times?
16  A.  I don't recall.
17  Q.  Are you aware that the prison had a grievance
18  system?
19  A.  Yes, sir.
20  Q.  And you did file a few prisoner grievances while
21  you were a prisoner between 2007 and when you got
22  paroled in 2011; is that right?
23  A.  Yes, sir.
24  Q.  Did you ever file a prisoner grievance while you
25  were at Lakeland Correctional facility?

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 113

1  A.  No, sir.
2  Q.  Did you ever file a grievance while you were at
3      Cooper Street Correctional Facility for 38 days
4      from December 15, 2008 to January 22nd, 2009?
5  A.  I don't believe so, no.
6  Q.  Did you file a prisoner grievance while you were at
7      the Cotton Correctional Facility?
8  A.  No.
9  Q.  Called J.C.S. after you left Cooper Street.
10 A.  No, sir.
11 Q.  When did you first file a grievance about any issue
12     that you have in this lawsuit?
13 A.  Once I realized I wasn't going to receive any
14     treatment and all my options were totally done
15     with.
16 Q.  How does the prison grievance system work?  Would
17     you tell us briefly how that works in your own
18     words.
19 A.  Step 1, you write your grievance.  It's sent to a
20     grievance coordinator.  Then they call you out.
21     You go talk to a grievance coordinator.  If it
22     doesn't work, from there, that -- that's Step 2.
23     Then Step 3, it goes to Lansing.
24 Q.  There's a three-step process, right?
25 A.  Yes, sir.

Page 114

1  Q.  Step 1 is you fill out a grievance form, sign it,
2      submit it to the grievance coordinator at the local
3      facility where you're incarcerated, correct?
4  A.  Yes, sir.
5  Q.  And then, if you don't like the Step 1 response,
6      you appeal to Step 2, which is to who?
7  A.  Step 2 is, I want to say, the -- I want to say the
8      warden or the grievance coordinator.
9  Q.  Okay.  Then Step 3, if you don't like the warden or
10     the Step 2 response, goes to Lansing; and then
11     Step 3, the Lansing central office responds to it,
12     right?
13 A.  Yes, sir.
14 Q.  All right.  And grievance forms were available to
15     you at each of the prisons where you were
16     incarcerated.  Were they?
17 A.  Yes, sir.
18 Q.  You never had a problem getting a grievance form if
19     you wanted one, did you?
20 A.  No, sir.
21 Q.  How did you get the grievance forms; what did you
22     have to do to get them?
23 A.  Ask the unit officer.
24 Q.  Okay.  So the unit officers in your housing unit
25     would have them at the unit station?

Page 115

1  A.  Yes, sir.
2  Q.  Did each prison where you were incarcerated have a
3      healthcare clinic?
4  A.  Yes, sir.
5  Q.  Could you access the clinic by submitting a
6      healthcare kite?
7      MR. MACKRAZ: Objection, form and foundation.
8  A.  Yes, sir.
9  Q.  What is a kite?
10 A.  Kite is request to seek medical attention.
11 Q.  Basically, kite is prison jargon for a written
12     request; is that right?  If you submit a written
13     request for healthcare, it's called a healthcare
14     kite; is that right?
15 A.  Yes, sir.
16 Q.  Right?
17 A.  Yes.
18 Q.  Were all your healthcare kites responded to?
19 A.  Yes, sir.
20 Q.  Were you ever prevented, by anyone, from submitting
21     a healthcare kite?
22 A.  No, sir.
23 Q.  How would you submit a healthcare kite to get
24     medical attention?
25 A.  You would fill it out; and, in the chow hall,

Page 116

1      wherever there was a box, you would slide the kite
2      in a box.
3  Q.  Kite box, kind of like a mailbox for healthcare
4      kites, right?
5  A.  Yes, sir.
6  Q.  And it was in the chow hall?
7  A.  No.
8  Q.  Is that true for every prison you were incarcerated
9      in?
10 A.  Not every one, no.
11 Q.  Okay.  Where was the kite box at Lakeland?
12 A.  At Lakeland, I believe, it was in the chow hall.
13 Q.  Where was the kite box when you were at Cooper
14     Street?
15 A.  Cooper Street was -- might be in the unit and in
16     the chow hall.
17 Q.  Okay.  Some places --
18 A.  Going to the chow hall, not necessarily in it.
19     Some would be in it.  Some would be right outside.
20 Q.  Right by the door when you go in, so you can drop
21     them off when you're going in, right?
22 A.  Yes, sir.
23 Q.  So the kite boxes were at convenient locations for
24     prisoners no matter which prison you were at; is
25     that right?

Page 117

1  A.  Yes, sir.
2  Q.  And you had to go to the chow hall three times a
3     day when you were in each prison, right --
4  A.  Yes, sir.
5  Q.  -- if you wanted to eat?
6  A.  Yes, sir.
7  Q.  You were never on administrative segregation where
8     they had to serve you your meals in a cell, were
9     you?
10 A.  No.
11 Q.  So you went to the chow hall three times a day, at
12    every prison you were at, from your housing unit to
13    the chow hall, right?
14 A.  Yes, sir.
15 Q.  And you walked back and forth?
16 A.  Yes, sir.
17 Q.  How long would it take to get a response to one of
18    your healthcare kites when you submitted one?
19 A.  Anywhere from a couple days, to couple weeks, to
20    never.
21 Q.  Are you familiar with the State of Michigan
22    licensing procedures for registered nurses?
23 A.  No, sir.
24 Q.  Are you familiar with the laws that regulate and
25    place restrictions on licenses that registered

Page 118

1     nurses have?
2  A.  No, sir.
3  Q.  Do you know what a registered nurse can and cannot
4     do under her registered nursing license in the
5     State of Michigan?
6  A.  No, sir.
7  Q.  What was your weight when you came to prison in
8     2007?
9  A.  Probably 255, 265, not for sure.
10 Q.  What do you weigh now?
11 A.  About 280, 290.
12 Q.  So it hasn't fluctuated too much, about 15 pounds,
13    from what you weighed in 2008 when you got hurt --
14    or allege you got hurt?
15 A.  I think I was 255, 265.
16 Q.  Okay.  So about the same as when you got in the
17    prison?
18 A.  Yep.
19 Q.  Did you know any of the defendants before you came
20    to prison in 2007?
21 A.  No, sir.
22 Q.  Have you had any interaction with any defendants
23    since you've left prison and were paroled on
24    January 25th, 2011?
25 A.  No, sir.

Page 119

1  Q.  Do you know who Carol Howes is?
2  A.  She's the deputy -- she was the warden at Lakeland
3     Correctional Facility.
4  Q.  When did you first meet her, if you did?
5  A.  Never met her.
6  Q.  So you don't even know what she looks like?
7  A.  Yes, I do.
8  Q.  Okay.  How do you know what she looks like if
9     you've never met her?
10 A.  She spoke to a group of us.  I've never had a
11    conversation one-on-one with her.
12 Q.  Okay.  So you were in some kind of meeting or
13    conference room where she spoke to some prisoners?
14 A.  I think it was outside.
15 Q.  So you've never talked to her on the telephone,
16    Carol Howes; is that correct?
17 A.  No, sir.
18 Q.  You don't have any written communications to or
19    from her, do you?
20 A.  No.
21 Q.  Do any of your relatives have any written
22    communication to or from Carol Howes?
23     MR. MACKRAZ: Objection, foundation.
24 A.  Possibly, I don't know.
25 Q.  Do you know if any of your relatives wrote to her

Page 120

1     and got a response from her?
2  A.  I believe some tried to write to her, yes.
3  Q.  Who?
4  A.  My wife.
5  Q.  So you've never had a personal conversation
6     face-to-face with Carol Howes; is that correct?
7  A.  Not to my knowledge.
8  Q.  Did any of your relatives talk to Carol Howes on
9     the telephone that they've told you about?
10 A.  I don't believe so, no.  Don't know.
11 Q.  You've never filed a prisoner grievance against
12    Carol Howes, have you?
13 A.  I might have.
14 Q.  Well, she was the warden at Lakeland Correctional
15    Facility.  You already told us you didn't file a
16    grievance while you were at Lakeland.
17 A.  No, sir.
18 Q.  So, do you still think that you might have filed a
19    grievance against Carol Howes, yes or no?
20 A.  On the original one I might have, yes.
21 Q.  Who was Donna Croston, do you know?
22 A.  No, sir.
23 Q.  Have you ever met Donna Croston to your knowledge?
24 A.  Not to my knowledge.
25 Q.  Do you know what prison she works at?

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 121

1  A. No, sir.
2  Q. Do you claim that you've ever been treated by
3     Donna Croston?
4  A. I don't know.
5  Q. So, if you had been treated by Donna Croston, you
6     don't remember it?
7  A. No, sir.
8  Q. Do you have anything in writing from Donna Croston?
9  A. I don't know.
10 Q. Did you ever write to her to your knowledge?
11 A. Not to my knowledge, no.
12 Q. Have you ever filed a grievance against
13    Donna Croston?
14 A. I don't know.
15 Q. Do you know who Valerie Bradshaw is?
16 A. Don't know.
17 Q. Do you know if you've ever met Valerie Bradshaw?
18 A. The name sounds familiar, and I believe I have.
19    I'm just not aware.
20 Q. All right. What date did you arrive at Lakeland
21    Correctional Facility?
22 A. I don't know.
23 Q. Was it December 5th, 2007?
24 A. Somewhere close to there, yes.
25 Q. And how long were you at Lakeland, about a year?

Page 122

1  A. Yes, sir.
2  Q. And you left there on December 15th, 2008; is that
3     correct?
4  A. Yes, sir.
5  Q. And where did you go after you left Lakeland?
6  A. To J.C.S.
7  Q. So you arrived at J.C.S. or Cooper Street
8     Correctional Facility in Jackson on December 15,
9     2008; is that right?
10 A. Yes, sir.
11 Q. When did you leave Jackson or Cooper Street
12    Correctional Facility?
13 A. About two or three weeks to a month later when I
14    went to the Cotton Facility which is right across
15    the street, Jackson Cotton Facility.
16 Q. You don't disagree with the Department of
17    Corrections records which show you left the Cooper
18    Street Correctional Facility on January 22nd, 2009,
19    do you?
20 A. No, sir.
21 Q. And you were at Cotton Correctional Facility from
22    January 22nd, 2009 to March 23rd, 2009; is that
23    accurate?
24 A. Yes, sir.
25 Q. So you were only at the Cooper Street Correctional

Page 123

1     Facility about 38 days, December 15th, 2008, to
2     January 22nd, 2009; is that correct?
3  A. Yes, sir.
4  Q. Do you know where Valerie Bradshaw worked?
5  A. No, sir.
6  Q. Could you describe her for us today?
7  A. No, sir.
8  Q. Do you have anything in writing, communications in
9     writing, that are in Valerie Bradshaw's handwriting
10    or signed by her?
11 A. Possibly. I don't know.
12 Q. Did you ever write to her?
13 A. Possibly, I don't know.
14 Q. Do you know who Jodi Nakata is?
15 A. No, sir.
16 Q. Do you know what facility she works at?
17 A. No, sir.
18 Q. Do you know if you were ever treated by either
19    Valerie Bradshaw or Jodi Nakata?
20 A. No, sir.
21 Q. Do you know that you've named Jodi Nakata and
22    Valerie Bradshaw in this lawsuit as defendants?
23 A. Yes, sir.
24 Q. Did you talk to your lawyers, before they filed a
25    complaint, and decided who to name in a complaint

Page 124

1     as a defendant?
2     MR. MACKRAZ: Objection. Hold on. I'm going
3  to instruct my witness not to answer about any
4  discussions he may have had with his attorney.
5     The question is: Did you talk to them? You
6  can say whether you talked to them or not. Do not
7  talk about any communications you may have had with
8  them.
9  A. Could you repeat the question, please.
10 Q. Did you talk to your lawyer about who to name in
11    the lawsuit?
12    MR. MACKRAZ: Objection. Don't answer the
13 question. Don't answer it.
14 A. No, I'm not answering.
15 Q. Did you tell your lawyer to sue Valerie Bradshaw or
16    Jodi Nakata?
17    MR. MACKRAZ: Objection. Don't answer it.
18 Q. I'm asking him what he said.
19    MR. MACKRAZ: That's right. That's
20 attorney-client communication. I'm instructing him
21 not to answer.
22    Don't answer.
23 Q. Did you review the lawsuit complaint before it was
24    filed?
25 A. Yes.

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 125

1  Q.  Did you approve of it before it was filed?
2  **A.  Yes.**
3  Q.  So you knew who was named in the lawsuit before it
4  was filed with the court, correct?
5  **A.  Yes.**
6  Q.  Tell us today why did you sue Valerie Bradshaw,
7  then?
8     MR. MACKRAZ: Objection, form and foundation.
9  If you know why she was named, you can.
10 **A.  Because she knew -- she was part of the nurse -- or**
11 **talked to the doctor which is all part of the same**
12 **health group that denied me healthcare.**
13 Q.  But you can't tell us today anything that
14 Valerie Bradshaw did in particular?
15 **A.  No, sir.**
16 Q.  What about Jodi Nakata?
17 **A.  No, sir.**
18 Q.  You can't tell us why you're suing her today or
19 what do you claim she did wrong?
20 **A.  No, sir.**
21 **(Whereupon, Defendants' Exhibit A, accident**
22 **report, was marked for purpose of identification.)**
23 Q.  All right.  Let's look at deposition Exhibit A that
24 I've had marked.  You have a copy in front of you,
25 do you not?  Do you have a copy in front of you?

Page 126

1  **A.  Yes, sir.**
2  Q.  All right.  And what is that, sir?
3  **A.  Looks like a accident report.**
4  Q.  All right.  Did you sign this report anywhere?
5  **A.  Yes, sir.**
6  Q.  Where is your signature, up here, on this document?
7  **A.  At the bottom -- I mean, not the bottom, "Signature**
8  **of Injured Person if Possible."**
9  Q.  What does that signature say there exactly?  Is
10 that how you sign your first name?
11 **A.  Yes, sir.**
12 Q.  And then your last name.  So how did you sign it?
13 **A.  Trent Sildack.**
14 Q.  Okay.  And did you make any other written remarks
15 on this document, at all?
16 **A.  My signature.**
17    MR. MACKRAZ: Or anywhere else on here?
18 Q.  Do you see where it says in the middle of the page
19 "Statement of Injured Person if Possible"; and then
20 it's hand written, quote, "While rocks his back
21 locked up."  You see that?
22 **A.  Yeah -- yes.**
23 Q.  Okay.  What is your reading level?  Can you read
24 this or not?
25 **A.  Yes, I can.**

Page 127

1  Q.  Okay.  What grade did you go up to in high school?
2  **A.  I got a G.E.D.**
3  Q.  Okay.  But you went to some high school, correct?
4  **A.  Yes, sir.**
5  Q.  What grade did you drop out in?
6  **A.  Eleventh.**
7  Q.  Okay.  So you can read and write?
8  **A.  Yes, sir.**
9  Q.  You can read on this form "While rocks his back
10 locked up," right?
11 **A.  Yes, sir.**
12 Q.  Did you write that?
13 **A.  Looks like it, yes.**
14 Q.  All right.  Is there any other writing on this
15 document that you made?
16 **A.  I believe just my own signature.**
17 Q.  Okay.  All right.  Just checking.  You can hand
18 that to the court reporter if you want.
19    All right.  When you worked at a prison job at
20 Lakeland, did you get paid for that?
21 **A.  Yes.**
22 Q.  How much did you get paid?
23 **A.  I don't know, 70 cents an hour, something like**
24 **that.**
25 Q.  Was it like a $1.24 a day?

Page 128

1  **A.  It might have been something like that.**
2  Q.  And how many days a week would you work at that
3  job?
4  **A.  Five.  Some days we'd work seven days.**
5  Q.  And how much would you get paid into your prisoner
6  account for your work at the prison job at Lakeland
7  per month?
8  **A.  Whatever it equaled out to be.  It was different**
9  **every time.**
10 Q.  Okay.  But you did get payments into your prisoner
11 account --
12 **A.  Yes, sir.**
13 Q.  -- from your prison job that you could spend at the
14 prison store, correct?
15 **A.  Yes, sir.**
16 Q.  And you did get paid, at your prison job, every
17 month you were there from the time you started your
18 job until you left in December of 2008, correct?
19 **A.  Yes.**
20 Q.  Now, you were only at Cooper Street Correctional
21 Facility 38 days, so you didn't have a prison job
22 there, did you?
23 **A.  No, sir.**
24 Q.  Did you have a prison job while you were at Cotton
25 Correctional Facility since you were only there 61

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 129

1   days?
2   A.   No, sir.
3   Q.   When you got to Newberry, did you have a prison job
4     up there?
5   A.   Not at first, and then I did receive one.  Then I
6     got laid off.
7   Q.   Okay.  What job did you have at Newberry?
8   A.   Working for the rec. room.
9   Q.   Okay.  What were your job duties there?
10  A.   Pass out rec. equipment.
11  Q.   Okay.  Like what?
12  A.   Basketballs, jump ropes, softballs.
13  Q.   Was that in the gym or on the yard?
14  A.   It was in the building behind the yard.
15  Q.   All right.  And you say you got laid off?
16  A.   Well, I got written off of work.
17  Q.   What do you mean by that?
18  A.   Causing too much pain to sit for a long period of
19    time, and it -- I was written off of work.
20  Q.   Did you have a job while you were at Ojibway
21    Correctional Facility?
22  A.   No, sir.
23  Q.   All right.  Could you tell us who David Kihm is?
24  A.   David Kihm, he works at Newberry Correctional
25    Facility.

