UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

TRENTON SILDACK,                    Civil Action No. 11-cv-12939

                Plaintiff,           HON. DENISE PAGE HOOD

v                                   MAGISTRATE JUDGE R. STEVEN WHALEN

CORIZON HEALTH INC., et al.

                Defendants.

---

## PLAINTIFF'S RESPONSE TO MOTIONS
## FOR SUMMARY JUDGMENT

Plaintiff, through his attorneys, THE MACKRAZ LAW OFFICE, PC, and STEPHEN L. GRIMM,

PC, for his response to the PHS Defendants' Motions for Summary Judgment, states as follows:

1. Admitted.

2. Admitted in part but denied that paragraph 2 contains a complete statement of Plaintiff's claim.

3. Denied.

4. Admitted

WHEREFORE Plaintiff denies that the *Individual PHS* Defendants are entitled to the

relief they seek and requests that their motion be denied.

THE MACKRAZ LAW OFFICE, PC

Dated: February 21, 2013              By:    /s/ Frederick E. Mackraz
                                      Frederick E. Mackraz (P52623)
                                      Attorney for Plaintiff
                                      401 Hall Street, SW-  Suite 134
                                      Grand Rapids, MI 49503
                                      (616) 235-4000
                                      fred@mackrazlaw.com

STEPHEN L. GRIMM, PC


By:      /s/ Stephen L. Grimm
         Stephen L. Grimm (P42215)
         Attorney for Plaintiff
         330 Fulton Street E.
         Grand Rapids, MI 49503
         (616) 459-0220
         steve@slgrimmpc.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

TRENTON SILDACK,                          Civil Action No. 11-cv-12939

             Plaintiff,                    HON. DENISE PAGE HOOD

v                                         MAGISTRATE JUDGE R. STEVEN WHALEN

CORIZON HEALTH INC., et al.

             Defendants.
_____

**PLAINTIFF'S BRIEF IN SUPPORT OF HIS
RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT**

      Plaintiff, through his attorneys, THE MACKRAZ LAW OFFICE, PC, and STEPHEN L. GRIMM, PC, for his brief in support of his response to the Defendants' Motions for Summary Judgment, states as follows

**ISSUES PRESENTED**

      Is there  a genuine issue of material fact as to whether the *Individual PHS* defendants were deliberately indifferent to the Plaintiff's serious medical needs?  Plaintiff answers, "Yes."

## CONTROLLING OR MOST APPROPRIATE AUTHORITY

U.S. Const. Amend. VIII

*Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

*Estell v. Gamble*, 429 U.S. 97 (1976).

*Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004).

*Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001).

*Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985).

*Scicluna v. Wells*, 345 F.3d 441, 447 (6th Cir. 2003).

*Terrance v. Northville Regional Psychiatric Hosp.,* 286 F.3d 834, 844 (6th Cir. 2002*).*

*Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir. 1989).

*Rogers v. Evans,* 792 F. Supp.1052, 1058 (11th Cir. 1986).

*Johnson v. Carns*, 398 F.3d, 868 (6th Cir. 2005).

## INDEX OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| 1 | Trenton Sildack Deposition Excerpts |
| 2 | July 7, 2008 Prisoner Accident Report |
| 3 | July 7, 2008 Examination Notes of Nurse Edwards |
| 4 | August 25, 2008 Progress Note of Nurse Edwards |
| 5 | November 25, 2008 Examination Notes of Nurse Practitioner Kirk |
| 6 | December 8, 2008 Medical Kite Response of Nurse Croston |
| 7 | December 14, 2008 Medical Kite Response of Nurse Baker |
| 8 | December 15, 2008 Medical Transfer – Nurse Schwartz |
| 9 | May 5, 2009 Examination Notes of Nurse Kovar |
| 10 | May 6, 2009 Note Summary of Dr. Warren |
| 11 | May 14, 2009 Note Summary of Dr. Sell |
| 12 | May 28, 2009 Note Summary of Dr. Sell |
| 13 | June 6, 2009 Medical Kite Response of Lisa Shilling |
| 14 | June 10, 2009 Examination Notes of Nurse Quinlan |
| 15 | June 11, 2009 Note Summary of Dr. Sell |
| 16 | June 15, 2009 Letter from Attorney Lieberman requesting MRI |
| 17 | June 22, 2009 Medical Kite Response of Nurse Pope |
| 18 | June 25, 2009 MRI Requested by Dr. Sell |

