UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TRENTON SILDACK,

            Plaintiff,                        No. 11-12939

v.                                   District Judge Denise Page Hood
                                   Magistrate Judge R. Steven Whalen

CORIZON HEALTH, INC., ET AL.,

            Defendants.

_____ /

**REPORT AND RECOMMENDATION**

      Currently before the Court is *Motion for Summary Judgment* [Docket #104] by

Defendants Prison Health Services, Inc., Corizon Health, Inc., Adam Edelman, M.D.,

Richard Miles, M.D., Lizabeth Ralles, M.D., James Rocco, M.D., Larry Sell, M.D.,

Rebekah Haggard, M.D., Joseph Burtch, D.O., Kim Mahler, D.O., Sylvia McQueen,

M.D., and Carl Keldie, M.D., filed November 9, 2012  which has been referred for a

Report and Recommendation ("R&R") pursuant to 28 U.S.C. § 636(b)(1)(B). I

recommend that the motion be GRANTED IN PART AND DENIED IN PART, as

follows:

      (1) That the motion be GRANTED as to Defendants Prison Health Services,

Inc. and Corizon Health, Inc.

(2) That the motion be GRANTED as to Defendant Drs. Sell, Burtch, Haggard, Ralles, Mahler, Miles, Rocco, and Keldie.

(3) That the motion be DENIED as to Defendant Drs. Edelman and McQueen.

## I.   BACKGROUND FACTS

On July 7, 2011, Plaintiff Trenton Sildack, through counsel, filed a civil rights complaint under 42 U.S.C. § 1983, based on events that occurred when he was a prison inmate in the custody of the Michigan Department of Corrections ("MDOC").

The complaint alleges that while the Plaintiff was a prison inmate in the MDOC's custody, the Defendants, who were charged with his medical care, were deliberately indifferent to his serious medical needs, in violation of the Eighth and Fourteenth Amendments. The amended complaint, filed September 13, 2011, contains the following allegations. *Docket #37.*

On July 7, 2008, while incarcerated at the Lakeland Correctional Facility ("LCF"), Plaintiff injured his back when, as part of his work detail, he was lifting and moving cement platforms weighing 300 to 400 pounds. *First Amended Complaint*, ¶¶ 48-50. From July 7, 2008 through December 25, 2008, his condition worsened, and he repeatedly requested medical treatment. *Id.* at ¶¶ 53-54.

On December 25, 2008, Plaintiff was transferred to the Cooper Street Correctional Facility, where he remained until January 21, 2009. During that period, he experienced

increasingly worsened back conditions, including severe lower back pain, pain radiating to his legs, back spasms, and numbness and tingling in his legs. He repeatedly requested medical treatment and was seen by Defendants Donna J. Croston, Jodi C. Nakata, and Valerie Bradshaw[1] and other  to now-dismissed individuals.  *Id.*  at ¶¶ 57-60.

On January 21, 2009, Plaintiff was transferred to the G. Robert Cotton Correctional Facility ("JCF"), where his symptoms, including severe lower back pain, pain radiating to his legs, spasms, numbness and lower extremity pain, continued to worsen. *Id.* at ¶¶62. During this period, he repeatedly requested appropriate treatment. *Id.* at ¶64.  On March 21, 2009, he was transferred to the Newberry Correctional Facility ("NCF"), where he remained until December 15, 2009, during which time he experienced the above-described symptoms as well as urinary pain, and incontinence. *Id.* at ¶¶ 67-70.  During this time, he was seen by Defendants to the present motion, Larry J. Sell, M.D., Rebekah M. Haggard, M.D., and Joseph R. Burtch, M.D. *Id.* at ¶70.

After being transferred to Ojibway Correctional Facility ("OCF") on December 15, 2009,  he continued to request medical care for his worsening condition. *Id.*  ¶¶ 72-75.  He was seen by present Defendants Dr. Burtch, Lizabeth Ralles, M.D., Kim Mahler, D.O., and James Rocco, M.D. *Id.*  ¶75.  Plaintiff alleges that during his incarceration at NCF and OCF, additional Defendants Adam Edelman, M.D., Sylvia McQueen, M.D., Carl J. Keldie, M.D., and Richard Miles, M.D., all non-treating physicians employed by Prison Health Services,

---

[1]These Defendants were dismissed on March 13, 2013. *Doc. #131*.