Page 130

1   Q.   What's his job?
2   A.   I want to say nurse practitioner.  I'm not for
3     sure.
4   Q.   Did you ever meet him personally?
5   A.   Yes.
6   Q.   How many times?
7   A.   Say three, four.
8   Q.   Okay.  Do you know the dates you claim you saw him
9     or met with him?
10  A.   No, sir.
11  Q.   Why did you see him three or four times?
12  A.   The release of my medical records.  I had to sign
13    papers.
14  Q.   So he was not a nurse who treated you, was he?
15  A.   No, sir.
16  Q.   So you would see him if you wanted a copy of your
17    medical records; is that what you're saying?
18  A.   Yes, sir.
19  Q.   If you saw him three or four times like you said,
20    was that what it was about each time?
21  A.   Once was about medical -- no, sir.
22  Q.   Okay.  What was the first time about when you met
23    David Kihm?
24  A.   It was either about medications or maybe getting a
25    shoe detail.  I'm not for sure.  I'd get written

Page 131

1   off of work.
2   Q.   Where would you meet with him?
3   A.   At the nurse's offices.
4   Q.   Okay.  Is that near the healthcare clinic?
5   A.   Yes, sir.
6   Q.   Would there be -- was there any other person
7     present while you were meeting or talking with
8     David Kihm?
9   A.   Not that I'm aware of.
10  Q.   So, on all three or four occasions you say you
11    talked with him, there were no other witnesses to
12    the conversation?
13  A.   Not that I'm aware of, no.
14  Q.   All right.  And the first time you talked about a
15    detail for what?
16  A.   I think it was to get written off work, and also I
17    asked about getting shoe detail maybe at the same
18    time.
19  Q.   What's a detail?
20  A.   They give you a work detail or shoe detail to be
21    able to wear tennis shoes instead of your state
22    shoes at certain times.
23  Q.   So a detail would be -- in prison parlance would
24    be --
25  A.   Permission.

Page 132

1   Q.   -- something that would -- a written document that
2     would give you permission to have a certain medical
3     appliance or something that you wouldn't ordinarily
4     have in prison; is that right?
5   A.   Yes, sir.
6   Q.   And the second time you talked with David Kihm,
7     what was the -- what did you talk about?
8   A.   Not for sure.
9   Q.   All right.  And the third time, what did you talk
10    about with David Kihm, if you did?
11  A.   I don't know.
12  Q.   And you said three or four times.  So what about
13    the fourth time, do you know what you talked about
14    then?
15  A.   I don't know exactly what we talked about.  I know
16    that it was either one of the things I mentioned
17    earlier.
18  Q.   Do you remember what was said in this conversation
19    with David Kihm on this first time that you talked
20    about a detail?
21  A.   No, sir.
22  Q.   So you can't tell us what David Kihm said to you?
23  A.   No, sir.
24  Q.   And David Kihm never treated you in the healthcare
25    clinic for any medical condition you had, did he?

Page 133

1  A.  No, sir.
2  Q.  All right.  What about Gary Freytag, did you know
3     him?
4  A.  No, sir.
5  Q.  You don't know who that is?
6  A.  Don't know.
7  Q.  Do you know why you're suing Gary Freytag?
8  A.  Because he had -- if he was around people that had
9     knowledge of what was going on with me.
10 Q.  Can you describe Gary Freytag for us?
11 A.  No, sir.
12 Q.  You can't give us a physical description of
13    Gary Freytag?
14 A.  No, sir.
15 Q.  How many times did you -- do you claim you met with
16    or had any interaction with Gary Freytag?
17 A.  I don't know.
18 Q.  Do you know any dates or times or locations that
19    you might have met Gary Freytag?
20 A.  I don't know.
21 Q.  Do you have anything in writing from Gary Freytag
22    that he signed or wrote on?
23 A.  Possibly.
24 Q.  What would you have from him, do you think?
25 A.  He'd either have kites or medical records.

Page 134

1  Q.  Did you keep kites from when you were in prison?
2  A.  Yes.
3  Q.  Where are those located?
4  A.  At my house.
5  Q.  How many do you have, do you think?
6  A.  I have no idea.
7  Q.  When you submit a healthcare kite, who do you
8     address it to?
9  A.  Who do you address it to?
10 Q.  Uh-huh.
11 A.  To whoever listens.  There's multiple people, so
12    you don't address it to really nobody, just a
13    medical staff as a whole.
14 Q.  Right.  So you submit a healthcare kite, and you
15    know that it's going to go to healthcare, but you
16    don't address it to a particular person.  Whoever's
17    on duty is going to respond, right?
18 A.  Yes, sir.
19 Q.  So your kites aren't addressed to anybody in
20    particular --
21 A.  No.
22 Q.  -- just to the healthcare?
23 A.  Yes, sir.
24 Q.  Okay.  Do you know what shift or days of the week
25    or schedule that Gary Freytag worked?

Page 135

1  A.  No, sir.
2  Q.  What about Donna Kovar, do you know who she is?
3  A.  No, sir.
4  Q.  Do you know why you're suing her in this case?
5  A.  Because she worked in healthcare.
6  Q.  Do you know how many interactions you may or may
7     not have had with Donna Kovar?
8  A.  No, sir.
9  Q.  Do you know if she ever treated you in the
10    healthcare clinic at Newberry Correctional
11    Facility?
12 A.  I don't know.
13 Q.  Do you have anything in writing from Donna Kovar?
14 A.  Possibly.
15 Q.  Do you know what days of the week or shifts she
16    worked?
17 A.  No, sir.
18 Q.  How many shifts are there at Newberry, do you know?
19 A.  I don't know.  I assume three.
20 Q.  Okay.  The custody or correction officers normally
21    work eight-hour shifts; is that correct?
22 A.  I don't know.
23 Q.  Well, you know that at various times of the day
24    that different people are working and that the
25    employees change a couple two times -- two times a

Page 136

1     day, right?
2  A.  Yes, sir.
3  Q.  Okay.  So you know that they have shifts; and, at
4     that those shift changes, new employees come in,
5     right?
6  A.  Yes, sir.
7  Q.  But you're telling us you don't know what those
8     hours of the shift changes are?
9  A.  No, sir.
10 Q.  What about the healthcare staff, did they have
11    shifts?
12    MR. MACKRAZ:  Objection, foundation.
13 A.  I have no idea.  I assume.  I mentioned that
14    earlier.
15 Q.  Did you ever have to go to the healthcare clinic at
16    night?
17 A.  No, sir.
18 Q.  When you went to the healthcare clinic, what time
19    of day was it normally?
20 A.  In the morning.
21 Q.  Okay.  So let's say, after the third meal of the
22    day or dinner, whatever you want to call it -- did
23    you ever have to go to the healthcare clinic at
24    Newberry after dinner?
25 A.  Yes.

Page 137

1 Q. Okay. So what time would that have been?
2 A. About 5:00, 6:00, maybe 7:00.
3 Q. All right. So the healthcare clinic did have
4 24-hour staffing, didn't it?
5 A. Yes, sir.
6 Q. So, if you had an emergency that couldn't wait for
7 you to submit a healthcare kite, you could have
8 requested to go see healthcare?
9 A. Yes.
10 Q. Okay. And is that true in all the prisons that you
11 were incarcerated at?
12 A. Yes.
13 Q. Did you ever go to the healthcare clinic on an
14 emergency basis while you were at Cotton
15 Correctional Facility?
16 A. I don't know.
17 Q. Did you ever go to the healthcare clinic on a
18 emergency basis while you were at Cooper Street
19 Correctional Facility for the 38 days you were
20 there?
21 A. I don't know.
22 Q. Did you ever go to the healthcare clinic at
23 Lakeland on an emergency basis?
24 A. Yes.
25 Q. How many times?

Page 138

1 A. I believe once.
2 Q. Was that the date of your Prisoner Accident Report
3 in Exhibit A?
4 A. Yes.
5 Q. Okay. And that was during the day, right, the
6 morning?
7 A. Yes.
8 Q. Okay. So is that the only time you went to
9 Lakeland Correctional Facility healthcare clinic on
10 an emergency basis?
11 A. I believe so. I'm not for sure.
12 Q. Okay. So any other time that you went to the
13 healthcare clinic at Lakeland, it would have been
14 based on a healthcare kite request that you
15 submitted on a routine basis, right?
16 A. Yes, sir.
17 Q. And Donna Quinlan, do you know who she is?
18 A. Sounds very familiar.
19 Q. "Sounds familiar," you said. Why does that sound
20 familiar?
21 A. I think she was on a lot of papers that denied me.
22 Q. Did you ever have any meetings with her,
23 Donna Quinlan?
24 A. Not that I recall.
25 Q. Do you know if she ever treated you in the

Page 139

1 healthcare clinic?
2 A. Not that I know.
3 Q. Do you know what shifts or days of the week or
4 schedule that she worked?
5 A. I don't know.
6 Q. Can you give us a physical description of
7 Donna Quinlan today?
8 A. No, sir.
9 Q. Can you give us a physical description of
10 Donna Kovar today?
11 A. No, sir.
12 Q. Can you give us a physical description of
13 Cathy Pope?
14 A. I believe she has brownish-reddish hair.
15 Q. And where and when did you first meet Cathy Pope,
16 if you did?
17 A. I think she's at Newberry.
18 Q. What was her position?
19 A. A nurse.
20 Q. How many times do you claim you saw her in the
21 healthcare clinic?
22 A. It was a nurse that worked there. Probably 10, 20
23 times.
24 Q. Do you have anything in writing from Cathy Pope?
25 A. Possibly. I don't know.

Page 140

1 Q. Do you recall any conversations with Cathy Pope
2 that you may have had at Newberry?
3 A. I do not.
4 Q. Do you recall any conversations with Donna Quinlan
5 or Donna Kovar?
6 A. No, sir.
7 Q. Do you recall any conversations you might have had
8 with Gary Freytag at Newberry?
9 A. No, sir.
10 Q. Do you know what shift or schedule Cathy Pope
11 worked at Newberry Correctional Facility?
12 A. I don't know.
13 Q. Well, why are you suing Cathy Pope, do you know?
14 A. 'Cause she worked with the healthcare system. All
15 the kites was addressed to them.
16 Q. Do you know if she ever received any of your kites
17 or responded to them? Today, can you tell us?
18 A. I do not know. Possibly.
19 Q. Okay. If you don't remember meeting or having
20 interaction with any of these nurses, are you
21 relying on the Department of Corrections' medical
22 records to determine the dates and times that you
23 may or may not have had interaction with them?
24 A. Yes, sir.
25 Q. Do you know who Tracie Hill is?

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 141

1  A.  No, sir.
2  Q.  Could you give us a physical description of
3    Tracie Hill today?
4  A.  No, sir.
5  Q.  Do you recall any conversations you may or may not
6    have had with Tracie Hill?
7  A.  No, sir.
8  Q.  Do you know what Tracie Hill's job title is?
9  A.  A nurse.
10  Q.  All right.  Do you know who Mary Roose is?
11  A.  No, sir.
12  Q.  Do you have anything in writing from either
13    Tracie Hill or Mary Roose?
14  A.  Possibly.
15  Q.  And what would you have in writing for either one
16    of them?
17  A.  The medical orders or kite, responding to a kite.
18  Q.  Okay.  And are you talking about a healthcare kite?
19  A.  Yes, sir.
20  Q.  Can you tell us any dates or times or locations of
21    any meeting you ever had with Mary Roose?
22  A.  No, sir.
23  Q.  Do you know when you claim she ever treated you at
24    the Ojibway Correctional Facility?
25  A.  Russo?

Page 142

1      MR. MACKRAZ: Spell it.
2  Q.  Roose, R-O-O-S-E.  Did you bring a copy of your
3    lawsuit complaint today --
4  A.  No, sir.
5  Q.  -- so that you could see the names of the people
6    you're suing?
7  A.  No, sir.
8  Q.  Did you bring anything with you today, any
9    documentation?
10  A.  Not -- just my oldest report.
11  Q.  Your what?
12  A.  Oldest report, the thing you have on the front with
13    my picture and all my crimes.
14  Q.  You mean the Department of Corrections' --
15  A.  Yes, sir.
16  Q.  -- website where they have prisoner's information?
17  A.  Yes, sir.
18  Q.  Why did you bring that?
19  A.  Just because I knew I had extensive record.  I
20    wouldn't be able to answer 'em probably, the times
21    and dates that I was locked up.
22  Q.  All right.  Did you say you were on any medication
23    today?
24  A.  No, sir.
25  Q.  And you're not having -- there's no medication that

Page 143

1    you're on that's affecting your memory, at all, is
2    there?
3  A.  No, sir.
4  Q.  I know that she asked you -- one of the first
5    questions was about, "Are you on any medication
6    right now," right?
7  A.  Yes, sir.
8  Q.  What was your answer?
9  A.  No, sir.
10  Q.  Nothing, right?
11      MR. MACKRAZ: Objection, asked and answered.
12  A.  No nothing.
13      MR. MACKRAZ: Are you impeaching him on it?
14      MR. THOM: Just making sure.
15  Q.  No, zippo, zilch?
16  A.  Nada, zero.
17  Q.  All right.  Don't want any confusion on that.
18  A.  All right.
19      MR. MACKRAZ: Crystal.
20  Q.  All right.  Jamie Monville, do you know who that
21    is?
22  A.  No, sir.
23  Q.  Do you know when or where you might have ever had
24    any interaction with Jamie Monville?
25  A.  No, sir.

Page 144

1  Q.  Can you give us a physical description of
2    Jamie Monville today?
3  A.  No, sir.
4  Q.  Do you know why you're suing her, at all?
5  A.  Affiliated with the healthcare system of the
6    Department of Corrections.
7  Q.  How would you know that if you don't even know her
8    or can't describe her or don't know if you had any
9    interaction with her?
10  A.  Because she was on my medical records or kite.
11  Q.  All right.  So you don't know what shift or dates
12    or schedule Jamie Monville worked?
13  A.  No, sir.
14  Q.  Do you know what her title is or what job she had?
15  A.  No, sir.
16      MR. THOM: All right.  I don't have anything
17    else.
18      MR. MACKRAZ: We are, for the record,
19    providing requests for copy of tax returns and
20    authorization for Marion General Hospital at the
21    request of counsel.
22      THE COURT REPORTER: Are you asking questions?
23      MR. MACKRAZ: No.
24      MR. EWLES: I have one question.
25      MR. MACKRAZ: I'm indulging counsel on one

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Page 145

1   question and follow up, if necessary.

2       RECROSS-EXAMINATION OF TRENTON SILDACK

3   **BY MR. EWLES:**

4  Q.  I should have asked you earlier:  Do you wear any

5   sort of the assistive devices?  Meaning any braces

6   on your right foot --

7  **A.  No, sir.**

8  Q.  -- or up on your leg, at all.

9  **A.  No, sir.**

10      **MR. EWLES:** That's all.

11      **MR. MACKRAZ:** Thank you.

12      **THE COURT REPORTER:** Do you need a copy?

13      **MR. MACKRAZ:** Condensed.

14      **MS. VAN THOMME:** I think we have a standing

15   order with Bienenstock.  If not, give us a call.

16      **MR. REYNOLDS:** I want a copy, full size and

17   mini, four to page, with exhibits on both.

18      **MR. EWLES:** Full and E.

19      **MR. THOM:** Full and mini e-mailed, PDF, no

20   paper sent.

21      **MS. MATSON:** I am not going to order right

22   now.

23      (Whereupon, the deposition was concluded at

24      4:15 p.m.)

25      *   *   *

Page 146

1                C E R T I F I C A T E

2          I, Shannon L. Zelt, Certified Shorthand Reporter

3   and Notary Public, authorized to administer oaths and to
    take and  certify depositions, do hereby certify that
4   the above-named witness was by me, before the giving of
    their deposition, first duly sworn to testify the truth,
5   the whole truth, and nothing but the truth to questions

6   propounded at the taking of the foregoing deposition in

7   a cause now pending and undetermined in said court.

8          I further certify that the deposition above-set

9   forth was reduced to writing by me by means of machine

10   shorthand and was later transcribed from my original

11   shorthand notes; that this is a true record of the

12   testimony given by the witness; and that said deposition

13   was taken at the aforementioned time, date, and place

14   pursuant to notice or stipulations of counsel.

15

16          IN WITNESS WHEREOF, I have set my hand and seal

17   this ____ day of _____, 20 ____.