| | |
|---|---|
| 19 | June 26, 2009 Administrative Progress Note of Nurse Kihm indicating medical records requested by Ombudsman Barber and Investigator Zimbelman. |
| 20 | July 10, 2009 MRI Report |
| 21 | Harriett Squier, M.D., Deposition Excerpts |
| 22 | July 22, 2009 Note Summary of Nurse Freytag |
| 23 | July 30, 2009 Handwritten Note of Edelman |
| 24 | August 14, 2009 Progress Notes of Dr. Stieve |
| 25 | August 23, 2009 Grievance |
| 26 | August 26, 2009 Neurosurgeon Consultation Request of Dr. Sell |
| 27 | September 9, 2009 Neurological Evaluation Letter – Dr. LaHaye |
| 28 | September 15, 2009 Epidural Steroid Injections Request of Dr. Burtch |
| 29 | October 6, 2009 Progress Note of Dr. Haggard |
| 30 | November 13, 2009 Grievance |
| 31 | December 7, 2009 MDOC Quality Assurance Office's  Response to Transfer Request made by Melissa Sildack |
| 32 | December 16, 2009 Examination Notes of Nurse Roose |
| 33 | January 7, 2010 Examination Notes of Dr. Burtch |
| 34 | January 7, 2010 Grievance |
| 35 | January 15, 2010  Email Reply from Edelman |
| 36 | January 19, 2010 Letter from Senator Prusi to Ombudsman Barber |
| 37 | January 20, 2010 Examination Notes of Kim Mahler |
| 38 | March 5, 2010 Administrative Progress Note |

| 39 | March 17, 2010 Examination Notes of Kim Mahler |
| 40 | March 24, 2010 Administrative Notes of Dr. Pandya |
| 41 | March 25, 2010 Examination Notes of Dr. Ralles |
| 42 | March 16, 2011 Evaluation Letter of Dr. Kachmann |
| 43 | October 28, 2011 IME Letter of Dr. Kershner |

**INTRODUCTION**

Plaintiff Trenton Sildack was sentenced to prison after a plea to a charge of home invasion.  On July 7, 2008, while serving his sentence, Mr. Sildack injured his back while on work detail at Lakeland Correctional Facility.  Mr. Sildack felt a pop and excruciating pain in his lower back, fell to the ground, and was helped back to his barracks.  Mr. Sildack's condition did not improve over time; it got worse.  Mr. Sildack's excruciating pain continued for years and he developed incontinence of bladder, right leg numbness, and right leg weakness.  Despite multiple transfers to different prisons, repeated grievances and requests for surgery, and an MRI demonstrating that Mr. Sildack had a herniated disc that was impinging on nerve roots, his surgical back condition was never treated during the following *two-and-one-half years that he was incarcerated*.  After parole, Mr. Sildack saw a neurosurgeon who performed the needed back surgery, but because of the delay, Mr. Sildack has permanent nerve damage and continues to have problems today.

Unlike many cases filed by prisoners alleging a lack of proper medical care or diagnosis, this case is not simply a disagreement over the care provided; rather, Mr. Sildack was given absolutely no care to address his surgical back condition in the face of well recognized symptoms and diagnostic films indicating that emergent surgery was required.  Further, prison healthcare providers blatantly ignored the recommendations of Dr. LaHaye, a neurosurgeon consultant that evaluated Mr. Sildack and prescribed treatment for him.

Currently pending are Motions for Summary Judgment filed by Defendant LaHaye (DKT 102); Defendants Howes, Croston, Nakata, Bradshaw, Kovar, Quinlan, Freytag and Pope (DKT 108); Defendants Corizon, Kirk, Heebsh, Qayyum, Quinlan, Howes, Kovar, Freytag, and Pope

(DKT 110); and Corizon Health, Inc., Prison Health Services, Edelman, Miles, Ralles, Rocco, Sell, Haggard, Burtch, Mahler, McQueen and Keldie (DKT 104).  Plaintiff states that he:

1.  Opposes the Motion for Summary Judgment requested by the PHS Defendants (DKT 104), except that he does not oppose dismissal of Corizon Health, Inc. and Prison Health Services.

2.  Does not oppose the Motion for Summary Judgment requested by the Defendants Corizon, Kirk, Heebsh, Qayyum, Quinlan, Howes, Kovar, Freytag, and Pope (DKT 110).

3.  Does not oppose the Motion for Summary Judgment requested by Dr. LaHaye (DKT 102).

4.  Does not oppose the Motion for Summary Judgment requested by the Department of Corrections Defendants Howes, Croston, Nakata, Bradshaw, Kovar, Quinlan, Freytag and Pope (DKT 108).[1]

To summarize, Plaintiff believes that summary judgment is not appropriate for and intends to pursue claims against Defendants Edelman, Miles, Ralles, Rocco, Sell, Haggard, Burtch, Mahler, McQueen, Keldie ("*Individual PHS* Defendants), and Stieve (who has not brought a motion at this time).

## FACTS

Mr. Sildack was born in 1978 and, at the time of his injury, was 30 years old.  He now lives in Marion, Indiana. Mr. Sildack obtained a GED and is married to Melissa Sildack, who was Melissa Knapp and his fiancé at the time of the injury.  (Exhibit 1 at pp. 6, 10).

On July 7, 2008, Mr. Sildack injured his back while moving heavy slabs of concrete on work detail.  He felt a pop in his back, fell to the ground, and could not walk.  He was in unbearable pain and helped back to his barracks and later to the cafeteria.  Eventually Mr. Sildack was brought to the health care unit in a wheelchair.  Within a matter of weeks, Mr.