Inc. ("PHS") or Corizon Health, Inc. ("Corizon") were "directly involved" in his failure to receive adequate medical care while incarcerated at these facilities.  *Id.* at ¶¶77-78.

Plaintiff alleges that individual Defendant Drs. Sell, Haggard, Burtch[2], Ralles, Mahler, Rocco, and Miles, treating or consultative physicians employed by either PHS or Corizon, violated his rights by the following acts or omissions:

> a.  Failing to order and conduct timely and appropriate examinations and/or evaluations;
>
> b.  Failing to timely and appropriately record and evaluate medical history, complaints, symptoms, and findings;
>
> c.  Failing to provide timely and appropriate appointments and referrals for appropriate medical testing, including but not limited to MRI testing;
>
> d.  Failing to timely and properly analyze and interpret the results of examinations and testing;
>
> e. Failing to appropriately notify subsequent treating doctors and consulting physicians of medical history, complaints, symptoms and findings;
>
> f.  Failing to provide timely and appropriate appointments and/or referrals to neurologist and/or neurosurgeon; and
>
> g.  Otherwise failing to provide timely and appropriate medical care and treatment, including but not limited to providing medical care and treatment as ordered by consulting doctors and specialists.  *Id.* at ¶90.

---

[2]Dr. Burtch's inclusion in the paragraph alleging constitutional violations by MDOC support staff was apparently a typographical error.  *Amended Complaint* at ¶89.

Plaintiff alleges further that individual Defendant Drs. Edelman, McQueen, and Keldie, non-examining supervising staff employed by PHS or Corizon, violated his rights by the following acts or omissions:

> a. Failing to approve and order timely and appropriate examinations and/or evaluations;
>
> b. Failing to approve, order, and provide timely and appropriate appointments and referrals for appropriate medical testing, including but not limited to MRI testing;
>
> c. Failing to timely and properly analyze and interpret the results for examinations and testing;
>
> d. Failing to approve, order, and provide timely and appropriate appointments and/or referrals to consulting doctors and specialists, including but not limited to a neurologist and/or neurosurgeon;
>
> e. Otherwise failing to approve, order, and provide timely and appropriate medical care and treatment, including but not limited providing medical care and treatment as ordered by consulting doctors and specialists; and
>
> f. Failing to develop, implement, and enforce appropriate policies and practices for treatment of patients . . . with low back injuries. *Id.* at ¶91.

Plaintiff underwent back surgery subsequent to his release from prison but alleges permanent injuries due to Defendants' failure to provide him with adequate treatment. He seeks monetary damages.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c).  To prevail on a motion for summary judgment, the non-moving party must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First American Bank*, 916 F.2d 337, 341-42 (6th Cir. 1990).  Drawing all reasonable inferences in favor of the non-moving party, the Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celetox Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  When the "record taken as a whole could not lead a rational trier of fact to find for the nonmoving party," there is no genuine issue of material fact, and summary judgment is appropriate. *Simmons-Harris v. Zelman*, 234 F.3d 945, 951 (6th Cir. 2000).

Once the moving party in a summary judgment motion identifies portions of the record which demonstrate the absence of a genuine dispute over material facts, the opposing party may not then "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact," but must make an affirmative evidentiary showing to defeat the motion.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6ᵗʰ Cir. 1989). The non-moving party must identify specific facts in affidavits, depositions or other factual material showing "evidence on which the jury could *reasonably* find for the plaintiff." *Anderson*, 477 U.S. at 252 (emphasis added). If, after sufficient opportunity for discovery, the non-moving party cannot meet that burden, summary judgment is clearly proper. *Celotex Corp.*, 477 U.S. at 322-23.