18

19

20

21          _____

22              Shannon L. Zelt, Notary Public

23              State of Indiana

24              My commission expires February 26, 2014

25

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

**$**

**$1.24 (1)**
127:25
**$10 (1)**
8:10
**$1500 (1)**
9:5
**$500 (1)**
9:5
**$9 (2)**
7:17;9:16
**$9.03 (1)**
7:17

**A**

**able (11)**
31:7;45:2;52:3,4,10;
56:17;64:4;85:16;90:4;
131:21;142:20
**access (1)**
115:5
**accident (3)**
125:21;126:3;138:2
**account (11)**
107:8;108:4,6,8,9,14,
16;110:10,11;128:6,11
**accurate (1)**
122:23
**acknowledged (1)**
24:4
**acknowledging (1)**
64:8
**across (5)**
36:21;75:16;76:6;
95:23;122:14
**acted (1)**
68:17
**acting (1)**
35:21
**actions (1)**
94:3
**actual (1)**
79:13
**actually (7)**
10:5;40:1;46:21;
48:17;50:12;62:6;
109:11
**ADD (2)**
15:15;63:2
**additional (5)**
21:13;87:22;91:7;
101:9,13
**address (10)**
6:15;30:19;63:19;
69:4;84:3;85:16;134:8,
9,12,16
**addressed (5)**
84:5;85:5;101:19;
134:19;140:15
**addressing (1)**

84:19
**administrative (1)**
117:7
**adopt (1)**
106:18
**adult (3)**
32:20.21;33:19
**advertising (1)**
94:2
**advice (1)**
90:23
**affected (1)**
54:3
**affecting (1)**
143:1
**affiliated (2)**
97:9;144:5
**afford (1)**
90:5
**afternoon (2)**
5:7;57:17
**Again (11)**
5:21;26:1,9;27:25;
28:16;42:19;43:19;
53:1;55:16;73:1;74:5
**against (5)**
21:14;67:20;120:11,
19;121:12
**agency (1)**
7:12
**ago (6)**
28:12;29:21,22;
86:21;89:20;103:1
**agree (1)**
9:25
**agreed (1)**
98:10
**ahead (17)**
15:19;16:20;21:17,
22;23:6;24:18,22;25:4,
18;47:1;48:8;65:7;
67:2;82:11;85:19;86:9;
102:18
**alaview (1)**
24:12
**alcohol (3)**
11:8,21;12:2
**allege (3)**
23:22;24:2;118:14
**alleged (1)**
101:20
**allergies (2)**
111:24;112:3
**allergy (1)**
112:13
**almost (1)**
44:17
**along (1)**
25:7
**always (1)**
43:3
**amended (1)**
21:12

**amount (3)**
25:12;52:24;79:14
**animals (3)**
110:1,3,6
**Ann (4)**
30:25;54:18;78:4;
81:4
**answered (1)**
143:11
**anticipating (1)**
79:3
**anti-inflammatory (1)**
72:10
**anymore (1)**
55:11
**apologize (5)**
19:23;31:24;60:21;
62:16;72:13
**appeal (1)**
114:6
**appliance (1)**
132:3
**applied (4)**
29:4,5;78:2;107:23
**appointment (2)**
22:16;97:2
**appointments (1)**
89:14
**appreciate (1)**
57:14
**apprehended (1)**
33:22
**approached (1)**
64:14
**approve (1)**
125:1
**approximately (4)**
8:7;41:17;66:2;73:2
**April (4)**
18:25;63:16;65:20;
86:22
**Arbor (1)**
30:25
**area (9)**
15:12;21:3;34:24;
36:22;52:16;54:9;75:8;
89:23,24
**arm (7)**
15:20,22;75:14,17;
99:3,3,13
**around (15)**
7:17;9:16;12:6;13:1;
43:21;52:16;60:11;
62:9;73:3,6,7,8,9;
109:5;133:8
**arrested (1)**
62:19
**arrive (1)**
121:20
**arrived (1)**
122:7
**aspirin (2)**
112:8,11

**assigned (5)**
34:13,25;35:12,17;
36:18
**assignment (1)**
41:25
**assist (1)**
24:15
**Assistant (4)**
58:13;80:6;82:25;
87:1
**assistive (1)**
145:5
**associate (1)**
104:3
**assume (4)**
5:25;28:2;135:19;
136:13
**attempts (1)**
29:2
**attention (5)**
35:4;66:14,17;
115:10,24
**attorney (3)**
23:14,16;103:8;
124:4
**attorney-client (1)**
124:20
**attorneys (2)**
25:19;94:1
**attribute (1)**
88:6
**attributed (2)**
68:25;76:12
**August (2)**
7:2,2
**authority (1)**
33:9
**authorization (1)**
144:20
**authorizations (1)**
64:7
**available (4)**
82:17;90:6,10;
114:14
**average (1)**
75:3
**aware (12)**
16:3;49:24;50:18;
53:22;59:13;83:4;
88:21;95:22;112:17;
121:19;131:9,13
**away (3)**
16:23;34:25;39:2

**B**

**back (61)**
15:21,24;16:10,17;
17:20;18:20;19:6;
20:18;21:7;26:15,16;
28:14;29:18;31:20;
34:11,22,23;35:9,19,
22;36:5;38:23;40:9;

43:7,10,23;44:3;46:21;
47:19;48:12;50:1,21;
51:8;52:1;53:24;61:13,
22;63:6;64:1;70:6;
73:14;74:21,22;75:8,
16,18,22;76:3,6;77:3,9,
11;82:16;83:7;87:25;
95:10;105:10;111:3;
117:15;126:20;127:9
**bad (5)**
20:23;36:6;39:17;
42:19;71:12
**balance (1)**
110:11
**bank (3)**
107:6,8;108:9
**barely (1)**
39:5
**barracks (2)**
17:1;40:9
**based (6)**
38:17;78:22;82:9;
101:7;105:2;138:14
**basic (1)**
5:10
**Basically (5)**
52:15;67:8;75:6;
102:21;115:11
**basing (1)**
82:7
**basis (10)**
75:2,4,7;93:20;
108:22;137:14,18,23;
138:10,15
**Basketballs (1)**
129:12
**bed (3)**
61:6,7,15
**began (2)**
15:24;27:25
**begin (3)**
12:17;60:6;61:2
**behalf (1)**
23:14
**behind (1)**
129:14
**belief (2)**
20:17;93:12
**bench (3)**
44:7,11;73:12
**bend (1)**
99:18
**benefits (2)**
20:12;53:20
**besides (3)**
81:11;88:9;112:12
**best (2)**
20:16;38:9
**better (4)**
17:8;23:7;87:14;
100:8
**beyond (1)**
19:9

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

Bienenstock (1)
145:15
big (3)
73:7;103:17;104:2
bills (2)
25:8;49:14
biological (6)
10:21,25;30:11,13,
15;106:21
birth (1)
6:13
bit (9)
54:2;62:25;65:17;
68:13;70:6;75:18;
82:20;83:3;103:1
black (1)
102:22
bladder (4)
17:13;45:9;63:3;
85:1
blades (2)
75:25;76:8
blue (1)
22:18
book (1)
55:22
both (3)
10:3;101:19;145:17
bother (1)
63:9
bothering (3)
35:20;36:1;77:10
bottom (2)
126:7,7
bottoms (2)
20:23;26:1
Boulevard (1)
6:16
box (5)
116:1,2,3,11,13
boxes (1)
116:23
braces (1)
145:5
Bradshaw (8)
121:15,17;123:4,19,
22;124:15;125:6,14
Bradshaw's (1)
123:9
break (4)
6:3,6;105:19,20
breath (2)
16:23;39:2
breathe (2)
39:1;69:25
breathed (1)
39:2
breeds (1)
110:5
briefly (1)
113:17
bring (8)
61:12,22;66:14,17;

67:21;142:2,8,18
broken (2)
15:20;46:21
brought (7)
35:3;40:6;47:21;
93:2,6,17;110:4
Brown (3)
30:16,17;96:25
brownish-reddish (1)
139:14
Broxholm (1)
31:2
B-R-O-X-H-O-L-M (1)
31:4
budged (1)
39:6
building (2)
36:14;129:14
bulging (1)
102:23
bunch (1)
39:24
Burtch (2)
22:12,14
businesses (1)
29:25
buy (6)
108:17;111:18,19,
21;112:1,11

**C**

cafeteria (3)
17:2;39:9,25
calendar (2)
56:10;57:2
calf (1)
21:3
call (12)
17:1;19:11;29:18;
39:22;45:25;46:6;
47:23;54:10;72:15;
113:20;136:22;145:15
called (18)
5:2;7:12;8:13;17:3;
20:3;22:18;24:12;
35:16;40:5,5;57:9;
103:17,17,22,25;104:2;
113:9;115:13
calls (1)
96:7
came (6)
39:8;51:21;80:7;
82:16;118:7,19
can (45)
5:21;6:4,8;15:19;
21:17,17;23:6;24:22;
25:4,20;26:20;30:1;
31:3;37:14;45:24;
46:25;47:23;53:6,24,
25;65:15;72:7;85:19;
96:18,21;102:18;
108:11,16,17;116:20;

118:3;124:6;125:9;
126:23,25;127:7,9,17;
133:10;139:6,9,12;
140:17;141:20;144:1
candidate (3)
77:15;87:24;88:1
captured (1)
33:22
card (2)
29:14,15
care (9)
24:3;41:20;77:17;
79:4;88:19;93:3,8,9;
96:6
caregiver (1)
92:16
caregivers (2)
67:23;86:17
Carol (7)
119:1,16,22;120:6,8,
12,19
cart (3)
36:20,21,23
case (9)
24:16;25:2;26:12;
51:9;53:25;63:25;94:7;
106:1;135:4
Cathy (6)
139:13,15,24;140:1,
10,13
Cause (7)
22:5;25:24;33:3;
43:25;68:21;90:4;
140:14
caused (5)
16:2;52:1;56:3;
67:25;93:13
causing (3)
47:7;81:25;129:18
cell (2)
111:3;117:8
cement (2)
16:15;38:4
center (1)
40:7
Centers (9)
18:5,7,8,12;49:17;
54:23;55:17;77:24;
84:1
central (1)
114:11
cents (1)
127:23
certain (10)
9:16;13:18;28:10;
52:24;58:8;70:4;85:21;
100:24;131:22;132:2
certification (1)
29:11
certified (1)
5:3
change (3)
17:15;61:9;135:25

changes (2)
136:4,8
charge (4)
33:25;34:4;43:25;
44:1
charges (1)
33:23
charity (1)
34:18
cheaper (1)
22:1
check (1)
110:21
checked (1)
77:3
checking (1)
127:17
checks (1)
107:4
chest (2)
71:11;75:19
child (3)
10:20;11:3;106:22
children (4)
10:16,18,21,22
Chlora-something (1)
112:2
choice (1)
105:4
chose (1)
94:12
chow (8)
115:25;116:6,12,16,
18;117:2,11,13
Christian-based (1)
55:18
chronic (1)
15:11
church (1)
55:19
cigarettes (1)
11:6
circumstances (2)
22:11;45:7
Citizen (1)
9:9
city (1)
6:17
claim (9)
21:19;25:16;107:11;
121:2;125:19;130:8;
133:15;139:20;141:23
claims (3)
51:9;52:2;53:25
class (1)
33:7
clear (7)
5:16;22;70:19;82:18;
84:9,10,20
cleared (1)
25:24
clearer (1)
51:11

client (1)
94:13
clinic (19)
95:21;97:16;101:25;
115:3,5;131:4;132:25;
135:10;136:15,18,23;
137:3,13,17,22;138:9,
13;139:1,21
clinics (1)
83:24
close (5)
55:22;61:3;65:24;
89:19;121:24
closest (1)
76:21
CMS (1)
57:19
cocaine (2)
12:16;13:4
cold (1)
111:21
Coldwater (1)
35:11
comfortable (1)
36:7
coming (1)
85:6
commercials (1)
94:1
Committee (1)
26:4
communication (2)
119:22;124:20
communications (3)
119:18;123:8;124:7
company (2)
7:11;8:21;53:1
Compensation (1)
107:11
complained (3)
15:21;60:24,25
complaining (1)
71:21
complaint (9)
21:13;35:8,9,10;
101:19;123:25,25;
124:23;142:3
complaints (3)
21:14;63:5,20
completely (1)
73:10
complications (1)
64:10
compound (1)
36:22
computer (1)
102:21
con (1)
15:1
concerned (2)
30:7;40:13
concerns (1)
85:5

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

concluded (1)
145:23
concrete (4)
36:13,16;38:8;39:3
Condensed (1)
145:13
condition (3)
17:16;99:25;132:25
conditions (4)
15:10,16;21:8;62:25
conference (1)
119:13
confident (1)
82:4
confusion (2)
33:17;143:17
conjugal (1)
106:13
cons (1)
100:2
conservative (4)
68:7;95:4;99:21;
100:20
consider (1)
54:16
considered (1)
77:4
consisted (1)
33:8
consistent (2)
71:6;74:13
constant (1)
71:14
consult (1)
80:25
consultation (7)
18:18;19:14;51:2;
79:15,17;81:15,17
contact (2)
57:10,11
continue (10)
15:8;16:5;19:14;
27:15;41:24;61:18;
72:14,16,23;90:25
continued (3)
16:7;17:18;109:9
continues (2)
63:7;69:7
continuously (1)
29:23
control (3)
66:23;67:2,3
convenient (1)
116:23
conversation (6)
92:18;98:1;119:11;
120:5;131:12;132:18
conversations (5)
98:4;140:1,4,7;141:5
convicted (5)
13:16;14:22;15:2;
34:1;62:19
conviction (5)

13:21;14:6,11,15,16
convictions (4)
13:21;14:19,21;15:4
Cooper (11)
106:7;113:3,9;
116:13,15;122:7,11,17,
25;128:20;137:18
coordinator (4)
113:20,21;114:2,8
co-payment (1)
50:13
co-payments (1)
50:5
co-pays (4)
50:25;51:1,3,14
copy (7)
125:24,25;130:16;
142:2;144:19;145:12,
16
Corizon (1)
21:19
Corona (1)
12:3
correction (1)
135:20
Correctional (24)
22:13;106:7;109:1;
112:25;113:3,7;119:3;
120:14;121:21;122:8,
12,18,21,25;128:20,25;
129:21,24;135:10;
137:15,19;138:9;
140:11;141:24
Corrections (6)
94:18;103:9;105:7,9;
122:17;144:6
Corrections' (2)
140:21;142:14
correctly (1)
42:11
COs (1)
97:3
cosmetics (1)
111:9
Cotton (7)
62:6;113:7;122:14,
15,21;128:24;137:14
counsel (3)
104:16;144:21,25
counseling (4)
55:10,11,12;56:1
counteracted (1)
20:16
County (1)
22:10
couple (13)
7:19;29:5;36:19;
57:19;60:8;70:23;71:4,
25;80:19;103:16;
117:19,19;135:25
course (1)
48:5
court (7)

5:15;31:19;105:20;
125:4;127:18;144:22;
145:12
coverage (1)
83:4
covered (2)
50:3;72:13
Crazy (4)
39:22;42:3;43:25;
103:11
Crazy's (1)
44:3
crimes (3)
13:16;62:19;142:13
criminal (1)
15:2
crop (2)
35:1,12
crops (1)
34:17
CROSS-EXAMINATION (3)
26:13;62:17;105:23
CROSS-EXAMINATON (1)
57:21
Croston (6)
120:21,23;121:3,5,8,
13
Crystal (1)
143:19
CT (3)
46:7,13,15
cube (1)
72:1
curls (1)
73:12
current (2)
6:15;62:24
currently (9)
6:21;11:4;15:6,10,
11;20:18,19;63:5;
89:15
custody (1)
135:20
cut (3)
31:23,23;65:7