---

[1] Plaintiff does not oppose dismissal of any of the non-movant or unserved Defendants referred to in DKT 108, except for Defendant Stieve, who was served but has not filed a motion.  Plaintiff intends to pursue his claims against Stieve.

Sildack was experiencing incontinence of bladder, as well as numbness and weakness in his right leg. (Exhibit 1 at pp. 16-17).

The Prisoner Accident Report from Lakeland Correctional Facility confirms that Mr. Sildack injured his back while working in the food service garden on July 7, 2008 at approximately 9:00 am. (Exhibit 2). He was seen by Nurse Edwards approximately one hour later with back spasms, unsteady gait, and a great deal of pain. (Exhibit 3).

Mr. Sildack's condition did not improve. On August 25, 2008, Mr. Sildack again saw Nurse Edwards, who documented that Mr. Sildack continued to have numbness and tingling and "no results from prescribed regime." (Exhibit 4).

On November 25, 2008, Nurse Practitioner Suzanne Kirk examined Mr. Sildack. She noted that Mr. Sildack had lower back pain radiating into his right lower extremity. Despite the conservative treatment, there was no change in his symptoms, and Mr. Sildack reported that the burning and numbness in his right leg were worsening. Nurse Practitioner Kirk reported that Mr. Sildack had impaired pressure sensation in the lateral aspect of his right thigh and foot. (Exhibit 5).

On December 8, 2008, Nurse Donna Croston responded to a request for medical services from Mr. Sildack, a "medical kite". Mr. Sildack said that the medications were not working to alleviate his pain. (Exhibit 6). On December 14, 2008, Mr. Sildack submitted another kite complaining of continued pains in his leg and lower back. The patient's perspective of the situation was urgent, but the staff treated it as routine. (Exhibit 7).

Mr. Sildack was transferred from Lakeland Correctional Facility to Coopers Street Correctional Facility on December 15, 2008. (Exhibit 8). During his stay at Lakeland, Mr. Sildack's pain did not improve and his condition deteriorated. Within days of arriving at Cooper

Street Correctional Facility, Mr. Sildack began asking for treatment of his back pain. Nurse Jody Nakata documented that Mr. Sildack's lower back, radiating pain was not responding to pain medications. On January 21, 2009, Mr. Sildack was transferred to the G. Robert Cotton Correctional Facility and then, two months later, to the Newberry Correctional Facility.

Mr. Sildack testified that he had urinary incontinence, a classic symptom of nerve root impingement requiring surgery, within weeks of the accident. (Exhibit 1 at p. 15). Despite the fact that Defendants contest this claim, there is no dispute that urinary changes were documented by Nurse Donna Kovar on May 5, 2009. Nurse Kovar documented that Mr. Sildack was complaining of pain in his back radiating down his right leg for over one year. Medications were not effective and Nurse Kovar documented "urinary changes." The nurse also documented objective signs of a reduced range of motion, peripheral numbness, and "unequal strength in extremities (right leg weaker than left)." (Exhibit 9). The following day, Dr. William Warren noted that there was a questionable herniation, and reflexes on the right were less than those on the left. (Exhibit 10). On May 14, Dr. Larry Sell charted that Mr. Sildack was still complaining of radicular pain and numbness in the right lower extremity, and ***conservative medical treatment was ineffective***. Dr. Sell documented a decreased amount of sensation along the right lateral thigh and calf and reflexes that were "barely elicited on the right." Dr. Sell stated that he was "suspicious" of a herniation. (Exhibit 11). By May 28, 2009, Dr. Sell noted that Mr. Sildack's symptoms had not improved, and the assessment was "spinal disc disease", probably at the level of L4 and L5 based upon Mr. Sildack's symptoms. Despite this assessment, Dr. Sell prescribed only daily stretching, light workouts, and medications, which had been ineffective for almost one year. Dr. Sell further planned for Mr. Sildack to get physical therapy "on discharge." (Exhibit 12).

4

On June 6, 2009, Mr. Sildack again submitted a medical kite.  Lisa Schilling documented the continued complaint of radiating back pain not getting better with medications, and she unequivocally recorded urinary incontinence as one of Mr. Sildack's complaints.  (Exhibit 13). A few days later, Nurse Quinlan also documented urinary changes, and additionally documented "deformity—unsteady gait—abnormal grip—radiation of pain down leg/below knee—right-(sharp)—peripheral numbness."  (Exhibit 14).

On June 11, 2009, despite clear indications of a herniation impinging on nerve roots requiring surgery and an acknowledgement of probable disc disease impinging on the L4-L5 nerve root causing numbness, decreased reflexes, weakness, and incontinence, Dr. Sell's plan was to continue the previously ineffective pain medications, limited activity, stretching exercise, and walking. (Exhibit 15).