## III.   DISCUSSION

### A.  Corporate Defendants PHS and Corizon

In support of the present motion, PHS and Corizon argue that because Plaintiff cannot show "a pattern or repeated evidence" of unconstitutional conduct by either Defendant, claims against them must be dismissed. *Defendants' Brief* at 15 (citing *Thomas v. City of Chattanooga,* 398 F.3d 426, 432-433 (6ᵗʰ Cir. 2005). I agree.

More significantly, Plaintiff does not oppose the motion by either of these Defendants. *Plaintiff's Response* at 2. As such, claims against PHS and Corizon should be dismissed with prejudice.

### B.  The Individual Defendants

#### 1.  Applicable Law

Prisoners have a constitutional right to medical care under the Eighth Amendment,. *Estelle v. Gamble,* 429 U.S. 97, 103; 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Prison officials may not act with deliberate indifference to the medical needs of their prisoners. *Id.* at 104.

-7-

An Eighth Amendment claim has two components, one objective and the other subjective. *Farmer v. Brennan,* 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Comstock v. McCrary,* 273 F.3d 693, 702 (6th Cir. 2001). Under the objective component, "the plaintiff must allege that the medical need at issue is 'sufficiently serious.'" *Id.* Under the subjective component, "the plaintiff must allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Id.*

Medical malpractice does not rise to the level of an Eighth Amendment violation. *See Estelle v. Gamble, supra*, 429 U.S. at 105-106 ("a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner"). The Sixth Circuit has also observed that "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are *generally* reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas,* 537 F.2d 857, 860 at n. 5 (6th Cir.1976)(emphasis added).

## 2. Defendant Drs. Sell, Burtch, Haggard, Ralles, Mahler, Miles, and Rocco

Plaintiff's allegations of pain from lumbar disc herniations, numbness, and permanent nerve damage are sufficiently serious to establish the first prong of an Eighth Amendment claim.  However, he cannot show that any of the Defendants in this subcategory were

-8-

deliberately indifferent to his medical needs.

With the exception of Defendant Miles, who performed a one-time consultative examination, and Dr. Rocco, whom Plaintiff alleges that he met on just one occasion, this group of Defendant physicians treated or advised Plaintiff between May, 2009 and March, 2010.

### a.  Dr. Sell

Dr. Sell examined Plaintiff on May 14, 2009.  *Defendants' Exhibit A-1* at 176. Plaintiff reported radicular pain and numbness in the right lower extremity.  *Id.*  Dr. Sell noted that while symptoms were "somewhat suspicious" for a herniated disc, Plaintiff was able to ambulate without difficulty.  *Id.*  In response to Plaintiff's claim that Flexeril was ineffective, Dr. Sell discontinued that medication and prescribed Baclofen along with temporarily large dosages of Prednisone.  *Id.*  On May 28, 2009, Plaintiff reported that Predisone had helped his pain for five days, after which time he returned to his former level of discomfort.  *Id.* at 175.  Dr. Sell recommended daily stretching and the continued use of pain medication.  *Id.* On June 11, 2009, Dr. Sell added Naprosyn to Plaintiff's medication regime and recommended limited activity and stretching.  *Id.*  As a result of Dr. Sell's June 11 recommendations, Plaintiff was taken off all work duty for two months as of June 22.  *Id.* at 162.  After examining Plaintiff on June 25, Dr. Sell referred Plaintiff for an MRI.  *Id.* at 149, 158.  After reviewing the MRI showing nerve root displacement, Dr. Sell referred Plaintiff for a neurosurgery evaluation, categorizing the referral type as "urgent." *Id.* at 135, 148; *Plaintiff's Exhibit 20.*  Plaintiff has testified that after receipt of the MRI, Dr. Sell stated

that he would recommend surgery.  *Defendants' Exhibit L,* at 98.