D

daily (3)
75:2,4,7
damage (3)
23:8,9;94:11
damages (3)
53:24;86:2;91:2
date (11)
6:13;17:8;18:1;
19:17,21;28:10;48:13;
78:20;86:21;121:20;
138:2
dates (9)
14:10;56:11;96:20;
130:8;133:18;140:22;
141:20;142:21;144:11

dating (2)
60:10;74:22
daughter (3)
10:25;30:11,12
daughter's (1)
30:22
David (9)
129:23,24;130:23;
131:8;132:6,10,19,22,
24
day (28)
16:7;36:2,4,12;
37:20,22;41:15;60:16;
74:5,7,20;80:15,17;
81:18;82:14,21,22;
87:4;102:8,11;117:3,
11;127:25;135:23;
136:1,19,22;138:5
days (18)
32:25;70:23,23;
74:11;78:8;87:8;113:3;
117:19;123:1;128:2,4,
4,21;129:1;134:24;
135:15;137:19;139:3
dead (2)
66:5;73:11
deal (1)
68:10
December (6)
113:4;121:23;122:2,
8;123:1;128:18
decided (1)
123:25
decision (4)
43:9,18;44:3,6
decrease (3)
70:15,24;71:19
defendant (1)
124:1
defendants (6)
21:14;57:19;106:1;
118:19,22;123:22
Defendants' (1)
125:21
deficient (3)
23:3,23;24:3
degree (3)
14:16,20;100:24
deliberate (6)
91:17;92:9,15,19,22;
94:9
deliberately (1)
94:14
deliver (3)
14:3,7,23
Delivery (1)
13:23
denied (3)
17:1;125:12;138:21
Department (8)
94:18;103:9;105:6,8;
122:16;140:21;142:14;
144:6

depended (1)
9:3
deposition (6)
5:7;26:9;57:24,25;
125:23;145:23
depressed (1)
54:3
depression (4)
52:17;55:4,5,8
deputy (1)
119:2
describe (7)
16:17;74:25;86:7;
96:21;123:6;133:10;
144:8
described (9)
63:1;68:24;69:2;
70:5,19;71:17;74:21;
93:15;100:5
description (7)
37:14;133:12;139:6,
9,12;141:2;144:1
detail (16)
34:13,16;35:1,12;
62:25;66:12;95:5;
99:24;130:25;131:15,
17,19,20,20,23;132:20
detailed (1)
48:9
determine (1)
140:22
devices (1)
145:5
diagnosed (4)
15:14;63:2;86:4;
104:5
diagnosis (1)
68:4
diary (1)
56:11
dictation (2)
86:14,15
different (8)
9:2;37:22;73:10;
74:19,19;100:6;128:8;
135:24
difficult (2)
5:15;52:16
dinner (2)
136:22,24
DIRECT (1)
5:5
dirt (1)
36:15
disability (8)
32:4,6,14;106:25,25;
107:1,21,24
disagree (3)
104:24;105:1;122:16
disc (6)
47:6,13;68:2,25;
81:24;102:23
discectomy (9)

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

18:19;24:7;47:2,5;
63:13;68:11;95:11;
99:16;100:9
**discuss (1)**
81:12
**discussed (4)**
64:14;92:15;95:5;
104:11
**discussion (1)**
92:20
**discussions (1)**
124:4
**disk (1)**
47:23
**distance (1)**
88:17
**disturbing (4)**
14:24;32:18,23;33:4
**divorce (1)**
56:5
**doctor (12)**
19:10;22:4;26:21;
40:8,16;45:19;54:17;
63:18;79:23,24;93:8;
125:11
**doctors (4)**
35:8,10;67:8;83:24
**document (4)**
126:6,15;127:15;
132:1
**documentation (4)**
56:14,15,19;142:9
**dogs (1)**
110:4
**dollar (1)**
51:20
**dollars (4)**
25:15;49:14;50:25;
51:24
**donate (1)**
34:17
**done (13)**
29:4,5;40:19;76:14;
80:23;81:2;82:4;88:19;
91:14;92:4,6;93:13;
113:14
**Donna (15)**
120:21,23;121:3,5,8,
13;135:2,7,13;138:17,
23;139:7,10;140:4,5
**door (3)**
33:6;71:9;116:20
**dorm (1)**
31:15
**down (34)**
5:16;15:13;20:21,23;
21:2,5,6;26:1;41:4;
63:23;67:15,18,21;
68:19,20;70:2;71:10;
74:4;75:3,14,19,22,23;
76:1,2,7;81:24;82:5;
85:22;88:15;89:23;
90:19;99:1;102:20

**Dr (124)**
18:15;19:10;22:5,7,
12,14,19,22,24;26:10,
10,11;28:17,20;45:17;
46:24;47:8,10,12,15,
19,22;48:1,2,21,24;
49:2;51:2,3,5,14,15;
58:10;59:14,15;62:14;
63:13;64:14;65:21;
68:5,13,24;77:18,19,
21;78:3,5,7,19,25;
79:13;80:4,15;81:1,12,
15,19;82:13;83:8,23;
84:3;85:15;86:4,10,16,
23;87:7,11,21;88:9,12,
14,19,20;89:2,9,18,22;
90:15,19,22;91:4,12,
18;92:4,6,8,19,21;
94:14,17,20,22;95:2,3,
12,14,24;96:3,5,6,7,8,9,
13,21;97:9,19,23,24,
25;98:1,2,7,9,10,12,16;
99:12;101:24;103:3;
104:11,23;105:12
**drank (3)**
11:21;12:2,3
**drink (5)**
11:8,23;12:2,5,8
**drips (1)**
61:8
**drive (3)**
76:24;78:25;88:17
**driver (1)**
9:14
**drop (10)**
15:11;20:20;23:10;
38:24;63:1;64:13;85:2;
86:5;116:20;127:5
**dropped (2)**
34:4,5
**drove (4)**
76:25;79:5;88:22,24
**drug (3)**
13:15;20:11;24:12
**drugs (2)**
11:10;12:12
**Duane (3)**
45:16,17;49:11
**Dubriwney (2)**
26:11;49:2
**due (1)**
84:11
**duly (1)**
5:2
**during (3)**
72:24,25;138:5
**duties (3)**
109:18,19;129:9
**duty (4)**
72:15,15,16;134:17
**dysfunction (4)**
54:10,14,25;104:8

**E**

**earlier (7)**
34:22;42:6;72:19;
105:11;132:17;136:14;
145:4
**earned (1)**
30:2
**easy (1)**
28:6
**eat (2)**
17:2;117:5
**E-B (1)**
54:21
**ecstasy (2)**
12:16;13:8
**Ed (2)**
53:13;60:22
**education (4)**
14:25;32:19,23;33:4
**educational (1)**
6:19
**effect (1)**
64:8
**effects (1)**
20:10
**EFT (1)**
107:8
**eight-hour (1)**
135:21
**either (8)**
90:19;104:11;
123:18;130:24;132:16;
133:25;141:12,15
**electronic (1)**
107:8
**Eleventh (1)**
127:6
**else (17)**
34:7;36:18;51:3,7,
17,25;52:7;53:23;
77:18;79:22;84:12;
85:25;93:24;103:12;
111:11;126:17;144:17
**em (5)**
22:1;50:18;58:4;
103:4;142:20
**e-mailed (1)**
145:19
**embarrassed (1)**
62:2
**emergency (10)**
18:3,18;77:5;81:15,
16;137:6,14,18,23;
138:10
**employed (6)**
6:21,23;7:7;39:14,
18;40:1
**employees (2)**
135:25;136:4
**employment (2)**
7:25;8:17

**end (3)**
7:2;50:12;109:5
**ended (1)**
50:3
**Enough (3)**
12:10,11;36:7
**entire (3)**
32:15;61:18;108:25
**entries (1)**
56:11
**envelopes (1)**
111:9
**equaled (1)**
128:8
**equipment (1)**
129:10
**ER (8)**
18:9;19:25;76:17;
77:21,23;78:7;81:2;
83:21
**erectile (4)**
54:9,13,24;104:8
**erection (1)**
69:19
**escorting (1)**
97:3
**estimate (2)**
25:13;49:15
**evaluated (2)**
40:9,19
**evaluation (2)**
42:16;81:20
**evaluations (1)**
102:10
**even (14)**
5:19;24:2;34:22;
39:1;44:10;47:23;
51:11;66:6;68:18;
69:25;94:2,12;119:6;
144:7
**events (2)**
56:12,20
**eventually (1)**
47:2
**everybody (1)**
68:17
**Everyone (1)**
31:25
**EWLES (9)**
6:8;62:13,13,18;
105:16;144:24;145:3,
10,18
**exact (4)**
7:8;19:17;39:23;
84:20
**exactly (7)**
28:8;58:21;72:4,5;
88:21;126:9;132:15
**exam (1)**
80:10
**EXAMINATION (2)**
5:5;102:7
**examined (2)**

5:3;80:3
**examining (1)**
67:19
**example (1)**
74:16
**except (2)**
57:7;63:23
**exchange (1)**
34:6
**excruciating (6)**
16:21;17:12;45:9;
63:23;66:4;70:2
**excuse (2)**
13:19,19
**exercises (2)**
28:23;91:1
**Exhibit (3)**
125:21,23;138:3
**exhibits (1)**
145:17
**expect (1)**
90:24
**expected (5)**
43:1,4,16;44:10,13
**expecting (1)**
50:1
**expenses (1)**
51:6
**experienced (1)**
70:7
**expert (3)**
24:15;25:6,7
**experts (2)**
24:20;25:2
**explain (4)**
26:20;60:20;91:24;
100:19
**explained (3)**
47:8;48:6;100:2
**extensive (3)**
15:2;20:11;142:19
**extent (2)**
56:8;92:18

**F**

**face-to-face (1)**
120:6
**facilities (2)**
67:24;97:10
**Facility (36)**
22:13,20;59:18;62:7;
66:18,20;76:20;97:6;
106:7;109:1;110:3;
112:25;113:3,7;114:3;
119:3;120:15;121:21;
122:8,12,14,15,18,21;
123:1,16;128:21,25;
129:21,25;135:11;
137:15,19;138:9;
140:11;141:24
**fact (2)**
54:6;94:10

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

facts (1)
    33:2
failed (1)
    23:11
fair (2)
    44:14;48:17
familiar (7)
    26:3;117:21,24;
    121:18;138:18,19,20
family (6)
    21:24;32:15;52:4,10;
    54:8,17
far (15)
    30:7;34:22;38:14;
    40:13;50:20;63:20;
    65:14;75:22;76:22;
    78:13;80:7;86:16;94:7;
    100:25;102:2
fast (1)
    29:6
fathers (1)
    106:21
fault (1)
    52:18
favor (1)
    44:17
February (3)
    11:18;111:15,19
feed (1)
    34:17
feel (7)
    20:11,12;25:25;
    44:21;66:6;86:6;93:2
feeling (2)
    69:13,18
feet (2)
    20:23;26:1
fell (1)
    16:23
felt (6)
    16:22;36:7;38:20,24;
    39:6;70:9
few (2)
    26:16;112:20
figure (2)
    44:9;51:20
figures (1)
    33:9
file (7)
    58:5;112:20,24;
    113:2,6,11;120:15
filed (10)
    107:10,13,18;
    120:11,18;121:12;
    123:24;124:24;125:1,4
fill (4)
    110:14,20;114:1;
    115:25
filled (1)
    110:19
film (2)
    46:6,7
films (1)

49:11
financially (2)
    31:7;90:4
find (4)
    27:7;29:2;51:23;
    55:21
finding (1)
    97:21
fine (1)
    46:4
finish (6)
    5:19;31:18;67:13;
    84:12;88:2,3
fired (3)
    38:10,14;42:7
first (31)
    5:2;13:21;16:25;
    26:16;42:11,17,20;
    44:10;45:11;61:25;
    62:5;68:14;69:10;
    71:14;78:19;79:1;
    81:18;83:13,16,20;
    103:25;106:3;113:11;
    119:4;126:10;129:5;
    130:22;131:14;132:19;
    139:15;143:4
five (10)
    27:19,20;61:16;74:8,
    11,18;75:5,7;87:8;
    128:4
fix (2)
    22:2;94:18
flick (1)
    69:16
fluctuated (1)
    118:12
fluctuations (1)
    75:3
focused (1)
    70:1
focusing (1)
    70:3
follow (6)
    26:15;28:13;87:7;
    96:2,5;145:1
followed (1)
    87:9
following (1)
    87:12
follows (1)
    5:4
follow-up (2)
    88:19,20
food (4)
    16:14;29:6;108:17;
    111:9
foot (25)
    15:11;20:20:21:6;
    23:10;63:1;64:13,20;
    65:2,4,5,6,11,11,12;
    66:24;67:2,3,20;68:15,
    22;85:2;86:5;99:4,13;
    145:6

forklift (3)
    9:14;29:9,12
form (24)
    15:18;16:19;21:15,
    21;23:5;24:17,21;25:3,
    17;38:4,4;52:13;72:3;
    85:18;93:4;94:8,16;
    110:14,22;114:1,18;
    115:7;125:8;127:9
forms (2)
    114:14,21
Fort (4)
    18:16;78:11,13;
    88:18
forth (1)
    117:15
found (1)
    99:12
foundation (21)
    21:16,21;23:5;24:17,
    21;25:3,17;44:5;49:22;
    52:13;82:10;85:18;
    86:8;93:5;94:8,16;
    102:17;115:7;119:23;
    125:8;136:12
four (17)
    10:24;12:6;31:5,13;
    74:8,11,12,18;87:7,17;
    106:18;130:7,11,19;
    131:10;132:12;145:17
fourth (1)
    132:13
fracture (1)
    46:21
frame (2)
    46:8;58:8
fraud (2)
    14:25;33:25
free (1)
    111:15
Freytag (9)
    133:2,7,10,13,16,19,
    21;134:25;140:8
friends (2)
    33:6;108:12
front (3)
    125:24,25;142:12
full (6)
    31:3,16,17;145:16,
    18,19
funds (1)
    107:8
further (3)
    17:15;18:14;23:16
fusion (6)
    24:8;68:12;95:11;
    99:16,19;100:10
fusions (1)
    99:17
future (1)
    87:22

G

garden (6)
    16:14;34:13;36:22;
    72:15;109:10,19
gardening (2)
    34:16;109:20
Gary (9)
    133:2,7,10,13,16,19,
    21;134:25;140:8
gave (9)
    18:10;19:14;29:14;
    33:7;58:25;59:1,1;
    68:14;110:11
GED (2)
    6:20;127:2
General (12)
    18:2;19:25;26:25;
    28:2;76:16;78:6;80:22;
    81:8;83:21;84:1;89:4;
    144:20
generally (1)
    27:12
gentlemen (1)
    48:9
glad (1)
    31:20
goatee-type (1)
    37:15
goes (6)
    25:7;31:14;49:19;
    108:8;113:23;114:10
gonna (1)
    71:10
Good (7)
    5:7;40:14;57:17;
    59:17;68:8;71:13;
    100:7
grade (2)
    127:1,5
greyhound (1)
    110:4
grievance (20)
    58:10;112:17,24;
    113:2,6,11,16,19,20,
    21;114:1,2,8,14,18,21;
    120:11,16,19;121:12
grievances (3)
    23:13,15;112:20
groin (10)
    15:12;20:19;54:9;
    63:1;69:7,10,13,23;
    71:2;85:2
ground (2)
    16:23;38:25
group (3)
    74:19;119:10;125:12
guaranty (3)
    63:22;64:2,4
guess (7)
    33:17;51:23;59:21;
    83:10;84:24;98:22;

104:16
guesstimate (2)
    37:8;49:15
guide (1)
    25:22
guidelines (1)
    5:10
guilty (4)
    32:25;33:4;34:6,9
guy (4)
    37:15;39:22;58:20;
    73:7
guys (6)
    36:19;60:1,6,10,12;
    72:1
gym (1)
    129:13

H

hair (2)
    96:25;139:14
half (5)
    7:23;9:1;102:25;
    106:10,15
hall (8)
    115:25;116:6,12,16,
    18;117:2,11,13
hallucinogenic (1)
    13:14
hand (3)
    67:11;126:20;127:17
handwriting (1)
    123:9
happen (7)
    16:2;25:21;26:22;
    30:19;42:8;93:24;
    101:22
happened (18)
    15:1,23;16:21;25:20;
    33:21;39:15,18,21;
    40:2,4;43:7,14;69:12,
    14;70:7,13,20;82:9
happy (3)
    102:7,10;105:11
hard (4)
    31:19;60:20;69:21,
    25
harvest (1)
    109:22
hate (1)
    69:15
head (2)
    5:14;58:19
Health (15)
    18:5,7,12;21:19;
    40:5,6,7,10;41:20;
    49:17;54:23;55:16;
    77:23;84:1;125:12
healthcare (42)
    17:3,5,6;23:13;
    41:19;50:4;115:3,6,13,
    13,18,21,23;116:3;

117:18;125:12;131:4;
132:24;134:7,14,15,22;
135:5,10;136:10,15,18,
23;137:3,7,8,13,17,22;
138:9,13,14;139:1,21;
140:14;141:18;144:5
**Healthy (1)**
50:8
**heard (4)**
70:14;73:13;95:24;
102:1
**heart (1)**
46:16
**heavy (1)**
35:25
**Heebsh (3)**
58:13,13,17
**heel (4)**
67:5,12,14,16
**heels (1)**
41:22
**height (1)**
96:22
**Heineken (1)**
12:3
**help (5)**
16:25;22:15;36:18;
55:24;83:1
**helped (3)**
17:2;39:8;82:25
**helper (1)**
8:14
**Henderson (3)**
26:10;48:21,24
**herein (1)**
5:2
**hereinafter (1)**
5:3
**here's (2)**
44:9;85:6
**hey (2)**
35:18;53:15
**high (3)**
33:13;127:1,3
**Hilary (6)**
80:6,7;82:25;87:1;
90:15;91:10
**Hill (1)**
140:25;141:3,6,13
**Hill's (1)**
141:8
**HIP (7)**
50:3,7,12,16;82:24;
83:2;90:7
**hire (2)**
52:25;53:18
**hired (1)**
53:19
**history (4)**
6:19;15:3;20:11;
80:4
**hobble (2)**
43:21,24