One year after Mr. Sildack's injury, despite the objective findings, symptoms, and assessment of physicians, Mr. Sildack still had not even received an MRI for diagnosis, much less surgical intervention for his back.  On June 15, 2009, because his complaints had been ignored, Mr. Sildack was forced to retain an attorney to send a letter to the Director of the Department of Corrections and the Warden of the Newberry Correctional Facility.  In that letter, the attorney communicated that Mr. Sildack suffered a back injury, which included ruptured discs and a worsening medical condition to the point that Mr. Sildack was walking with a pronounced limp.  The attorney indicated that requests for an MRI had been ignored and formally requested the diagnostic film to be completed.  (Exhibit 16).  On June 21, 2009, Mr. Sildack submitted another kite, which was responded to by Nurse Kathy Pope on June 22, 2009. Mr. Sildack stated that his "nerve damage" was getting worse. (Exhibit 17).  On June 25, 2009, an MRI was finally ordered.  The "presumed diagnosis" was a lumbar disc on the right side

(Exhibit 18).  The following day, an Administrative Progress Note documents that Ombudsman Keith Barber and Investigator Jessica Zimbelman had made requests for Mr. Sildack's medical records.  (Exhibit 19).

The MRI Report confirmed what Dr. Sell already knew; Mr. Sildack had a herniated L4-L5 disc *that was displacing the right L5 nerve root*. The L5-S1 level showed similar findings with more central broad-based disc protrusion, *central canal narrowing, and displacement of the L5 nerve root, which was clinically correlated*. (Exhibit 20).  Given the MRI finding, leg weakness, urinary incontinence, unrelieved pain through conservative treatment, and decreased sensation, there could be no genuine doubt that Mr. Sildack had an urgent medical condition requiring surgery.

Dr. Harriett Squier, assistant to Adam Edelman, Director of Utilization Management and an employee of Defendant Prison Health Services, testified that muscle weakness, bladder dysfunction, peroneal numbness, and lack of cremasteric reflex each **independently** require emergency surgery because they are indications of nerve damage.  (Deposition of Harriett Squier, Exhibit 21 at pp. 27-28).[2]  In fact, Dr. Squier testified that if someone has bladder dysfunction in connection with a back injury without any other signs, that would dictate the need to for emergency surgery.  (Exhibit 21 at pp. 31-32).  Mr. Sildack received no surgical treatment even after the findings of urinary incontinence, weakness, and the MRI report for the *one-and-one-half years* that Mr. Sildack remained at Newberry.

Dr. Squier began working for Correctional Medical Services in April of 2008.  When CMS lost its contract with the State of Michigan to Prison Health Services, Dr. Squier transferred and continued with the new company.  (Exhibit 21 at pp. 14, 54.  Her job at CMS was

---

[2]Dr. Squier provided the testimony for a different case where CMS/PHS personnel ignored a prisoner's need for diagnosis and surgery. She would not have known the implications her testimony would have for this case.

to review charts and to determine if outside medical services were needed, and she covered the entire state.  (Exhibit 21 p. 15).  Dr. Squier explained that a Form 407 was utilized when a medical provider for prisoners was asking for outside services to treat the prisoner.  (Exhibit 21 p. 16).

On July 22, 2009, Nurse Freytag noted that Mr. Sildack was making complaints "with classic disc" and that an MRI supporting the diagnosis of lumbar disc existed.  Mr. Sildack was requesting referral for treatment of the disc at that time.  (Exhibit 22).  On July 23, 2009, Dr. Sell *acknowledged his awareness that Mr. Sildack needed neurosurgical evaluation and treatment*, noting a herniated disc at the L4-L5 and L5-S1 levels with radicular symptoms.  Dr. Sell noted positive straight leg testing, decreased deep tendon reflexes, and neurodeficits along the lateral aspect of the right lower extremity.  Dr. Edelman, the Medical Director, hand wrote a note stating that the "presence of disc herniation is not necessarily indication for surgery. Please send MRI Report."  (Exhibit 23).

On August 14, 2009, Dr. Jeffrey Stieve made an administrative note indicating that he had reviewed Mr. Sildack's medical chart, which included all of the above-noted findings.  He charted that he had a telephone conversation with Dr. McQueen and Dr. Edelman and also indicated that the case had been reviewed with Dr. Keldie.  The note states that "We do not think surgery is indicated based on the MRI alone, and feel more physical exam data is needed.  This is especially true in light of his fiancé indicating he has foot drop to Dr. Keldie."  Therefore, Dr. Stieve and the healthcare providers did not move forward with surgery as requested but instead entered "an alternative treatment plan."   (Exhibit 24 at ¶6).  The alternate plan included weight loss, education, and "working directly with healthcare."  At the time of the note, medical records reflected loss of strength, incontinence, numbness, unabated physical pain for over one year, and

an MRI showing nerve root compression.  Dr. Stieve and those referenced offered no treatment whatsoever for Mr. Sildack's surgical disc.  The note references the fact that Melissa had been calling to get medical attention for Mr. Sildack:

> His fiancé's decision to phone PHS's President and CMO and her threats of legal action are not helping us to continue to provide [Mr. Sildack] with the optimal evidence-based medical care he deserves.[3]  (Exhibit 24).