To be sure, the fact that an inmate receives *some* level of medical attention does not necessarily preclude constitutional scrutiny of the quality of that care.  *See  Terrance v. Northville Regional Psychiatric Hosp*., 286 F.3d 834, 844 (6th Cir. 2002)(*citing  Waldrop v. Evans*, 871 F.2d 1030, 1035 (11th Cir. 1989))("the relevant inquiry as to whether the defendants provided grossly inadequate care" may require "a particularized, fact-specific inquiry").   However, Plaintiff cannot establish that Dr. Sell inferred, then disregarded a substantial health risk.  Over the course of two months, Dr. Sell examined Plaintiff on multiple occasions; prescribed a number of different medications in response to complaints of ongoing pain; recommended that Plaintiff cease work temporarily and perform stretching exercises; and recommended an MRI and a neurosurgery consultative examination. Admittedly, Dr. Sell's June 25, 2009 recommendation for an MRI came on the heels of a letter sent by Plaintiff's attorney to the Director of MDOC complaining that Plaintiff was not receiving adequate care of his back condition.  *Plaintiff's Exhibit 16.*  However, at the time of the MRI recommendation, Dr. Sell had been treating Plaintiff for only six weeks and in that time had already prescribed multiple pain medications, Predisone, and a work release. Further, it is undisputed that while Dr. Sell was able to *recommend* aggressive treatment, his recommendations and those by subsequent treating physicians were subject to the approval of a supervising, non-treating physicians employed by PHS or Corizon referred to as "utilization management." *Defendants' Brief* at 5.  While it could be argued in retrospect that Dr. Sell ought to have referred Plaintiff for aggressive treatment more promptly, his initial

-10-

recommendation of pain medication, oral steroids, stretching, and work release, would establish at most, a claim for malpractice.   As such, I recommend that claims against Dr. Sell be dismissed with prejudice.

### b.  Drs. Burtch, Haggard, Ralles and Mahler

For the same reasons, claims against Drs. Burtch, Haggard, Ralles, and Mahler should be dismissed.  Dr. Burtch's affidavit states that  he examined Plaintiff on only two occasions, noting that upon examining Plaintiff for the first time on September 15, 2009, he reviewed the MRI and a September 9, 2009 recommendation for additional imaging studies, steroid injections, and possible surgery by neurosurgeon Paul LaHaye, M.D.[3]  *Defendants' Exhibit E,* at ¶¶4-5; *Plaintiff's Exhibit 27.* As a result of Dr. Burtch's own examination, his review of the imaging results, and Dr. LaHaye's recommendation, Dr. Burtch submitted recommendations for an MRI of the cervical spine and steroid injections to "utilization management."  *Id.* at  ¶5.  Dr. Burtch states that despite his request for treatment consistent with Dr. LaHaye's recommendation, "[u]tilization management decided to defer both" requests "in favor of an alternative treatment plan." *Id.* at ¶6.  Dr. Burtch examined Plaintiff again on January 7, 2010.  *Id.* at ¶7.  Consistent with his original recommendation, he later contacted Dr. Squier[4] (Defendant Dr. Edelman's assistant) requesting a second neurosurgical consultive examination which was also apparently denied.  *Id.* at ¶8.  It bears repeating that

---

[3] Dr. LaHaye was dismissed on March 15, 2013.  *Doc.. #129.*

[4] Dr. Squier is not a party to the present motion.

the "utilization committee," rather than the treating sources, had the authority to approve aggressive treatment. While Dr. Burtch opined that Plaintiff required more aggressive treatment on two occasions, he was not authorized to order such treatment. As such, Plaintiff cannot show deliberate indifference by this Defendant.

According to Defendant Dr. Haggard's affidavit, her role in Plaintiff's treatment was limited to an October 6, 2009 one-time review of his records and discussion of the implementation of "utilization management's" "alternative treatment plan" in response to the September 9, 2009 recommendation of additional imaging studies, steroid injections, and possible surgery by Dr. LaHaye. *Defendants' Exhibit F* at ¶2-4, *Plaintiff's Exhibit 27.* She advised Plaintiff to perform range-of-motion exercises, discontinue weight lifting, lose weight, and continue to take non-steroidal pain medication. ¶¶4-5. She admits that she also warned him that 50 percent of the back surgeries of the type he requested resulted in "'failed back syndrome,'" which created "a worse outcome than his present symptoms." *Id.* at ¶6. Dr. Haggard's involvement was limiting to explaining utilization management's "alternative treatment plan." Because she was not granted any decision-making authority in deciding Plaintiff's treatment, claims that she was deliberately indifferent should be dismissed.