**Hold (1)**
124:2
**holding (1)**
39:3
**Hollywood (1)**
8:4
**home (8)**
14:16,20;27:7;33:7;
34:10;55:22,23;87:4
**hope (1)**
52:24
**Hopefully (1)**
56:9
**hopped (1)**
40:25
**horticultural (1)**
43:20
**horticulture (7)**
16:15;35:14,15,17;
36:8;41:24;72:15
**hoses (1)**
36:14
**Hospital (16)**
18:3;19:2,25;26:25;
28:2;76:17;77:2;78:1,
7;80:22;81:8;83:19,22;
87:2;95:23;144:20
**hospitals (1)**
83:24
**hour (6)**
7:16;8:10;9:17;80:2;
102:25;127:23
**hourly (1)**
7:14
**hours (7)**
7:18;8:11;9:19;
70:13;71:17,18;136:8
**house (2)**
33:5;134:4
**housing (2)**
114:24;117:12
**Howes (7)**
119:1,16,22;120:6,8,
12,19
**huh-uh (1)**
5:14
**hundred (1)**
83:9
**hurt (6)**
20:23;37:20;39:1;
88:17;118:13,14
**hurting (2)**
36:5;71:12
**hygiene (2)**
108:17;111:9

**I**

**ibuprofen (2)**
24:11;72:11
**idea (11)**
28:24;32:7;33:2;
36:24;37:2,12;47:12;

49:25;50:23;134:6;
136:13
**identification (1)**
125:22
**ignorance (1)**
29:10
**illegal (1)**
12:12
**immediate (1)**
70:13
**immediately (1)**
38:24
**impeaching (1)**
143:13
**important (1)**
5:20
**incarcerated (16)**
8:3,19;9:7;21:9;
23:18,20;35:7;47:11;
60:9,13;108:20;114:3,
16;115:2;116:8;137:11
**incarceration (5)**
8:22;9:8;12:1;58:2;
61:19
**inches (1)**
76:2
**incident (7)**
61:4;65:25;66:11;
84:11;85:15;88:7;
101:21
**income (4)**
10:1;32:1,14;49:19
**incontinence (15)**
17:13,23;10;45:8,10,
23;60:25;63:3;69:5;
84:4,19;85:1,4,7,14;
104:9
**increase (1)**
70:20
**increased (2)**
70:16,17
**indefinitely (1)**
16:6
**Indian (1)**
58:20
**Indiana (19)**
6:18;10:5,6;18:5,7,
12;19:3;29:16;31:14;
49:17;50:8;54:23;
55:16;62:22;77:23;
84:1;89:3;107:11,14
**indicate (1)**
104:22
**indicated (3)**
39:7;56:3;94:24
**indicating (6)**
20:21;21:5;27:2;
67:5,15;74:3
**indication (2)**
38:1;97:8
**indifference (5)**
91:17;92:9,15,19,22;
94:9

**indifferent (1)**
94:15
**indulging (1)**
144:25
**infections (1)**
15:20
**information (1)**
142:16
**initial (3)**
51:2;79:14,17
**Initially (1)**
41:8
**injection (1)**
24:4
**injections (5)**
94:24;95:4;99:20;
100:18;101:5
**injured (3)**
52:5;126:8,19
**injuries (1)**
107:19
**injury (5)**
16:8,10;43:14;61:5;
63:6
**inmate (1)**
44:1
**inmates (3)**
16:25;34:17;110:20
**input (2)**
68:15;90:22
**inspecting (1)**
7:10
**Installing (1)**
8:15
**instead (3)**
5:13;88:18;131:21
**instruct (1)**
124:3
**instructing (1)**
124:20
**insurance (4)**
18:6;78:2;83:3;90:5
**intended (1)**
52:20
**intent (2)**
14:3,23
**intention (2)**
14:7;94:5
**interaction (6)**
118:22;133:16;
140:20,23;143:24;
144:9
**interactions (1)**
135:6
**interest (1)**
20:16
**interested (1)**
93:7
**Interrogatories (1)**
104:15
**interrupt (1)**
64:23
**interval (3)**

41:18,25;42:10
**intervention (1)**
101:4
**interview (1)**
29:19
**into (12)**
28:11;38:4;51:20;
75:14,16,17,19;86:12;
99:24;108:8;128:5,10
**intoxicated (1)**
12:11
**invasion (3)**
14:16,20;34:10
**inventoried (1)**
110:25
**investigate (1)**
28:3
**involve (1)**
100:19
**IRS (1)**
10:3
**issue (8)**
21:9;64:13;69:5,8;
84:3;85:4,14;113:11
**issues (2)**
21:7;85:8
**items (5)**
108:17,17,23;
110:13,16

**J**

**Jack (3)**
103:17,18;104:2
**Jackson (12)**
9:9;30:18,24;33:11;
45:16;62:6,10;103:18;
106:6;122:8,11,15
**Jager (1)**
12:3
**Jagermeister (1)**
12:4
**jail (1)**
33:1
**Jamie (4)**
143:20,24;144:2,12
**January (10)**
6:23;15:9;19:21;
48:11,14;113:4;
118:24;122:18,22;
123:2
**jargon (1)**
115:11
**JCS (3)**
113:9;122:6,7
**Jean (2)**
10:12;106:4
**J-E-A-N (1)**
10:12
**Jeff (1)**
28:17
**job (32)**
8:2;9:3;25:23;26:17;

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

29:2,9;30:8;34:19;
36:8;43:20;52:23;
53:20;108:25;109:3,
10,18,19;127:19;128:3,
6,13,16,18,21,24;
129:3,7,9,20;130:1;
141:8;144:14
**jobs (4)**
  30:1,5;38:9;52:15
**Jodi (5)**
  123:14,19,21;
  124:16;125:16
**July (16)**
  16:11;20:5;34:12;
  36:2;46:10;61:4;66:1,
  2,11,21;69:14;84:11;
  85:15;101:23;104:20;
  106:4
**jump (5)**
  47:1,19;48:8;68:19;
  129:12
**justify (1)**
  44:16
**juvenile (2)**
  14:23;32:17

**K**

**Kachmann (50)**
  18:15;28:17,18,20;
  47:8,12,22;51:2,3,14;
  63:13;64:14;65:21;
  77:18,19,21;78:3,5,7,
  19,25;79:13;80:4,15;
  81:1,12,15,19;82:13;
  83:8,14,23;84:3;85:15,
  20;86:4,10,16,23;87:7,
  11,21;88:9,11,20;91:4;
  92:21;96:6,9;104:11
**Kachmann's (1)**
  90:15
**keep (8)**
  5:11;6:8;28:22;
  87:12;110:9;112:5,5;
  134:1
**Keldie (2)**
  22:24,25
**Kershner (17)**
  19:10;51:5,15;88:12,
  14,19;89:2,9,18,22;
  90:19,22;91:12,18;
  92:8,19;104:12
**Kevin (1)**
  105:25
**kid (1)**
  15:20
**kids (1)**
  54:12
**Kihm (9)**
  129:23,24;130:23;
  131:8;132:6,10,19,22,
  24
**kind (13)**

16:3;19:13;21:20;
55:23;73:6;76:9;87:9;
98:18;103:16;106:25;
111:24;116:3;119:12
**kinds (1)**
  53:23
**King (1)**
  30:23
**Kirk (3)**
  59:9,11,12
**kite (21)**
  41:20;115:6,9,10,11,
  14,21,23;116:1,3,11,
  13,23;134:7,14;137:7;
  138:14;141:17,17,18;
  144:10
**kites (8)**
  115:18;116:4;
  117:18;133:25;134:1,
  19;140:15,16
**knee (1)**
  71:11
**knew (8)**
  47:14;60:4;66:4;
  94:10,11;125:3,10;
  142:19
**knowledge (11)**
  23:2;24:19;25:5;
  38:16;46:19;120:7,23,
  24;121:10,11;133:9
**Kovar (5)**
  135:2,7,13;139:10;
  140:5

**L**

**LaHaye (35)**
  47:10,15,19;48:1,2;
  62:14;68:5;92:4,6;
  94:14,17,22;95:2,3,12,
  14,24;96:3,5,8,13,21;
  97:9,19,23,25;98:2,9,
  10,12,16;99:12;103:3;
  104:23;105:12
**LaHayes (1)**
  58:10
**LaHaye's (3)**
  94:20;96:7;101:24
**laid (3)**
  42:13;129:6,15
**Lakeland (16)**
  109:1,4;112:25;
  116:11,12;119:2;
  120:14,16;121:20,25;
  122:5;127:20;128:6;
  137:23;138:9,13
**Lansing (3)**
  113:23;114:10,11
**larceny (1)**
  14:12
**Larry (2)**
  68:1;97:24
**last (13)**

7:3,4;8:2;11:15;
25:23;27:17;59:25;
86:20;89:17;95:3,7;
99:21;126:12
**later (6)**
  41:16;69:14;71:18;
  82:23;87:8;122:13
**laundry (2)**
  61:10,22
**law (1)**
  32:24
**lawns (1)**
  109:14
**laws (1)**
  117:24
**lawsuit (17)**
  21:10;25:16;49:21;
  50:17;52:2;92:25;93:2,
  6,18,21;94:6;113:12;
  123:22;124:11,23;
  125:3;142:3
**lawsuits (2)**
  107:16,18
**lawyer (2)**
  124:10,15
**lawyers (1)**
  123:24
**lay (1)**
  41:4
**leaders (1)**
  39:23
**least (4)**
  36:4;44:14,18;85:13
**leave (4)**
  25:23;100:8,12;
  122:11
**led (1)**
  45:7
**left (21)**
  15:22;26:17;29:1;
  30:3;40:25;64:22;65:6,
  13;75:11,12,14,19;
  76:5,7;101:24;113:9;
  118:23;122:2,5,17;
  128:18
**leg (29)**
  17:14;20:20;21:5;
  26:1;40:22,24,25;41:2,
  5,22;45:8;63:2,3,24;
  64:22,25,25;65:3,8,10;
  69:1;71:2;77:11;82:5;
  85:22;98:25;99:1,13;
  145:8
**legal (4)**
  25:6,21;28:11;93:5
**less (1)**
  74:2
**letter (2)**
  23:14,16
**level (1)**
  126:23
**license (5)**
  29:11;76:25;79:7,10;

118:4
**licenses (1)**
  117:25
**licensing (1)**
  117:22
**life (1)**
  37:7
**lifetime (1)**
  13:17
**lift (15)**
  36:12,24;37:3;38:7,
  12,18;40:22;41:22;
  67:4,4,14,17;73:5,5,15
**lifted (2)**
  37:7;38:15
**lifting (12)**
  16:4;36:16;37:18;
  38:18;39:12;42:3,6;
  72:24;73:1,4;74:5,12
**lifts (1)**
  73:11
**likely (5)**
  24:6,7;68:1;99:15;
  107:9
**limitations (2)**
  64:16,19
**Lincoln (1)**
  6:16
**lingering (1)**
  100:13
**list (2)**
  24:13;111:12
**listen (1)**
  102:15
**listened (1)**
  95:2
**listening (1)**
  94:12
**listens (1)**
  134:11
**little (13)**
  29:14;54:2;58:20;
  61:3;62:25;65:17;
  68:13;70:6;75:18;
  82:20;83:3;96:22;
  103:1
**live (5)**
  10:25;30:17;31:13,
  15,16
**lives (1)**
  30:21
**Living (3)**
  50:8;75:6;78:13
**load (1)**
  36:20
**local (4)**
  19:11;88:16,17;
  114:2
**located (2)**
  89:2;134:3
**location (1)**
  101:25
**locations (3)**

116:23;133:18;
141:20
**locked (3)**
  126:21;127:10;
  142:21
**long (33)**
  7:7;8:7,25;9:21;
  10:14;15:8;19:7;25:25;
  27:9,17;28:8,12;29:21;
  32:5;37:24;59:23;
  62:15;63:21;68:9;78:6;
  80:1;82:1,6,9;83:13;
  87:2;88:15,17;102:24;
  105:18;117:17;121:25;
  129:18
**longer (3)**
  15:17;50:18;86:1
**look (3)**
  16:22;76:2;125:23
**Looked (1)**
  87:14
**looking (1)**
  29:23
**looks (4)**
  119:6,8;126:3;
  127:13
**Lortabs (1)**
  20:3
**loss (2)**
  15:12;85:2
**lost (2)**
  25:16;90:4
**lot (5)**
  12:9;31:21;52:15;
  104:3;138:21
**low (2)**
  48:12;81:24
**lower (5)**
  15:13;16:10,17;
  38:23;77:11
**Ls (1)**
  53:7
**LSD (2)**
  12:15,21
**LSD-effect (1)**
  13:15
**Lugene (1)**
  31:2
**L-U-G-E-N-E (1)**
  31:4
**Lutheran (3)**
  19:2;83:19,22
**lying (1)**
  68:17

**M**

**ma'am (33)**
  6:7,22;8:1;9:11;11:5,
  7,9,11,21;11;27:24;
  28:19;30:12;34:14;
  37:13;39:16,19;46:22,
  25;47:3;48:20,23;49:1,

3,7,10,12;51:16;55:9,
20;56:2,6;57:7,12
**MACKRAZ (55)**
15:18;16:19;20:14;
21:15,21;23:5,18;
24:17,21;25:3,17;
31:18;44:5;46:8,12;
49:22;52:6,13;53:4;
59:19;60:14;63:11;
66:20;67:1,13,16;
72:17;82:10;85:18;
86:8;88:2;93:4;94:8,
16;102:17;103:13;
105:18;115:7;119:23;
124:2,12,17,19;125:8;
126:17;136:12;142:1;
143:11,13,19;144:18,
23,25;145:11,13
**mad (1)**
79:3
**mail (1)**
107:5
**mailbox (1)**
116:3
**main (2)**
20:9;77:11
**mainly (1)**
74:9
**makes (1)**
37:5
**making (1)**
143:14
**malpractice (1)**
94:3
**malpractice-type (1)**
94:6
**man (2)**
52:16;61:10
**Management (1)**
26:3
**many (24)**
7:18;8:11;9:19;
10:18;13:16,18;20:15;
58:22;79:12,12;86:22;
88:21;89:9,12;90:16;
112:15;128:2;130:6;
133:15;134:5;135:6,
18;137:25;139:20
**March (1)**
122:22
**Marcy (1)**
26:9
**Marenisco (1)**
22:10
**Marie (2)**
95:12,21
**marijuana (5)**
12:15,17;13:23;14:3,
7
**Marion (16)**
6:18;18:2;19:25;
26:25;28:2;76:16;
77:22;78:6;80:22;81:8;

83:20;84:1;89:3,4,24;
144:20
**Mark (1)**
57:18
**marked (2)**
125:22,24
**Marquette (1)**
95:10
**marriage (3)**
54:11;56:4;106:15
**married (7)**
10:9,14;32:8,10;
106:3,6,10
**Martin (1)**
12:4
**Mary (3)**
141:10,13,21
**masturbate (1)**
69:20
**MATSON (6)**
26:8,9,14;46:10;
57:13;145:21
**matter (3)**
55:5;100:10;116:24
**may (26)**
46:3,3;64:9,9,10;
72:12;75:2;82:20;
85:14,14,15,15;103:1;
109:5,5,6,7;124:4,7;
135:6,6;140:2,23,23;
141:5,5
**maybe (15)**
33:17;57:7;58:24;
60:18;63:18;75:17;
87:8;89:11;94:2;96:22;
97:24;104:12;130:24;
131:17;137:2
**McQueen (1)**
22:22
**MDOC (5)**
16:9;23:2;24:10;
26:3;58:3
**meal (1)**
136:21
**meals (1)**
117:8
**mean (17)**
23:18;24:23,23;
25:19;32:23;42:22;
52:15;64:25;65:7;
85:12;86:14;91:24;
100:5;105:5;126:7;
129:17;142:14
**Meaning (1)**
145:5
**means (4)**
26:20;52:6;84:9;
92:14
**meant (4)**
92:11,13;100:23;
102:23
**M-E-A-T-A-L (1)**
53:10

**medical (34)**
15:10,16;21:8,14;
22:16;23:4,22;24:3;
25:8;49:14;51:6,24;
56:18;58:1,3;62:24;
92:23;93:3,8;94:2,6,
20;115:10,24;130:12,
17,21;132:2,25;
133:25;134:13;140:21;
141:17;144:10
**medication (9)**
18:10;51:19;55:8;
58:25;60:22;112:13;
142:22,25;143:5
**medications (1)**
11:4;19:24;24:9;
99:8;112:9,12;130:24
**medium (1)**
105:18
**meds (1)**
72:2
**meet (6)**
22:9,11;119:4;130:4;
131:2;139:15
**meeting (5)**
48:21;119:12;131:7;
140:19;141:21
**meetings (1)**
138:22
**Melissa (5)**
10:12;30:13;32:3;
59:23;106:3
**M-E-L-I-S-S-A (1)**
10:12
**memory (1)**
143:1
**mentioned (5)**
30:10;99:6,6;132:16;
136:13
**mess (1)**
73:3
**Messing (1)**
60:11
**met (18)**
22:7,22,24;26:8;
49:4,5;58:17,22;79:14,
15;119:5,9;120:23;
121:17;130:9,22;
133:15,19
**Metal (3)**
53:5,9,21
**M-E-T-A-L (1)**
53:9
**Michelle (3)**
54:18;78:4;81:4
**Michigan (10)**
10:3;15:4;29:13;
30:18;62:20;106:6;
107:11,13;117:21;
118:5
**middle (3)**
55:24;76:9;126:18
**Might (26)**