Mr. Sildack continued his plea for help through the grievance process.  In one of his many Step Three Grievances, Mr. Sildack stated that he "still has not seen a neurosurgeon", that "the pills I receive do nothing for the pain" and that he needs "complete MRI Surgery and physical therapy."  (Exhibit 25, consistent with an August 11 request for surgery, Exhibit 25 p.3).

On August 26, 2009, Dr. Sell filled out a Consultation Request.  Under the presumed diagnosis section, Dr. Sell sought to "refer to Dr. Coccia in Marquette for lumbar disc and was seeking confirmation of the diagnosis.  Dr. Sell noted that Mr. Sildack had pain at L4-L5 radiating down laterally the right leg with complaints of numbness, decreased reflexes in the right knee and ankle, and positive straight leg raise tests on the right.  He noted that the MRI supported the diagnosis.  (Exhibit 26).  Accordingly, On September 9, 2009, Mr. Sildack was sent offsite to be evaluated by a neurosurgeon at Marquette General, Dr. Paul LaHaye.  Dr. LaHaye noted that Mr. Sildack had multiple issues, "first of which is a right L4-L5 and L5-S1 disc herniation.  He has obvious right sciatica."  The doctor prescribed epidural steroid injections for pain relief "in the short term" and then surgery.  Dr. LaHaye stated that he would like to see Mr. Sildack returned to him after the treatment had been accomplished. (Exhibit 27). Unfortunately, but perhaps not surprisingly, ***Defendants provided neither the injections nor the surgery prescribed by Dr. LaHaye***.

---

[3] Taken at face value, Mr. Sildack was not getting the "medical care he deserved" because his fiancé was bothering the Defendant medical providers.

8

On September 15, 2009, Dr. Burtch noted his presumptive diagnosis of lumbar radiculopathy with radiation to right leg, ***not responsive to conservative medical management***. Dr. Burtch acknowledged that Mr. Sildack had a known lumbar herniated disc, sensory deficits to temperature, pain, and vibration of the right lateral lower leg and dorsum of right foot, diminished reflexes of the right leg, and right leg weakness.  (Exhibit 28).  On October 6, 2009, Dr. Haggard charted that she spoke to Mr. Sildack at length regarding his surgical and lumbar pain problems.  Dr. Haggard explained that the epidural steroid injections and surgery prescribed by Dr. LaHaye were "indicated for acute back, not chronic back," and were only temporarily effective.  Dr. Haggard went on to state that, in spite of the multiple symptoms and the objective findings on the MRI suggesting a nerve root needing surgery, they would offer absolutely no treatment for his surgical back.  Dr. Haggard charted:

> For those reasons, alternative therapy for his chronic back pain is to discontinue heavy lifting (weight pit), weight loss, gentle back ROM exercise which were explained and demonstrated to the patient, and continued NSAIDS for pain relief.  (Exhibit 29).

Although the note contains the self serving suggestion that Mr. Sildack had the option to "elect surgery," Mr. Sildack had been begging for surgical intervention for months without success and would continue to do so into the future (*See, e.g.,* Exhibit 25 and 32).  As a result of the meeting with Dr. Haggard, Mr. Sildack filed yet another grievance.  The grievance was again denied and, at the step three process, Mr. Sildack again complained that the medical personnel were refusing to follow Dr. LaHaye's surgical plans.  (Exhibit 30).

Because of the complete denial of care for Mr. Sildack's surgical back, his fiancé contacted the health unit manager and asked that Mr. Sildack be transferred to a facility in Coldwater so that they could pursue medical care at Mr. Sildack's own expense.  In response, the

Quality Assurance Office of the Michigan Department of Corrections likely revealed the real reason that Mr. Sildack was being left to suffer with a surgical nerve root impingement, money:

> Please be aware that all arrangements regarding this type of care must be pursued through the facility Warden's Office.   If the Warden(s) agree to the transfer, please be aware that you will be responsible for all of the costs associated with the transfer as well as all of the costs of the care. (Exhibit 31).

On December 16, 2009, despite the suggestion that it was Mr. Sildack's option to elect surgery, nurse Maryanne Roose charted that Mr. Sildack was asking to see Dr. LaHaye to continue with the plan for surgical repair of his back.  (Exhibit 32).  That surgery never occurred.

Dr. Burtch evaluated Mr. Sildack on January 7, 2010.  He noted that Mr. Sildack had two years of severe, constant back pain that had been worsening over time.   The back pain started when Mr. Sildack was lifting the cement slabs in July of 2008.   From a neurological examination, Dr. Burtch found that Mr. Sildack had impaired sensory function, decreased reflexes, muscle weakness, and "chronic low back pain due to herniated disc that has not improved with conservative therapy."   Dr. Burtch further acknowledged that a neurosurgeon recommended surgery if steroid blocks did not help and stated that he would discuss the case with Prison Health Systems for a referral back for neurosurgery.   Dr. Burtch also called Dr. Squier regarding the case.  (Exhibit 33).  (Note Exhibit 21 regarding Squier testimony of surgical indications).