According to Defendant Dr. Ralles' affidavit, she treated Plaintiff on December 30, 2009 and March 25, 2010. *Defendants' Exhibit G* at ¶¶3, 7. She states that at the first appointment she was informed that Plaintiff had a pain management consultative examination the following day. *Id.* at ¶ 4. On the same day, Plaintiff declined her offer for Ultram for pain relief. *Id.* at ¶5. Because Dr. Ralles was informed that Plaintiff's pain would be addressed the following day by a pain specialist, the offer of Ultram pending the consultative examination the following day does not amount to deliberate indifference. At the second examination the following March, she states that she addressed Plaintiff's reports of urinary symptoms, ordering the following tests: urine culture, prostate-specific antigen test, erythrocyte sedimentation rate test, and a complete blood count. *Id.* at ¶8. She also ordered that he be allowed to continue the use of Mobic for pain relief. ¶9. Dr. Ralles states that she did not participate in creating policy regarding prisoners and like Drs. Sell, Burtch, and Haggard, did not have the authority to authorize or deny aggressive medical treatment. Claims against her are subject to dismissal.

Evidence submitted with the present motion shows that Dr. Mahler, who treated Plaintiff between January and March, 2010, attempted to procure appropriate care for Plaintiff's back condition by submitting a request to have neurosurgeon Dr. LaHaye conduct a followup examination. *Defendants' Exhibit H* at ¶4. Over the next month, Dr. Mahler provided additional information "at the request of [the] utilization management [Defendant Dr. Edelman] in order to assist in their review." *Id.* at ¶5. She states that despite her findings that Plaintiff experienced radiculopathy, loss of ankle jerk, and incontinence, the utilization

-13-

management declined to follow her advice and again, opted for "an alternative treatment plan." *Id.* at ¶¶3, 6.  After having her recommendations denied by supervising PHS staff, she discussed Plaintiff's option with him and continued to prescribe Mobic.  *Id. ¶*7.  Because Dr. Mahler did not possess the authority to approve or deny requests for aggressive treatment, and in fact, such treatment was nixed by supervisory staff against Dr. Mahler's advice, it cannot be shown that Mahler was deliberately indifferent to Plaintiff's condition.

### c.  Dr. Miles

Plaintiff does not dispute Dr. Miles' statement that he was not a treating source, but rather, conducted a one-time independent medical evaluation on behalf of PHS.  *Defendants' Exhibit D* at ¶¶2-4.  Dr. Miles states that at no time was he responsible for providing medical treatment to Plaintiff or making treatment decisions.  *Id.* at ¶¶8-9.  His August 29, 2009 assessment of Plaintiff noted "subjective low back pain with right lower extremity weakness." *Id.* at ¶5.  Dr. Mile's notes also state that Plaintiff reported "episodes of incontinence."[5]  *Defendants' Exhibit A-1* at 137.  Because Dr. Miles was hired to evaluate rather than treat Plaintiff and had no duty to authorize or administer even conservative treatment, claims against him should be dismissed.

### d.  Dr. Rocco

---

[5]Dr. Miles' remark that Plaintiff reported incontinence on August 20, 2009 flatly contradicts Defendants' claim that "*[t]he very first time* . . . Plaintiff reported any issue with incontinence to one of the PHS Defendants was on January 20, 2010." *Defendants' Reply, Docket #123* at 5.