19:19;47:13,20;53:7;
59:1,1;73:9;77:9;
87:24;92:20;95:22;
96:10;100:7,7,8,12;
101:1,2;116:15;
120:13,18,20;128:1;
133:19;140:7;143:23
**military (1)**
108:1
**mind (3)**
5:11;24:14;98:13
**Mindlin (4)**
26:10;45:17,20;
46:24
**mini (2)**
145:17,19
**minute (1)**
64:24
**minutes (3)**
76:23;78:14,18
**missed (1)**
60:21
**misunderstanding (1)**
82:20
**misunderstood (1)**
33:18
**mixed (1)**
110:5
**Mobic (2)**
24:11;72:8
**money (9)**
30:2;50:20;51:13;
52:7;108:7,8,11,16;
110:8
**money-wise (1)**
53:23
**monies (1)**
50:1
**month (12)**
7:8;27:21;44:25;
53:14;73:3,17,25;
78:22;110:11;122:13;
128:7,17
**months (10)**
8:8;9:22,22;19:8;
27:19,20;29:22;87:10,
15,18
**Monville (4)**
143:20,24;144:2,12
**more (12)**
13:20;19:22;21:5;
31:21;48:9;49:16;
65:14;74:9;77:17;
80:12;86:2;91:13
**morning (2)**
136:20;138:6
**most (6)**
24:5,7;30:22;68:1;
99:15;107:9
**mostly (2)**
29:24;72:8
**mother (2)**
30:13,15

**mother's (2)**
30:22;31:1
**motioned (1)**
77:9
**motioning (2)**
67:10,11
**mouth (1)**
84:15
**move (2)**
39:5;80:19
**moving (1)**
16:15
**mow (1)**
109:14
**MRI (34)**
23:12,21,23;46:6,12,
13,14;47:17;48:4,5,6;
57:7;68:2,4,6,18,21;
80:20,21,23;81:2,6,9,
13,14,16,21,23;92:3;
97:21;98:15;101:13,
16;102:22
**MRIs (1)**
92:2
**much (22)**
12:8;21:25;25:19,20;
28:24;37:4;49;41:3;
44:7;53:17;57:14;
69:24;73:15;84:14,17;
89:12;105:17;110:10;
118:12;127:22;128:5;
129:18
**multiple (1)**
134:11
**muscle (1)**
74:19
**mushrooms (3)**
12:15,25;13:13
**mustache (1)**
37:15
**myself (1)**
61:10

**N**

**Nada (1)**
143:16
**Nah (1)**
29:20
**Nakata (5)**
123:14,19,21;
124:16;125:16
**name (17)**
6:10;10:11;26:9;
27:1;31:1;37:12;53:1,
12;55:13;58:19;
103:25;105:25;121:18;
123:25;124:10;126:10,
12
**named (4)**
80:6;123:21;125:3,9
**names (6)**
39:20,24;59:17;

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

96:20;103:22;142:5
**name's (2)**
 57:18;62:13
**Naprosyn (1)**
 72:8
**naproxen (2)**
 24:11;59:2
**nature (1)**
 64:9
**near (1)**
 131:4
**necessarily (1)**
 116:18
**necessary (1)**
 145:1
**neck (8)**
 15:22,24;21:7;74:21;
 75:8,24;76:7;99:2
**need (15)**
 6:3;10:5;24:4,7;
 29:10;43:23;68:11;
 87:12,21;91:7;99:16;
 100:9;105:19,20;
 145:12
**needed (3)**
 18:19;20:12;68:7
**negatives (2)**
 20:13,15
**negligence (2)**
 92:23;93:3
**nerves (1)**
 47:7
**neurosurgeon (1)**
 98:20
**new (3)**
 61:12,22;136:4
**Newberry (18)**
 57:8;61:25;62:4,8,
 10;92:3;97:7,12;129:3,
 7,24;135:10,18;
 136:24;139:17;140:2,
 8,11
**newspaper (1)**
 9:10
**next (4)**
 14:1,6,11,15
**nice (2)**
 5:16,21
**nickname (3)**
 103:11,15;104:1
**nicknames (1)**
 39:24
**night (1)**
 136:16
**nobody (2)**
 44:10;134:12
**nodding (1)**
 5:13
**nope (5)**
 29:20;30:6;42:18;
 43:11;59:13
**normal (1)**
 31:19

**normally (4)**
 43:4;69:19;135:20;
 136:19
**nose (1)**
 112:5
**note (3)**
 27:2,5;28:5
**notes (5)**
 56:10,13,24;57:2,25
**Nothing's (1)**
 68:20
**notice (3)**
 66:1;69:10,22
**noticed (4)**
 48:3;66:18;69:11,24
**noticing (1)**
 71:1
**notified (3)**
 40:2;49:20;50:16
**NP (1)**
 59:12
**NSAIDS (1)**
 72:3
**numb (2)**
 21:6;66:5
**number (2)**
 13:18;51:21
**numbness (14)**
 15:12;17:14;20:19,
 21;23:10;45:9;54:9;
 63:1;69:7,10,18,23;
 71:1;85:2
**numerous (1)**
 67:8
**nurse (13)**
 40:8,16;54:18,22;
 59:9;93:8;118:3;
 125:10;130:2,14;
 139:19,22;141:9
**nurses (4)**
 83:25;117:22;118:1;
 140:20
**nurse's (1)**
 131:3
**nursing (1)**
 118:4

**O**

**obeying (1)**
 33:8
**Object (3)**
 15:18;21:15,21
**Objection (24)**
 16:19;23:5;24:21;
 25:3,17;44:5;49:22;
 52:13;60:14;82:10;
 85:18;86:8;93:4;94:8,
 16;102:17;115:7;
 119:23;124:2,12,17;
 125:8;136:12;143:11
**obtain (2)**
 56:17;90:1

**occasion (1)**
 35:20
**occasionally (2)**
 20:22;74:7
**occasions (1)**
 131:10
**occurred (2)**
 16:10,13
**odd (2)**
 30:1,5
**off (26)**
 26:19,21,24;27:5,15;
 28:7;31:23,23;36:22;
 42:23;43:3,7;65:7;
 71:8;72:20,21;82:24;
 104:17;108:17;116:21;
 129:6,15,16,19;131:1,
 16
**offer (3)**
 67:19,24;91:12
**offered (1)**
 68:24
**office (6)**
 49:8;90:15,20;96:7;
 101:24;114:11
**officer (2)**
 17:3;114:23
**officers (6)**
 37:11;68:18;71:25,
 25;114:24;135:20
**officer's (1)**
 37:12
**offices (1)**
 131:3
**off-site (1)**
 97:14
**often (4)**
 12:5;60:12;61:15;
 111:5
**Ojibway (3)**
 22:10;129:20;141:24
**old (6)**
 10:20;11:24;31:10;
 38:5;60:5;63:6
**oldest (2)**
 142:10,12
**once (14)**
 15:14;43:14;44:25;
 58:24;60:18;86:24;
 89:11;92:3;110:11;
 111:6,7;113:13;
 130:21;138:1
**One (56)**
 10:19;14:1;22:14;
 31:11,11,11,12;33:6;
 36:20;37:11;38:3,3,9;
 39:3,17;40:22,24;
 41:22;43:16;48:5;53:8;
 63:18;65:13;68:5;70:1,
 3,8,8;72:4,5;73:23;
 75:1;76:21;77:15,16;
 79:15;82:23;83:11;
 91:13;95:15;97:19;

100:7,7,8;104:22;
 114:19;116:10;117:17,
 18;120:20;129:5;
 132:16;141:15;143:4;
 144:24,25
**one-on-one (1)**
 119:11
**ones (3)**
 25:5;57:7;93:16
**ongoing (1)**
 100:13
**only (8)**
 25:5;32:14;85:20;
 91:1;122:25;128:20,
 25;138:8
**onto (1)**
 36:20
**opened (1)**
 33:6
**opinion (5)**
 23:3;67:24;68:23;
 91:12;97:22;101:8
**opinions (1)**
 93:5
**opposed (1)**
 56:22
**options (1)**
 113:14
**order (7)**
 81:5;83:1;110:14,22;
 111:5;145:15,21
**ordered (8)**
 45:4,5,5,6,7,13;59:3;
 110:23
**orders (1)**
 141:17
**Ordinarily (2)**
 42:25;132:3
**organized (1)**
 57:4
**original (1)**
 120:20
**orthopaedics (2)**
 89:5,8
**others (3)**
 24:13;62:16;72:7
**out (45)**
 8:10;9:13;11:16;
 18:15;22:18;24:24;
 25:8;29:7;34:4;42:1;
 43:10,19,21,23,24;
 44:3,7,9,10,15,18,25;
 45:3;51:4,7,13,18,23,
 25;52:6;65:9;72:21;
 73:3;77:3;89:2;90:19;
 97:21;102:22;110:14;
 113:20;114:1;115:25;
 127:5;128:8;129:10
**outpatient (1)**
 87:5
**outside (5)**
 21:5;23:24;109:11;
 116:19;119:14

**outweighed (1)**
 20:12
**over (12)**
 5:20;25:14;36:21;
 40:6;49:13;50:24;61:3;
 63:11;75:16;80:20;
 81:21;92:1
**overseeing (1)**
 44:2
**over-the-counter (2)**
 112:8,12
**overtime (2)**
 7:20,22
**own (7)**
 51:4,18;52:1;89:5;
 92:2;113:17;127:16

**P**

**PA (1)**
 58:12
**page (2)**
 126:18;145:17
**paid (12)**
 7:22;25:12;44:18,23;
 50:1,2,22;111:1;
 127:20,22;128:5,16
**pain (55)**
 15:13,13,21,22,24;
 16:17,24;17:12;19:24;
 20:9,22;21:7;24:5,9;
 25:25;26:3;27:25;28:3;
 34:23;41:3;45:9;47:7;
 63:1,23;66:4,23;68:10;
 69:24;70:2,7,8,14,24;
 71:4,6,13,14,24;74:1,2,
 21,23,25;75:4,7,14;
 77:11;81:25;82:4;85:3,
 21;98:25;100:8,13;
 129:18
**painful (2)**
 26:2;77:17
**paper (1)**
 145:20
**papers (2)**
 130:13;138:21
**paperwork (1)**
 80:8
**parlance (1)**
 131:23
**Parma (1)**
 33:11
**parole (6)**
 7:25;15:6,8;17:21,
 21;19:21
**paroled (4)**
 6:24;17:16;112:22;
 118:23
**part (8)**
 25:16;32:21;33:18;
 34:15;101:14;102:23;
 125:10,11
**particular (6)**

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

27:3,13;36:12;
125:14;134:16,20
**parts (1)**
7:10
**pass (2)**
57:13;129:10
**past (4)**
15:16;60:8;91:14;
102:16
**pathway (1)**
36:14
**Patriot (1)**
9:9
**pay (16)**
8:9;9:2,15;11:3;
25:8;44:25;50:13,14,
21;51:1,14,14,15,18,
25;83:1
**payers (1)**
83:4
**paying (3)**
44:16;50:12;106:22
**payments (1)**
128:10
**PDF (1)**
145:19
**pending (2)**
6:5;107:16
**people (17)**
24:23;39:8,20;50:8;
72:1;86:7;91:13;
103:16,17,23;104:2,4;
108:7;133:8;134:11;
135:24;142:5
**per (3)**
7:16;9:17;128:7
**percent (5)**
64:21;65:6,11,12;
83:9
**performed (5)**
63:18;83:18;88:4;
102:8,10
**performing (1)**
85:24
**period (3)**
27:9;62:9;129:18
**permanent (5)**
28:9;52:20;86:2;
93:16;94:11
**permanently (1)**
53:16
**Permission (2)**
131:25;132:2
**person (11)**
14:12;22:7,22;37:14;
67:19;68:14;85:9;
126:8,19;131:6;134:16
**personal (5)**
56:13,24;57:25;
107:19;120:5
**personally (1)**
130:4
**pertains (1)**

96:5
**phone (3)**
45:25;55:22;96:7
**phrase (1)**
35:13
**phrased (1)**
72:16
**physical (15)**
19:6,7;50:14;88:15,
16;90:1,11,18;92:2;
133:12;139:6,9,12;
141:2;144:1
**physically (1)**
98:24
**physician (3)**
26:24;58:13;98:19
**physicians (1)**
25:1
**pick (1)**
39:5
**picture (1)**
142:13
**pieces (1)**
38:5
**place (5)**
55:18,21,24;81:5;
117:25
**placed (1)**
53:4
**places (3)**
29:6;83:23;116:17
**plain (2)**
46:6,7
**plan (6)**
24:20;25:1;98:11,13;
102:2,5
**planned (1)**
82:14
**plans (1)**
56:4
**plant (2)**
109:21,21
**plants (1)**
110:2
**play (1)**
54:12
**playing (4)**
73:6,7,8,9
**plead (1)**
34:9
**pleading (2)**
33:4;34:6
**please (7)**
5:12,18,23;6:4,10;
51:10;124:9
**pleased (1)**
102:1
**pled (2)**
32:25;33:23
**Plus (1)**
43:14
**pm (3)**
105:21,22;145:24

**pocket (6)**
25:9;51:4,8,13,18;
52:1
**point (23)**
27:25;30:8;32:1;
39:7,25;40:4;41:12;
42:4,15;43:22;44:21;
45:4,22;46:20,23;49:8;
56:4;66:7;71:4,13;
85:10,12;111:18
**pointing (2)**
21:2;102:22
**police (2)**
17:3;68:18
**policy (2)**
21:20,23
**pop (4)**
16:22;38:20,22,24
**Pope (6)**
139:13,15,24;140:1,
10,13
**popping (5)**
70:5,10,14;73:13,18
**position (17)**
7:14;8:13,18;9:12,
21;27:3,14,18;29:1;
33:3;42:8;52:11,19,21,
21;93:25;139:18
**positive (1)**
18:11
**Positives (1)**
20:15
**possession (4)**
13:23;14:2,7,23
**possible (3)**
88:15;126:8,19
**possibly (15)**
24:8;48:16;49:16;
68:12;95:11;99:16;
100:10;119:24;123:11,
13;133:23;135:14;
139:25;140:18;141:14
**pound (2)**
36:25;37:3
**pounds (5)**
16:16;37:6,17;38:18;
118:12
**poured (1)**
38:4
**power (1)**
103:8
**practitioner (4)**
54:19,22;59:9;130:2
**prepared (1)**
19:22
**Prescription (1)**
51:19
**present (1)**
131:7
**press (5)**
67:15,18,21;73:19;
74:16
**pressed (1)**

40:21
**presses (2)**
73:12,14
**pretty (11)**
21:25;25:19,20;
35:14;37:4;44:7;53:17;
61:5;74:23;84:14,17
**prevented (1)**
115:20
**previous (1)**
8:22
**prior (12)**
8:17;9:6;26:8;35:4;
36:4;74:14;80:5;83:2,
8;95:14;101:3;106:14
**prison (42)**
11:15;15:21;21:19;
25:10;39:14,18;40:1;
56:17,19;60:1;61:9;
76:14;78:23;96:3;
106:6,9;108:3;109:10;
112:17;113:16;115:2,
11;116:8,24;117:3,12;
118:7,17,20,23;120:25;
127:19;128:6,13,14,16,
21,24;129:3;131:23;
132:4;134:1
**prisoner (21)**
108:4,6,18,20,23,25;
109:3;110:8,10,13;
111:8;112:1,9,20,21,
24;113:6;120:11;
128:5,10;138:2
**prisoners (3)**
108:9;116:24;119:13
**prisoner's (1)**
142:16
**prisons (3)**
108:19;114:15;
137:10
**Probably (18)**
12:6,22;13:20;24:13;
25:14;43:8;50:10;51:1;
54:18;58:24;61:16;
68:7;75:23,23;96:22;
118:9;139:22;142:20
**problem (6)**
17:8;52:2;94:25;
105:14;111:22;114:18
**problems (10)**
17:20;35:19;54:11;
56:3,7;66:3;69:1;
93:14,14;98:24
**procedure (8)**
63:17,19;64:1,1,5,9;
85:17,23
**procedures (2)**
100:16;117:22
**process (1)**
113:24
**products (1)**
111:13
**prognosis (3)**