On January 7, 2010, Mr. Sildack filed another grievance in which he stated that he was "informed to get healthcare at my own expense.  I requested to get moved to a location where that would be possible.  I was then deliberately moved to a location where it is impossible to get healthcare at my own expense."  (Exhibit 34).

On January 15, 2010, Melissa Sildack emailed Dr. Burtch asking why Dr. Burtch had not arranged for surgery. Dr. Edelman mistakenly return emailed Melissa Sildack, an email that was clearly intended for Dr. Burtch, stating simply "Hi Joe, do not answer please." (Exhibit 35). Dr. Burtch followed the order.

In the continuing effort to get Mr. Sildack the surgery he needed, Melissa contacted Michael Prusi, State of Michigan Senate Democratic Leader. The Senator wrote to the Legislative Corrections Ombudsman, Keith Barber, specifically asking that he respond to Melissa's requests for help to get Mr. Sildack surgery. (Exhibit 36).

On January 20, 2010, Kim Mahler examined Mr. Sildack and noted 18 months of sharp, severe burning pain. She noted that Mr. Sildack was complaining of incontinence and right foot weakness and numbness. Objectively Mr. Sildack had "palpable fullness on the right side where he is complaining of pain." Her neurological evaluation demonstrated sensory dysfunction of the right foot and leg, no right ankle reflex, difficult dorsal flexion on the right, right-sided lower extremity weakness, and the inability for Mr. Sildack to walk on heels or flex his right foot. The note further indicates:

> Right-sided back pain with radiculopathy. Loss of ankle jerk right. Incontinence, which has been present from the beginning, but patient unaware that it was related to the back pain. The plan states that a neurosurgeon recommended epidural steroid injections, but because Mr. Sildack was transferred prior to any intervention he received none. "In light of his incontinence, surgery may be an option." (Exhibit 37).

Rather than treat Mr. Sildack or heed the objective signs and symptoms requiring surgery, health care professionals decided to request clandestine monitoring of his activity. An Administrative Progress Note dated March 5, 2010 states:

11

> Per Dr. Mahler's request, the housing unit was asked to monitor PT's activity.  RUO Roberts reported that PT does limited porter duties, i.e. pushing a broom.  When asked to pick up a box of supplies, the PT stated that he was not able to.  RUO stated he had seen no other activity by the PT.  It was noted that the prisoner does not participate in any sports or wt lifting at this time. (Exhibit 38).

Despite the failure to "catch" Mr. Sildack in a compromising position, no neurosurgical treatment was ordered.

On March 17, 2010, Kim Mahler charted that Mr. Sildack was reporting that his pain was getting worse and that he still had leaking urine throughout the day.  He was subjectively complaining of low back pain with radiation, and numbness.  "Tody [sic] pain is worse than it's ever been.  Still stretching, no yoga. Pain 10/10 back and leg."  Objectively Dr. Mahler noted positive straight leg raise test, diminished right quad strength, diminished distal strength, decreased reflexes, and no Achilles reflex on the right. "Patient is unable to come up on his toes on the right side."  The plan was that Mr. Sildack would "continue with stretching, and "his girlfriend will continue to follow up on her end."  (Exhibit 39).

On March 24, 2010, Dr. Pandya noted Mr. Sildack's serious neurologic condition and also noted that the course of action suggested by the neurosurgeon Dr. LaHaye was "not agreed with by [Dr. Edelman]."  Dr. Pandya sought a re-evaluation and planned to discuss the case at the medical committee. (Exhibit 40).

On March 25, 2010, Nurse Ralles confirmed that Mr. Sildack had been complaining of urinary incontinence for *one-and-one-half years*.  His pain was listed as 10/10 and he had reduced strength on his right side, was unable to stand on his toes on the right side, and had reduced reflexes. (Exhibit 41).

Trenton Sildack received absolutely no treatment for his surgical back or neurologic conditions despite a neurosurgeon's recommendation, positive MRI findings, multiple clinical signs and symptoms, and the knowledge of a nerve root impingement.  After discharge, Mr. Sildack obtained the medical care he had so desperately sought while incarcerated.  Ann Michelle Webb at Indiana Health Services recognized the problem and referred Mr. Sildack to a neurosurgeon, Dr. Jeffrey Kachmann. Dr. Kachmann found virtually the same conditions reflected in the Department of Corrections records: chronic right leg radiating pain, lower extremity weakness, numbness, and an MRI showing disc herniation and nerve root compression.  Dr. Kachmann stated that Mr. Sildack was "very symptomatic from the herniated disc at the L4-L5 level on the right" and he recommended, and later performed, a right L4-5 discectomy, i.e., surgery.  (Exhibit 42).  Mr. Sildack suffers from permanent nerve damage as a result of the delay in treatment.