Plaintiff alleges that he met Dr. Rocco while incarcerated at OCF. *Defendants' Exhibit L, Plaintiff's deposition* at 22. Plaintiff testified that Dr. Rocco informed him that Dr. Burtch had "never put in a request for surgery or help" for the back condition. *Id.* To the contrary, Dr. Rocco, a former employee of PHS, states that he does not recall treating or even meeting Plaintiff, noting that neither his own records nor MDOC records show that he treated Plaintiff. *Defendants' Exhibit B, ¶¶*2-6. He also denies participating in decisions regarding Plaintiff's medical care. *Id.* at ¶¶6-7. Plaintiff's position that he met Dr. Rocco is supported by a January 15, 2010 email by Plaintiff's fiancée to Dr. Burtch, stating that Dr. Rocco had informed Plaintiff that Dr. Burtch had "'changed his mind'" about previously recommending a neurosurgical evaluation. *Plaintiff's Exhibit 35.*

Dr. Rocco's actions, even as alleged by Plaintiff, do not rise to the level of a constitutional violation. Plaintiff does not claim that he received treatment, much less substandard treatment, from Dr. Rocco or that Dr. Rocco had any part in the decision to withhold treatment. Assuming the truth of Plaintiff's testimony that he met Dr. Rocco on one occasion and that Dr. Rocco told him that Dr. Burtch had "'changed his mind'" about the previously recommended treatment, these facts cannot be construed to state a constitutional claim, much less establish a question of fact sufficient to survive this motion. As such, claims against this Defendant should be dismissed with prejudice.

**3. Drs. Edelman, McQueen, and Keldie,**

**a) Dr. Edelman**

Defendants concede, in effect, that Dr. Edelman was one of the individuals responsible for the September 30, 2009 denial of the aggressive care recommended both by neurosurgeon Dr. LaHaye and multiple treating sources. *Defendants' Brief* at 9. Dr. Edeman, whose title was "Medical Director for Utilization Management" for Corizon and PHS, states that on August 14, 2009, after reviewing the MRI showing nerve root displacement, he conferred with Dr. McQueen and Dr. Stieve, all of whom agreed that "additional physical examination findings would need to be considered in order to determine a plan for treatment." *Defendants' Exhibit I* at ¶¶2-3. The next paragraph of his affidavit skips to February 16, 2010, when he received Dr. Mahler's request for a follow-up appointment with Dr. LaHaye. *Id.* at ¶4. Dr. Edelman states that upon receiving that recommendation, he requested additional information from Dr. Mahler in order "to assist in consideration of the February 16, 2010 consultation request." *Id.* at ¶5. He states that he denied the request for a neurosurgical evaluation after he considered "all of the relevant medical evidence." ¶6. He states that his decision was based on his "professional judgment as a medical doctor," as well as Plaintiff's medical history, MDOC policies, and "consultations and research concerning medical literature concerning current appropriate treatment of [the] condition." *Id.* at ¶7. He denies any further involvement in Plaintiff's medical care. *Id.* at ¶8.

Dr. Edelman's affidavit leaves out some pertinent facts. In conformance with

Edelman's August 14, 2009 decision to obtain more evidence, neurosurgeon Dr. LaHaye made three recommendations on September 9, 2009 after examining Plaintiff and reviewing the MRI of the lumbar spine: (1) epidural steroid injections should be administered immediately (2) an MRI of the cervical spine should be ordered in response to Plaintiff's reports of upper extremity pain, and (3) if the steroid injections failed to produce good results, surgery was warranted. *Plaintiff's Exhibit 27.* His findings are consistent with conclusions of Dr. Sell, who endorsed the need for surgery after viewing the MRI, *Defendants' Exhibit L,* at 98, and Dr. Burtch's September 15, 2009 opinion that Plaintiff required steroid injections. *Defendants' Exhibit E,* at ¶¶4-5. Dr. Edelman's September 30, 2009 denial of steroid injections, an MRI of the upper extremities, and possible surgery flies in the face of recommendations by those physicians.