90:24;91:5,8
**program (2)**
50:20;78:2
**proper (1)**
23:13
**properly (2)**
24:24;94:19
**pros (1)**
100:2
**provide (4)**
19:13;52:3,10;54:8
**provided (2)**
104:16,16
**provider (2)**
50:4;93:8
**provides (1)**
49:18
**providing (1)**
144:19
**psych (1)**
24:12
**pull (2)**
71:10;109:22
**purchase (3)**
108:22;110:17;111:8
**purchased (1)**
110:13
**Purdue (1)**
31:14
**purpose (2)**
93:1;125:22
**pursuing (1)**
49:20
**push (3)**
36:21,21;68:20
**pushups (1)**
74:10
**put (8)**
22:14;41:20;46:8,16;
82:24;84:14;98:5;
108:14

**Q**

**Qayyum (2)**
59:14,15
**quarantine (1)**
35:10
**quick (1)**
57:19
**Quinlan (4)**
138:17,23;139:7;
140:4
**quit (1)**
52:11
**quite (4)**
11:17;18:11;19:1;
53:12
**quote (1)**
126:20

**R**

radiate (1)
  75:14
radio (1)
  94:2
radiologist (5)
  45:18,20;46:24;
  48:22;49:2
radiologists (2)
  26:12;57:6
radiologist's (1)
  49:8
raised (1)
  34:17
Ralles (1)
  22:19
range (1)
  9:4
rank (2)
  70:10;75:4
rate (4)
  7:16;8:9;9:2,15
rather (1)
  103:25
read (3)
  126:23;127:7,9
reading (1)
  126:23
real (2)
  84:20;85:10
realized (1)
  113:13
really (15)
  12:9;20:23;42:2;
  43:11,14;44:20;45:3;
  60:19;73:4;84:18,19;
  85:9;95:22;106:21;
  134:12
reason (6)
  48:25;77:1;81:14;
  93:1;97:19;98:16
rec (2)
  129:8,10
recall (19)
  9:23;17:6;22:25;
  25:12;27:11;42:24;
  45:21,24;46:25;55:13;
  58:16;80:7;84:18;
  112:16;138:24;140:1,
  4,7;141:5
recalling (1)
  58:21
receive (8)
  18:9,14;23:16;24:9;
  32:5;108:11;113:13;
  129:5
received (5)
  17:4;23:4,21;24:11;
  140:16
receives (1)
  32:4
receiving (2)
  32:6;55:11
recent (1)

25:1
recently (2)
  10:6;104:17
recess (1)
  105:21
recognized (1)
  66:7
recollection (2)
  58:12;59:12
recommend (8)
  42:22;68:9;98:11;
  99:20;100:12;101:2,9;
  104:12
recommendation (1)
  42:15
recommendations (2)
  94:22,23
recommended (3)
  55:2;77:23;101:12
record (9)
  5:17,22;21:1;32:17,
  20,21;33:19;142:19;
  144:18
records (14)
  10:1;56:18;58:1,3,7,
  9;94:20;103:2;122:17;
  130:12,17;133:25;
  140:22;144:10
record's (1)
  84:9
recover (1)
  91:2
RECROSS-EXAMINATION (1)
  145:2
Redrum (3)
  39:22;42:3;103:13
referred (6)
  18:5,15;23:24;77:20;
  86:17;97:23
reflect (1)
  21:1
reflexes (3)
  80:18,18;99:4
refresh (1)
  55:24
refuse (1)
  105:3
refused (3)
  104:23,25;105:1
regard (1)
  93:3
regarding (1)
  99:24
registered (4)
  117:22,25;118:3,4
regular (5)
  46:19;47:24;57:9;
  100:24;108:22
regularly (2)
  74:23;87:9
regulate (1)
  117:24
related (6)

51:8,24;52:2;54:6;
  62:1;85:14
relations (1)
  106:14
relationship (1)
  60:7
relative (1)
  93:9
relatives (4)
  108:11;119:21,25;
  120:8
release (2)
  96:2;130:12
released (8)
  18:2;19:19;24:25;
  25:9;60:17;76:17;
  78:23;103:4
releases (1)
  9:25
relevance (1)
  60:14
relieve (2)
  24:5;71:11
relying (1)
  140:21
remarks (1)
  126:14
remember (35)
  5:13;48:15,17,21;
  49:6;58:17,22;59:6,7,8,
  10,18;64:7;78:20;
  83:11;86:16;96:13,18,
  19;97:18,23;98:22,23;
  99:8,11,14;100:11;
  101:12,17;102:24;
  103:5;104:18;121:6;
  132:18;140:19
remembering (1)
  72:14
remind (1)
  72:17
Remy (1)
  12:4
repeat (2)
  51:10;124:9
rephrase (1)
  66:16
report (6)
  125:22;126:3,4;
  138:2;142:10,12
reporter (6)
  5:15;31:19;105:20;
  127:18;144:22;145:12
represent (5)
  26:10,11;57:18;
  62:14;105:25
representation (1)
  25:21
request (6)
  22:15;115:10,12,13;
  138:14;144:21
requested (1)
  137:8

requests (1)
  144:19
resided (1)
  108:19
residence (1)
  76:22
resistance (1)
  67:20
resolve (1)
  16:5
resort (2)
  95:3;99:21
respond (1)
  134:17
responded (2)
  115:18;140:17
responding (1)
  141:17
responds (1)
  114:11
response (4)
  114:5,10;117:17;
  120:1
responsibilities (1)
  34:15
restriction (1)
  28:21
restrictions (1)
  117:25
result (2)
  64:5;77:21
resulted (1)
  101:20
results (2)
  81:12;99:11
retail (2)
  14:25;33:25
retain (1)
  24:20
retained (1)
  24:15
returns (1)
  144:19
review (2)
  57:23;124:23
reviewed (1)
  57:25
reword (1)
  5:23
REYNOLDS (5)
  57:17,18,22;62:12;
  145:16
RGNC (1)
  35:9
rid (2)
  82:3;85:21
ride (1)
  33:7
right (101)
  10:21;11:19;21:3;
  35:13;38:23;41:2,5;
  44:11;54:7;60:9;62:7,
  9;63:17;64:17,20,24,

25,25;65:2,3,4,5,12,15;
  68:19,22;69:7;70:7;
  71:17;75:16,17,17,25;
  76:8,18;77:12,13;83:8;
  95:23;96:16;106:11,
  16;107:10,16;108:3;
  109:9,12,21;110:8;
  111:16;112:6,22;
  113:24;114:12,14;
  115:12,14,16;116:4,19,
  20,21,25;117:3,13;
  121:20;122:9,14;
  124:19;125:23;126:2,
  4;127:10,14,17,19;
  129:15,23;131:14;
  132:4,9;133:2;134:14,
  17;136:1,5;137:3;
  138:5,15;141:10;
  142:22;143:6,6,10,17,
  18,20;144:11,16;145:6,
  21
rights (1)
  21:20
risks (1)
  100:15
Road (1)
  30:23
Robert (1)
  6:11
R-O-B-E-R-T (1)
  6:11
Rocco (1)
  22:7
rocks (2)
  126:20;127:9
rolled (1)
  40:7
room (3)
  18:3;79:20;97:4;
  119:13;129:8
Roose (4)
  141:10,13,21;142:2
R-O-O-S-E (1)
  142:2
ropes (1)
  129:12
rotate (1)
  34:20
Roughly (3)
  9:22;27:20;65:25
route (2)
  101:2,3
routine (1)
  138:15
routinely (1)
  108:22
run (1)
  29:11
running (1)
  112:5
ruptured (1)
  47:6,13,20,23;68:2,
  25;81:24

rush (1)
27:16
Russo (1)
141:25
Ryan (1)
62:13

**S**

same (14)
9:2;14:2;17:16;
22:20;37:20;41:15,21;
67:9;70:18,21;91:3;
118:16;125:11;131:17
Sault (2)
95:12,21
saw (21)
17:6;24:2;40:17;
78:7;80:15;81:18;
83:23;86:20;88:11;
89:17;95:15,15,19;
96:13;97:14;98:16,21;
102:1;130:8,19;139:20
saying (8)
5:14;15:24;28:5;
52:11;84:10,13;85:6;
130:17
scale (3)
70:8,20;75:1
scan (2)
46:7,15
schedule (6)
95:9;99:22;134:25;
139:4;140:10;144:12
scheduled (4)
82:14,22,23;89:14
school (5)
33:9,10,13;127:1,3
second (8)
14:16;43:18;44:13;
45:2;82:16;83:7;91:25;
132:6
Security (3)
107:1,21,23
seeds (1)
109:22
seeing (10)
22:12;71:22;80:5;
81:11;89:22;94:17;
95:25;97:25;98:12;
104:13
seek (2)
17:25;115:10
segregation (1)
117:7
Sell (6)
68:1,13,24;97:24;
98:1,7
semis (1)
9:13
send (1)
108:14
sends (2)

108:7,8
sensation (1)
70:10
sense (1)
31:21
sent (5)
40:9;41:12;97:11;
113:19;145:20
separate (1)
56:5
September (2)
96:16;101:25
serious (2)
77:17;81:17
serve (1)
117:8
service (7)
16:14;40:5,6,10;
52:22;91:8;108:1
Services (2)
21:19;89:23
sessions (3)
90:11,16,18
set (1)
62:12
seven (5)
9:22;10:21;59:24,25;
128:4
seven-year-old (1)
30:10
several (1)
87:15
sex (1)
60:13
sexual (2)
60:6;106:14
shaking (1)
5:13
sheets (4)
61:9,12,21,22
shelled (1)
52:6
shift (5)
134:24;136:4,8;
140:10;144:11
shifts (6)
135:15,18,21;136:3,
11;139:3
shoe (3)
130:25;131:17,20
shoes (2)
131:21,22
shoot (1)
25:25
shooting (5)
63:1;70:2;82:4;
85:22;99:1
shoots (5)
15:13;20:22;21:6;
75:24,25
short (1)
105:18
Shorter (1)

37:15
shortly (1)
42:9
shot (1)
68:9
shots (2)
24:5;68:9
shoulder (6)
73:12,14,19;74:16;
75:25;76:8
shoulders (1)
73:16
shovel (1)
109:15
show (3)
29:10;109:15;122:17
showed (4)
23:8,8;48:6;81:9
showing (3)
68:6;102:21,22
side (10)
20:10;38:23;64:17;
65:16;75:10,12;76:5,7;
77:12,13
sidewalk (2)
38:5,5
sidewalks (1)
109:15
sign (6)
9:25;114:1;126:4,10,
12;130:12
signature (5)
126:6,7,9,16;127:16
signed (3)
104:17;123:10;
133:22
signing (2)
64:7;104:18
SILDACK (17)
5:1,5;6:11,12;10:12;
26:8,13;43:23;57:17,
21;62:13,17;86:11;
105:23;106:4;126:13;
145:2
S-I-L-D-A-C-K (2)
6:12;10:13
similar (1)
29:15
simple (2)
73:12;94:10
simplified (1)
69:16
Sinus (3)
15:20;111:21;112:12
sit (7)
43:21;44:7,11;71:10;
73:11;96:21;129:18
situation (1)
77:7
six (5)
9:22;13:20;29:22;
75:5,7
size (1)

145:16
slab (1)
36:25
slabs (8)
16:15;36:16;37:3;
38:8;39:3,12;42:3,7
slender (1)
96:23
slide (2)
36:22;116:1
smoke (2)
11:6,14
smoked (2)
11:12;12:15
snap (1)
16:22
sneezing (1)
112:6
snorted (1)
12:15
Social (3)
107:1,21,23
softballs (1)
129:12
solely (1)
76:5
somebody (7)
37:9;44:13,17;62:5;
77:18;108:7,8
somehow (1)
43:18
someone (10)
35:18,21;39:25;
42:22;43:22;53:11;
54:16;80:4;90:19;
103:12
someone's (1)
35:4
sometime (1)
96:15
sometimes (8)
7:21;12:3;61:17;
64:22;65:8,9;71:9;
111:6
somewhere (3)
27:6;73:21;121:24
soon (3)
16:21;25:24;61:5
Sorry (3)
78:17;89:10;101:23
sort (18)
27:2;28:20;29:11,15,
18;39:11;49:17;54:16;
55:2,7;56:10;57:2;
59:3;64:1,4;91:4;
109:15;145:5
sought (2)
17:20;54:13
sound (7)
11:18;70:5,14;73:13,
18;96:16;138:19
sounds (3)
121:18;138:18,19

source (2)
32:1,14
South (1)
6:16
spaces (1)
40:21
speaking (1)
49:6
specialist (6)
19:12;23:24,25;24:3;
47:17;84:6
specialists (2)
86:18;88:10
specialty (1)
89:6
specific (9)
21:13;34:19;58:12;
59:12;64:13;65:1,14;
68:22;92:8
specifically (3)
40:20;66:22;77:10
spell (2)
6:10;31:3;53:6;
142:1
spend (4)
51:4,7,12;128:13
spent (3)
49:13;50:24;110:8
spoke (3)
57:5;119:10,13
spoken (2)
46:23;48:24
sports (1)
54:12
spring (1)
109:21
squats (1)
73:11
staff (3)
63:19;134:13;136:10
Staffing (10)
7:13;26:18;27:18,21;
29:1;30:3;52:12,20;
53:3;137:4
stamps (1)
111:9
stand (6)
40:22,24;41:2,5,21;
80:19
standing (2)
25:25;145:14
Star (10)
7:12;26:18;27:18,21;
29:1;30:3;52:12,19,19;
53:3
start (8)
12:21,25;13:4,8;
27:17;65:23;73:1;
109:3
started (14)
7:5;8:10;9:13;17:12;
20:6;25:25;37:18;54:2;
58:9;60:10;65:24;71:1;

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

74:13;128:17
**starting (1)**
74:5
**starts (2)**
50:10;75:24
**State (8)**
6:10;10:3,5;89:24;
91:12;117:21;118:5;
131:21
**stated (1)**
21:12
**statement (2)**
105:2;126:19
**states (1)**
62:20
**station (1)**
114:25
**stay (1)**
17:16
**stayed (1)**
70:21
**stays (1)**
31:14
**STDs (1)**
104:5
**Ste (2)**
95:12,21
**Step (10)**
113:19,22,23;114:1,
5,6,7,9,10,11
**Step-children (4)**
10:24;31:5,10;
106:18
**steroid (7)**
24:4;68:9;94:24;
95:4;99:20;100:18;
101:5
**stick (1)**
42:10
**Stieve (1)**
22:5
**still (11)**
15:6;20:10,19,21;
23:9,22;24:3;42:3;
44:16;92:14;120:18
**stop (6)**
6:6;12:19,23;13:2;
20:8;64:23
**stopped (2)**
20:6,7
**stopping (1)**
63:23
**store (12)**
108:18,20;110:9,13,
14,16,22;111:5,12;
112:1,9;128:14
**stores (2)**
108:23;111:8
**street (13)**
30:21;106:7;113:3,9;
116:14,15;122:7,11,15,
18,25;128:20;137:18
**strength (2)**

67:3;99:1
**stretch (2)**
71:11;74:9
**stretches (2)**
28:22;80:19
**strike (3)**
58:6,11;92:25
**strong (4)**
64:21;65:6,11,12
**stuff (10)**
40:23;41:22;46:17;
52:4;61:11;74:10;76:8;
96:20;110:25;112:3
**submit (6)**
114:2;115:12,23;
134:7,14;137:7
**submitted (2)**
117:18;138:15
**submitting (2)**
115:5,20
**substance (1)**
98:4
**successful (1)**
64:10
**sudden (4)**
16:3;66:15;69:15,17
**suddenly (1)**
22:12
**sue (3)**
22:1;124:15;125:6
**suggesting (1)**
100:3
**suing (6)**
125:18;133:7;135:4;
140:13;142:6;144:4
**summer (1)**
109:24
**supervision (1)**
39:11
**supervisor (1)**
53:11
**support (4)**
10:23;11:2,3;106:22
**supporting (1)**
31:8
**supposed (2)**
33:5;72:10
**sure (38)**
5:16;6:8;7:2;11:17;
14:9;18:1;19:1,17;
23:1;25:15;27:1;29:17;
45:6;48:8,13,13;49:16;
51:11;53:12;59:22;
65:1;72:4;83:9;84:10,
16;85:13;86:21;96:21;
107:3,7;110:22,25;
118:9;130:3,25;132:8;
138:11;143:14
**surgeon (2)**
28:13;77:16
**surgeries (2)**
50:2;87:22
**surgery (35)**

18:20,22;19:2;20:9,
24;22:15;27:17,20;
28:14;50:13,22;65:19,
20;77:15;79:13,16;
82:13,21;83:8,14,18,
22;86:22;87:3,16,25;
88:3;90:12;92:4,6;
94:22;95:10;98:6;
99:23;100:6
**surgical (5)**
63:17;64:1,9;85:17;
101:3
**suspension (1)**
33:5
**sweep (1)**
109:14
**switch (1)**
69:17
**sworn (1)**
5:3
**symptoms (4)**
23:9;63:23;82:2;
102:15
**system (5)**
49:18;112:18;
113:16;140:14;144:5