On October 25, 2011, Dr. Charles Kershner, an orthopedic surgeon, performed an evaluation of Mr. Sildack and reviewed records of his time in prison.  Dr. Kershner wrote:

> After a thorough review of the history and records provided regarding the claimant, Trenton Sildack's care while incarcerated in the Michigan Department of Corrections, it is my opinion that the treating physicians, nurses and physician's showed deliberate indifference to a serious medical problem, that is, a ruptured L4-5 disc on the right and that their indifference and failure to provide adequate treatment was more likely than not the cause of the constant pain and irreversible nerve damage that has not completely resolved in spite of ultimately having adequate care by Dr. Kachmann.  It is my opinion further that had he received the treatment as recommended by Dr. Lahaye even though this was delayed for almost a year, that he would have suffered less and would have been more likely to avoid permanent neurological residual. (Exhibit 43).

13

## LAW AND ARGUMENT

The Individual PHS Defendants seek summary judgment based solely upon the argument that the Plaintiff has not established a question of fact regarding deliberate indifference.  See DKT 104 at pp. 17-19.  Plaintiff's 42 U.S.C. §1983 claim is premised on his Eighth Amendment right to be free from cruel and unusual punishment.  U.S. Const. Amend. 8.  The Eighth Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity and decency…" against which the Court must evaluate penal measures.  *Estell v. Gamble*, 429 U.S. 97 (1976).  The government has an obligation to provide medical care for those whom it is punishing by incarceration, and an inmate must rely on prison authorities to treat his or her medical needs.  *Id.*  Our Supreme Court has concluded that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain" proscribed by the Eighth Amendment whether the indifference is manifest by prison doctors or prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  *Id.*  Regardless of how evidenced, deliberate indifference to prisoner's serious illness or injury states a cause of action under §1983.

There is no dispute that the right to adequate medical care is guaranteed to convicted federal prisoners under the Eighth Amendment and made applicable to convicted state prisoners and pretrial detainees by the Due Process Clause of the Fourteenth Amendment.  *Id.* at 101-05. Once alerted to a prisoner's serious medical need, prison personnel are under an obligation to offer medical care to the prisoner. *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001) *citing Danese v. Asman*, 875 F.2d 1139, 1244 (6th Cir. 1989) *cert. den.* 495 U.S. 1027 (1990).

Deliberate indifference to an inmate's need for medical attention suffices for a claim under 42 U.S.C. §1983. *Roberts v. City of Troy*, 773 F.2d 720, 723 (6th Cir. 1985).  Delaying or

denying a prisoner's access to medical care constitutes deliberate indifference. *Estell, supra* at 104; *Scicluna v. Wells*, 345 F.3d 441, 447 (6th Cir. 2003). The current record is replete with testimony and evidence that the Individual PHS Defendants, as well as Dr. Stieve, were deliberately indifferent to Mr. Sildack's serious need for back surgery and interfered with a neurosurgeons prescription for treatment of that condition.

An 8th Amendment claim has an objective and subjective component. To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the subjective component, the plaintiff must allege facts to show that the defendant subjectively perceived facts from which to infer substantial risk to the prisoner, that the defendant did in fact draw the inference and that the official disregarded the risk. *Farmer, supra* at 834-35. *Estell, supra* at 104. Simply receiving some level of care does not necessarily preclude an 8th Amendment claim; the Court should conduct a factual inquiry. *See Terrance v. Northville Regional Psychiatric Hosp.,* 286 F.3d 834, 844 (6th Cir. 2002*); Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir. 1989); *Rogers v. Evans,* 792 F. Supp.1052, 1058 (11th Cir. 1986).

### A. <u>Objective Component – The Plaintiff had a sufficiently serious medical need</u>

PHS Defendants do not contest the objective component of Plaintiff's claim in their motion, and for good reason. The need to provide medical care to prevent nerve damage is obvious, even to a lay person, and is more than a "minor malady." See *Blackmore v. Kalamazoo County*, 390 F.3d 890 (6th Cir. 2004). Dr. LaHaye, Dr. Squier, Dr. Kershner and Dr. Kachmann all confirm the seriousness of a herniated disc impinging on a nerve, a condition that needed ongoing treatment. Dr. Squier testified:

> Q: What happens if one doesn't get emergency surgery where there is that kind of involvement?

15

A:      You run the risk of having some permanent nerve damage.

(Exhibit 21 at p. 29).