Further, Dr. Edelman states that when he received Dr. Mahler's February 16, 2010 request that Plaintiff have a follow-up appointment with neurosurgeon Dr. LaHaye, he "requested...additional information." Apparently, the "additional information" required Dr. Mahler to ask prison staff to monitor Plaintiff's activity. *Plaintiff's Exhibit* 38, Administrative notes state that Plaintiff was able to use a broom, but did not participate in any sports. *Id.* Plaintiff told staff that he was unable to pick up a box of supplies. Despite the fact that none of this information contraindicated any of the recommendations for

-17-

additional treatment or consultations, or even suggested that Plaintiff was malingering, Dr. Edelman denied Dr. Mahler's  request for a neurosurgical evaluation.

So, Dr. Edelman disregarded the opinions and conclusions of Drs. LaHaye, Sell, Burtch and Mahler (including information from Drs. Burtch and Mahler that Plaintiff was not responding to conservative treatment) to the extent that he would not even order additional testing or consultations. The conclusions of those treating and consultative doctors were consistent with Plaintiff's symptoms, as observed and noted by prison staff. This calls into serious question Dr. Edelman's statement that he considered "all of the relevant medical evidence."  To the contrary, it appears that he *ignored* all of the relevant medical evidence. The fact that Dr. Edelman requested and received additional information, yet disregarded that information, suggests deliberate indifference.[6]

---

[6] In addition, Dr. Stieve's meeting notes from August 14th  are troublesome. Dr. Stieve stated that Plaintiff's "fiancée's decision to phone [Dr. McQueen] and [Dr. Keldie] and her threats of legal action are not helping us to continue to provide [Plaintiff] with the optimal evidence based medical care he deserves." *Plaintiffs' Exhibit 24.*  First, given that PHS supervisory Defendants later disregarded  the treating and neurological evidence in denying Plaintiff more aggressive treatment makes Dr. Stieve's statement  that he and Drs. Edelman and McQueen would provide "optimal evidence based medical care" (despite the "unhelpful" interference of Plaintiff's fiancée) appear to be a calculated response to a threat of legal action rather than a plain-spoken declaration that Plaintiff would receive adequate medical care.

Further, this comment suggests that the meeting participants, annoyed by calls to PHS upper management by Plaintiff's persistent fiancée, were willing to put brinkmanship ahead of Plaintiff's medical needs.  Notably, the same report also states that Plaintiff would "receive counseling for his active [substance] abuse problems," despite the fact treating notes from May, 2009 forward do not suggest that he experienced any "active" substance abuse problems aside from tobacco use.  *Id.*

Moreover, any contention that "alternate treatment" consisting of aerobic exercise, stretching, and yoga was sufficient to address Plaintiff's back condition is unsupported by the opinion of any treating or consultative source. The fact that Edelman and other supervising staff approved *some* treatment does not resolve the question of whether the care was "grossly inadequate" to the extent necessary to establish an Eighth Amendment violation. *Terrance, supra,* 286 F.3d at 844; *Strayhorn v. Caruso*, 2013 WL 1189842, *1-4 (E.D. Mich February 15, 2013)(medical staff advising heart attack victim to breath into a paper bag not entitled to summary judgment on Eighth Amendment claims).

Although Defendants attempt to gloss over the September, 2009 events, the evidence supports the conclusion that Dr. Edelman was involved in the September 30, 2009 decision to deny Plaintiff additional medical care. First, Dr. Stieve's August 14, 2009 meeting notes state that he, Dr. Edelman and Dr. McQueen would be reviewing the additionally created evidence before coming to a decision. *Plaintiffs' Exhibit 24*. Second, the September 30, 2009 denial of aggressive treatment was signed by Dr. Edelman's assistant, Dr. Harriett Squier. *Plaintiff's Response* at 6; *Defendants' Exhibit A-1* at 42, *Exhibit I* at ¶1. Finally, while Dr. Edelman's affidavit does not mention the September, 2009 events, he does not deny that he was personally involved in denying Plaintiff the treatment recommended by Dr. LaHaye.

Given these many questions of material fact, Dr. Edelman is not entitled to summary judgment.