**T**

**talk (12)**
53:14;63:11;81:8;
100:15;113:21;120:8;
123:24;124:5,7,10;
132:7,9
**talkative (1)**
85:9
**talked (28)**
54:24;55:4;62:24;
66:11;70:6;72:19,23;
81:20;83:2;84:23;85:1;
88:10;94:23;98:15;
99:13;100:6,18;
102:20;103:11;119:15;
124:6;125:11;131:11,
14;132:6,13,15,19
**talking (12)**
5:20;56:16;67:23;
68:23;71:3,22;75:1;
100:11;101:17;106:25;
131:7;141:18
**talks (1)**
86:12
**taller (1)**
96:22
**tax (2)**
10:1;144:19
**teachers (1)**
33:9
**teams (1)**
38:12
**telephone (2)**
119:15;120:9
**telling (3)**

99:12;102:16;136:7
**temp (1)**
52:23
**temporary (3)**
7:12;52:21,22
**ten (11)**
70:8;9,12,19,20;71:8,
17,18,20;75:1;78:8
**tennis (1)**
131:21
**tension (1)**
71:12
**term (1)**
88:16
**terms (6)**
28:21;46:18;47:12;
50:20;57:9;73:8
**test (4)**
67:9;81:19;99:3,3
**tested (3)**
80:18,18;99:4
**testified (2)**
5:4;72:18
**testing (3)**
59:4;80:17;101:10
**tests (3)**
22:20;81:19;99:13
**theirselves (1)**
36:20
**therapy (12)**
19:6,7,15;27:16;
50:14;88:15,16;89:23;
90:1,11,18;100:21
**thinking (3)**
29:8;84:25;101:23
**third (3)**
14:20;132:9;136:21
**third-party (1)**
83:4
**THOM (8)**
13:12;21:1;105:19,
24,25;143:14;144:16;
145:19
**THOMME (5)**
5:6;21:4;23:20;26:6;
145:14
**though (4)**
52:18;53:8;66:7;
92:8
**thought (3)**
33:17;87:24;97:11
**thoughts (1)**
99:24
**thousand (5)**
25:14;49:13;50:24;
51:20,24
**three (31)**
8:8;10:15;12:6;19:8;
26:12;31:15;60:15,18;
61:16;69:11;73:2,17,
24;74:6,12;83:15,15;
87:9,17;106:9,9,15;
117:2,11;122:13;

130:7,11,19;131:10;
132:12;135:19
**three-step (1)**
113:24
**throughout (2)**
37:7;61:18
**Thumb (1)**
22:13
**tightens (1)**
74:3
**Tile (4)**
8:4,14,15;52:4
**till (5)**
11:15;13:7;15:9;
76:25;82:17
**times (31)**
7:19;12:6;58:22;
60:8,15;61:16;74:8,18;
79:12;86:22;89:9,12;
112:15;117:2,11;
130:6,11,19;131:22;
132:12;133:15,18;
135:23,25,25;137:25;
139:20,23;140:22;
141:20;142:20
**tingling (1)**
20:21
**title (2)**
141:8;144:14
**Tobacco (4)**
111:13,15,18,19
**today (16)**
15:17;35:22;69:8;
105:2;123:6;125:6,13,
18;139:7,10;140:17;
141:3;142:3,8,23;
144:2
**toes (13)**
40:22;41:9,10;65:15,
15,21;66:3,8,19,22;
67:16,17;71:3
**together (5)**
37:2;60:1,2,2,15
**told (51)**
21:24;22:1,3,4,5,14,
17;26:17;28:22;31:5;
32:10,17,17;33:25;
34:12,21,22;37:4,9,10;
38:17;42:6;49:13;51:6,
12;62:5;63:21;68:1.5,
10;81:24;82:1,6;85:8,
20;86:3,4,11;87:21;
91:7;95:9;98:24,25;
99:2,2,14,15;101:5;
105:2;120:9,15
**took (6)**
11:16;12:15;16:23;
17:4;39:2;77:17
**top (2)**
24:14;58:19
**total (1)**
29:10
**totally (1)**

113:14
**touch (3)**
40:22;41:9;96:8
**touching (1)**
41:9
**toward (1)**
50:2
**towards (1)**
75:23
**Town (1)**
103:18
**Tracie (5)**
140:25;141:3,6,8,13
**track (1)**
110:9
**Tracy (2)**
30:16,17
**transcript (1)**
31:20
**transfer (2)**
62:9;107:8
**transferred (7)**
22:13;42:9;43:12;
44:24;45:1;62:7;107:6
**treat (6)**
21:25;23:11;83:23;
104:23,25;105:4
**treated (13)**
15:22;21:18;24:24;
25:6;63:22;121:2,5;
123:18;130:14;132:24;
135:9;138:25;141:23
**treating (1)**
25:1
**treatment (30)**
17:20,25;18:9,14,17;
19:5,9,13;23:4,17,22;
25:9;41:19;54:13;55:2;
68:7;86:1;93:10;95:4;
96:6;98:11,13;99:21;
100:2,24;102:2,5;
104:7;105:1;113:14
**Trent (2)**
103:24;126:13
**TRENTON (9)**
5:1,5;6:11;26:13;
57:21;62:17;103:23;
105:23;145:2
**T-R-E-N-T-O-N (1)**
6:11
**trial (1)**
34:4
**Tried (2)**
68:20;120:2
**True (12)**
27:23;34:2;35:24;
36:10;42:17;43:16,17;
44:14;47:2;48:12;
116:8;137:10
**Try (18)**
31:18,22,23;40:22;
43:10,19,24;44:14;
51:11;62:14,15;63:11;

65:14;67:17,20;71:11;
73:3;74:8
**trying (4)**
44:9;51:23;63:20;
96:8
**TV (1)**
94:1
**twice (3)**
58:24;86:24;89:11
**two (31)**
38:12,12,15;41:16;
53:7;60:15,18;61:3;
65:24,24,25;66:10;
69:11,14;71:14,14,18,
20,21;72:12,24,25;
78:10;83:15;97:1,3;
103:20;111:7;122:13;
135:25,25
**two-week (3)**
41:18,25;42:10
**Tylenol (1)**
24:11
**type (8)**
13:14,15;18:10,20;
28:11;72:11;85:23;
107:2
**types (1)**
100:6
**typically (1)**
103:22

**U**

**unable (1)**
41:7
**unbearable (1)**
16:24
**under (4)**
22:11;39:11;50:3;
118:4
**underlying (1)**
33:2
**understood (1)**
42:11
**undertake (2)**
101:2,3
**unemployment (1)**
107:13
**unit (7)**
71:25;114:23,24,24,
25;116:15;117:12
**unloading (1)**
9:13
**untreated (2)**
82:2,7
**unusual (1)**
42:25
**up (44)**
6:9;17:2;25:19;
26:15;28:13;35:21;
39:5;40:23,25;41:22;
47:21;50:3,12;51:21;
61:6;65:10;67:5,14,17,

21;69:19;70:22;75:3;
80:19;87:7,9,12,23,25;
96:2,5;99:2;105:8,8;
111:18,19;126:6,21;
127:1,10;129:4;
142:21;145:1,8
**upon (3)**
101:7;102:8,11
**upper (8)**
34:24;63:6;75:8,17;
87:25;101:14,15,16
**urinary (2)**
84:4;104:8
**urologist (2)**
104:7,13
**use (2)**
25:1;69:15
**used (4)**
74:16;91:18;92:8;
100:20
**using (3)**
12:17,25;38:6
**usual (1)**
36:6
**utensils (1)**
111:10

**V**

**vague (1)**
5:23
**Valerie (9)**
121:15,17;123:4,9,
19,22;124:15;125:6,14
**Valium (1)**
20:3
**VAN (5)**
5:6;21:4;23:20;26:6;
145:14
**various (1)**
135:23
**vegetables (2)**
109:22;110:2
**versus (1)**
85:6
**video (1)**
29:13
**violated (1)**
21:20
**visit (19)**
77:21;79:1;80:1;
81:3;82:16;83:7,13,16;
86:13;91:21,22,25;
96:18,19;97:19,20;
98:1;102:24;103:3
**visits (4)**
79:12;88:20,25;
106:13
**voice (1)**
6:9

**W**

**wages (1)**
25:16
**wait (5)**
5:18;67:13;73:21;
82:17;137:6
**waiting (1)**
82:24
**wake (2)**
61:6;69:19
**walk (4)**
16:24;28:23;40:14;
71:9
**walked (1)**
117:15
**walking (1)**
74:9
**Walmart (3)**
29:7,8,19
**warden (4)**
114:8,9;119:2;
120:14
**warehouse (1)**
29:7
**washed (1)**
61:11
**watched (1)**
29:13
**Waters (3)**
45:16,17;49:11
**way (7)**
36:6;44:16;47:1;
65:10;83:11;92:14;
93:24
**Wayne (4)**
18:16;78:11,13;
88:18
**weakness (16)**
17:14;20:20;45:8,10,
23;63:3;67:25;68:16,
23;69:1;71:2,2;82:1;
85:2;86:6;98:25
**wear (2)**
131:21;145:4
**Web (5)**
54:18,20,22;78:4;
81:4
**W-E-B (1)**
54:20
**website (1)**
142:16
**weeds (1)**
109:22
**week (42)**
7:18;8:11;9:5,19;
12:7;18:1;42:1,1,12,13,
17,20,23;43:1,3,7,9,16,
18;44:10,13;45:2;61:3,
16;65:24;72:20,21;
74:8,11,18;76:17;
82:23;87:8;91:21,22,
24;111:6,7;128:2;
134:24;135:15;139:3
**weeks (29)**

41:16;60:18;61:4;
65:24,25,25;66:10;
69:11,14;71:4,14,15,
19,20,21;72:12,24,25;
73:2,17,24;74:6,12;
78:10;83:15,15;111:7;
117:19;122:13
**weigh (1)**
118:10
**weighed (5)**
16:16;37:9;38:2,3;
118:13
**weighing (1)**
80:12
**weight (2)**
73:5;118:7
**weightlifting (3)**
76:10,12;88:7
**weights (10)**
16:4;37:7;38:18;
72:24;73:1,4,5,8;74:5,
10
**weren't (4)**
21:25;42:6;60:2;
101:5
**Western (3)**
33:11,11,12
**wet (3)**
61:6,7,15
**Whatever's (1)**
111:12
**What's (5)**
10:11;31:1;73:8;
130:1;131:19
**wheelchair (3)**
17:4;40:6,14
**Whenever (1)**
45:5
**When's (2)**
86:20;89:17
**Where'd (1)**
45:15
**Whereupon (3)**
105:21;125:21;
145:23
**wherever (1)**
116:1
**white (1)**
37:15
**Whoever's (1)**
134:16
**whole (5)**
31:22,22;58:4;76:6;
134:13
**who's (1)**
48:21
**wife (15)**
22:5;32:2;57:1,5,10;
76:25;79:6,17,24;
88:24;96:10;103:6;
106:22,24;120:4
**wife's (1)**
10:11

Sildack vs.
Corizon Health, Inc., et al.

Trenton Sildack
October 04, 2012

wiggle (4)
65:15,21;66:8,19
wiggling (1)
66:3
Wiley (3)
53:5,11,21
W-I-L-E-Y (1)
53:7
wintertime (1)
109:15
wish (2)
21:18;95:2
within (1)
18:1
without (3)
63:21;74:10;86:1
witness (4)
5:2;13:14;57:16;
124:3
witnessed (1)
21:24
witnesses (2)
24:15;131:11
wobble (1)
65:9
words (8)
38:12;46:6;84:14,21;
91:18;92:8;100:20;
113:18
work (44)
7:18;9:8;24:6;25:24;
26:21,24;27:4,5,10,12,
13;28:7,21;29:23;32:3;
37:2;41:24;42:16,20;
43:5,15,16,20;53:17;
60:19;65:10;68:11;
72:1;95:9;99:22;101:6;
109:9;110:6;113:16,
22;128:2,4,6;129:16,
19;131:1,16,20;135:21
worked (20)
7:12;8:4,21;9:9;
10:6;27:21;52:23;
53:14,18;109:11;
123:4;127:19;134:25;
135:5,16;139:4,22;
140:11,14;144:12
Worker's (1)
107:10
working (8)
16:14;30:2;43:1;
53:2;54:7,8;129:8;
135:24
works (4)
113:17;120:25;
123:16;129:24
worse (3)
17:9,10,11
worsen (1)
17:18
worsened (1)
17:17
worst (1)

70:9
write (8)
23:14;28:20;113:19;
120:2;121:10;123:12;
127:7,12
writing (12)
56:12;102:20;
111:10;121:8;123:8,9;
127:14;133:21;135:13;
139:24;141:12,15
writings (1)
57:2
written (13)
26:19,21;115:11,12;
119:18,21;126:14,20;
129:16,19;130:25;
131:16;132:1
wrong (9)
68:6,20;91:14;93:9,
13;94:10;99:7;101:15;
125:19
wrote (10)
23:13,16;26:24;28:5,
7;56:19,22;58:10;
119:25;133:22

X

X-ray (16)
23:7;41:13;45:4,7,
11,13,15;46:7,11,18,
19;47:24;48:11,15;
57:10;99:7
X-rays (3)
42:9,11;48:3

Y

yard (5)
37:11,12;109:11;
129:13,14
year (12)
7:3,3,4;9:1,23;53:18,
19;89:19,20;104:20;
109:7;121:25
years (7)
10:15;11:24;59:24,
25;60:5;106:10,15
Yep (4)
75:13;96:17;103:21;
118:18
younger (1)
60:8

Z

zero (1)
143:16
zilch (1)
143:15
zippo (1)
143:15

0

02 (3)
9:24;13:5;14:9
04 (1)
74:22
08 (3)
11:17;66:2,2
09 (2)
96:15,16

1

1 (3)
113:19;114:1,5
10 (2)
32:11;139:22
11 (5)
18:25;19:1;31:12;
65:20;86:22
12 (2)
76:2,4
13 (1)
31:11
135 (3)
73:20,21,24
14 (1)
105:25
15 (7)
11:24;12:18;60:4;
76:23;113:4;118:12;
122:8
15th (2)
122:2;123:1
16 (2)
31:11;33:16
16th (1)
46:10
17 (10)
12:22,24;13:1,3,9,
11;14:24;33:16,20,20
18 (2)
31:11;33:15
185 (3)
73:20,21,24
18-year-old (1)
31:14
1978 (1)
6:14

2

2 (4)
113:22;114:6,7,10
20 (1)
139:22
2001 (3)
9:24;13:5;14:9
2004 (13)
8:24;9:6;13:7;14:14;
15:23,25;34:23;35:7;
63:6;75:6;76:15;88:6;

101:19
2007 (15)
8:6;11:15;12:1,20;
14:18,20;15:1;34:1;
60:9;101:20,21;
112:21;118:8,20;
121:23
2008 (16)
16:9,10;34:12;35:4;
46:10;61:4;84:11;
85:15;101:23;109:8;
113:4;118:13;122:2,9;
123:1;128:18
2009 (12)
11:17,18;32:10;
48:11,14;111:15,19;
113:4;122:18,22,22;
123:2
2010 (5)
18:25;19:20,20;
32:12;106:4
2011 (12)
6:24;7:4;19:18,19,
21,22;20:5;26:23;
55:15;63:16;112:22;
118:24
2012 (1)
104:20
2013 (1)
15:9
21st (2)
66:2,21
22nd (4)
113:4;122:18,22;
123:2
23rd (1)
122:22
24-hour (1)
137:4
255 (2)
118:9,15
25th (2)
19:21;118:24
265 (2)
118:9,15
280 (1)
118:11
290 (1)
118:11

3

3 (3)
113:23;114:9,11
3- (6)
16:16;36:24;37:5,17;
38:7,18
3/8 (1)
6:14
3:18 (1)
105:21
3:26 (1)
105:22

30 (1)
9:20
300 (2)
37:3;38:2
30th (1)
104:20
315 (2)
73:16;74:16
325 (1)
73:16
38 (4)
113:3;123:1;128:21;
137:19

4

4:15 (1)
145:24
40 (5)
7:19;8:12;9:20;
78:14,18
400 (6)
16:16;36:24;37:3,5,
17;38:18
400-pound (1)
38:8
45 (2)
78:16,18
46953 (1)
6:18

5

5:00 (1)
137:2
50 (5)
7:20;64:21;65:6,11,
12
5802 (1)
6:16
5th (2)
6:24;121:23

6

6 (1)
76:2
6:00 (1)
137:2
60 (2)
7:20;8:12
61 (1)
128:25
6th (1)
48:11

7

7:00 (1)
137:2
70 (1)
127:23
78 (1)

6:14
**7th (11)**
  16:11;36:2;61:4;
  66:1,11;69:14;71:5;
  74:6;84:11;101:23;
  106:4

---

**8**

---

**8 (1)**
  9:16

---

**9**

---

**90 (1)**
  32:25
**97 (2)**
  13:25;14:5
**9th (1)**
  101:25