**B.  Subjective Component – PHS Individual Defendants and Dr. Stieve perceived a substantial risk and disregarded it.**

The Individual PHS Defendants and Dr. Stieve subjectively perceived the facts from which to infer a substantial risk of harm and drew the inference, and then disregarded the inference.  It is not necessary for the Plaintiff to show that the defendant acted for the purpose of causing harm or with knowledge that harm would result.  *Comstock, supra* at 703, *quoting Farmer* 511 U.S. at 835 (1970).   It is permissible for this Court to infer from circumstantial evidence that a prison official had the requisite knowledge to demonstrate deliberate indifference.  *Id.*  The subjective knowledge standard does not allow a prison official to "escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risk that he strongly suspected to exist." Although the right to adequate medical care does not encompass the right to be diagnosed correctly, the Sixth Circuit has:

> long held that prison officials who have been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such prisoner. *Comstock*, supra at 702 citing *Danese v. Asman, supra* at 1244.

In *Johnson v. Carns*, 398 F.3d 868 (6th Cir. 2005). The Sixth Circuit noted that:

> There is a substantial difference between those cases involving deliberate indifference to a patient who *requested* medical care and those cases involving a failure to properly detect a prisoner's visible medical condition.  (Citing *Danese*, 875 F.2d at 1244). After all, "[i]t is one thing to ignore someone who has a serious injury and is asking for medical help; it is another to be required to screen prisoners correctly and find out if they need help. *Johnson*, 398 F.3d at 874 fn7.

16

In the instant case, Mr. Sildack requested medical care for his surgical disc repeatedly, and MRI reports and neurosurgeon recommendations made clear the exact nature of Mr. Sildack's condition and that emergent treatment was needed.  Dr. Squier, who was employed by both CMS and PHS, testified under oath as to what signs and symptoms would demonstrate to a medical provider that emergency surgery was needed.[4]  Dr. Squier testified that a herniated disc with nerve root involvement would be demonstrated by muscle weakness, bowel or bladder dysfunction, peroneal numbness, lack of cremasteric reflex.  (Exhibit 21 p. 27).  Dr. Squier clarified:

> No, sir.  If you have any of those findings such as muscle
> weakness, loss of bowel or bladder control clearly related to back
> pain that is – that would require emergency surgery.  That signifies
> there is nerve damage.  (Exhibit 21 p. 28).

The *Individual PHS* defendants reviewed the Plaintiff's medical record, were involved in his care, or were otherwise aware that he had the classic signs and symptoms of a surgical disc.  They knew that an MRI showed a herniation with nerve root involvement, and that an off-site neurosurgeon had prescribed Epidural Steroid Injections and then Surgery.  But none of the Defendants provide Mr. Sildack the needed care or saw to it that the care was provided to him.  (*See, e.g., Exhibits 11, 12, 15, 18, 23 and 26 regarding Dr. Sell; Exhibits 23 and 24 regarding Dr. Steive, Exhibits 23, 24, 35 and 40 regarding Dr. Edleman; Exhibit 24 regarding Drs. McQueen and Keldie; Exhibits 28 and 33 regarding Dr. Burtch, Exhibit 30 regarding Dr. Haggard; Exhibits 37, 38 and 39 regarding Dr. Mahler and Exhibit 41 regarding Nurse Ralles*).

Strangely, the PHS defendants attach and rely on their Exhibit P in support of their motion.  That document states that emergency surgery is required when there is positive imaging

---

[4] Of course, Dr. Squier did not testify to these signs and symptoms in this case; she testified under oath in a different case.  She has been named as an expert witness and, to the extent she testifies contrary to her deposition at trial, her prior inconsistent statements given under oath would not be hearsay and will be offered as substantive evidence.

of lumbar disease and rapidly progressive neurologic findings that correlate.  That is precisely the case here, and the Defendant's cannot bootstrap a defense by willfully delaying an MRI. Defendants' Exhibit P creates, at a minimum, a questions of fact.

PHS Defendants also rely on Exhibit O, a letter of from an oft named defense expert, Dr. Drouillard.  The expert seemingly ignores the evidence in the record of serious neurologic deficits and positive MRI imaging and claims that there was a "change" in status when Mr. Sildack finally did get surgery.  The basis for his opinion is belied by the records and his conclusions flatly contradicted by the conclusions of Dr. Kershner (Exhibit 43).

## CONCLUSION

At a minimum, a question of fact exists sufficient to defeat the *Individual PHS* Defendants motion.  Plaintiff respectfully requests that this Court deny Defendants' motion and set this matter for facilitative mediation.


                                      THE MACKRAZ LAW OFFICE, PC

Dated:  February 21,  2013            By:     /s/ Frederick E. Mackraz
                                      Frederick E. Mackraz (P52623)
                                      Attorney for Plaintiff
                                      401 Hall Street, SW-  Suite 134
                                      Grand Rapids, MI 49503
                                      (616) 235-4000
                                      fred@mackrazlaw.com

                                      STEPHEN L. GRIMM, PC


                              By:      /s/ Stephen L. Grimm
                                      Stephen L. Grimm (P42215)
                                      Attorney for Plaintiff
                                      330 Fulton Street E.
                                      Grand Rapids, MI 49503
                                      (616) 459-0220
                                      steve@slgrimmpc.com

18