**b) Dr. McQueen**

-19-

Dr. McQueen's affidavit states that she was Medical Director of PHS at the time of the events in question and acknowledges that she, along with Drs. Edelman and Stieve decided on August 14, 2009 that additional information was required before approving surgery. *Defendants' Exhibit J,* at ¶¶3-6. She states somewhat disingenuously that "shortly thereafter, [Plaintiff] had a neurosurgery consult, and the neurosurgeon who evaluated him did not recommend surgery." *Id.* at ¶7. She apparently justifies her part in the September 30, 2009 decision to recommend aerobics, stretching, and yoga instead of more aggressive care on this basis.

However, Dr. McQueen's affidavit misrepresents Dr. LaHaye's recommendation, which actually stated that Plaintiff required immediate steroid injections, which if ineffective *should be followed by surgery. Plaintiff's Exhibit 27.* I note that while Dr. McQueen's affidavit implies that she and other decision makers followed Dr. LaHaye's advice, in fact, they did not follow *any* of Dr. LaHaye's recommendations for steroid injections, an MRI of the cervical spine, and, if necessary, surgery. As discussed above, the decision that aerobics, stretching, and yoga was adequate treatment for Plaintiff's condition was contradicted by two treating sources and Dr. LaHaye's expert opinion. *Defendants' Exhibit A-1* at 42. Consistent with my reasons for denying Dr. Edelman summary judgment for the September 30, 2009 denial of proper treatment, summary judgment should also be denied to this Defendant.[7]

### c) Dr. Keldie

---

[7]However, unlike Dr. Edelman, Dr. McQueen did not appear to have   involvement in the decision to deny Plaintiff appropriate treatment after September 30, 2009.

Dr. Keldie, Chief Medical Officer for PHS at the time of these events, is a closer call. *Defendants' Exhibit K* at ¶1. He states that he became of aware of Plaintiff's condition in the summer of 2009 when Plaintiff's fiancée called him directly to inquire about treatment for Plaintiff's condition. *Defendants' Exhibit K* at ¶2. Dr. Keldie acknowledges that he discussed Plaintiff's current treatment with Dr. McQueen prior to her August 14, 2009 meeting with Drs. Edelman and Stieve. *Id.* at ¶¶3-4; *Plaintiff's Exhibit 24.*

However, Dr. Keldie denies all subsequent involvement in the decision making process. *Defendants' Exhibit K* at ¶¶5, 7. In contrast to Dr. McQueen's acknowledgment that she was aware of Dr. LaHaye's findings at the time of the September 30 denial of more aggressive treatment, Plaintiff has provided no evidence to show that after August 14, Dr. Keldie was privy to the results of the neurosurgical consultation, Dr. LaHaye's recommendations, or utilization management's September 30, 2009 decision to refuse Plaintiff aggressive treatment. Further, the fact that Dr. Keldie, as Chief Medical Officer of PHS, *could* have overridden the September 30, 2009 decision to deny aggressive treatment to Plaintiff is not sufficient to show that he approved or acquiesced in the alleged denial of critical treatment or was even personally aware of utilization management's decision. The absence of evidence showing that Dr. Keldie impliedly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate mandates dismissal

of the constitutional claims. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir.1984); *Monell v. Department of Social Services.,* 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

## IV.   CONCLUSION

For these reasons, I recommend the Defendants' motion for summary judgment [Doc. #104] be GRANTED IN PART AND DENIED IN PART, as follows:

(1) That the motion be GRANTED as to Defendants Prison Health Services, Inc. and Corizon Health, Inc.

(2) That the motion be GRANTED as to Defendant Drs. Sell, Burtch, Haggard, Ralles, Mahler, Miles, Rocco, and Keldie.

(3) That the motion be DENIED as to Defendant Drs. Edelman and McQueen.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).   Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).   Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.   *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v.*

*Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response. The response shall be not more than 20 pages in length

unless by motion and order such page limit is extended by the court. The response shall

address specifically, and in the same order raised, each issue

contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Date: August 23, 2013

---

**CERTIFICATE OF SERVICE**

I hereby certify on August 23, 2013, I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on August 23, 2013: **None**

s/Terri L. Hackman
Judicial Assistant to
Magistrate Judge R. Steven Whalen
(313) 234-5115